IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

EXHIBIT A

| | |
|---|---|
| WILLIAM S. WOLLESEN, IOWA PLAINS FARMS, BYRITE FARM SUPPLY, INC., KRISTI J. WOLLESEN, AND JOHN W. WOLLESEN,<br><br>Plaintiffs,<br><br>v.<br><br>WEST CENTRAL COOPERATIVE, JEFFREY B. STROBURG, SUSAN TRONCHETTI, DARRELL JENSEN, CHRISTOPHER S. COEN, CRAIG HEINEMAN, JAY DREES, ROGER GINDER, JAMES CARLSON, DARYL DOERDER, DELBERT CHRISTENSEN, GLEN CHRISTENSEN, SAM SPELLMAN, DANIEL HELLER, SCOTT B. CHESNUT, HARRY A. AHRENHOLTZ, LINDA BUSS, TIMOTHY WEIGEL, DAWN THIELEN, WESTCO AGRONOMY COMPANY, LLC, WIXTED, INC. D/B/A WIXTED POPE NORA THOMPSON, WIXTED POPE NORA THOMPSON & ASSOCIATES, LLC, EILEEN WIXTED, GARDINER THOMSEN, P.C., DANIEL MARK GARDINER, DENNIS GARDINER, MILAN KUCERAK, AND FARMERS COOPERATIVE COMPANY, D.B.A. LANDUS COOPERATIVE<br><br>Defendants. | Case No. 5:16-cv-4012<br><br>**SECOND AMENDED VERIFIED COMPLAINT AND JURY DEMAND** |

Plaintiffs William S. Wollesen, Iowa Plains Farms, Kristi J. Wollesen, Byrite Farm Supply, Inc., and John W. Wollesen (collectively, the "Wollesens"), by and through their attorneys, bring this action against Jeffrey B. Stroburg, Susan Tronchetti, Darrell Jensen, Christopher S. Coen, Craig Heineman, Jay Drees, Roger Ginder, James Carlson, Daryl Doerder, Delbert Christensen, Glen Christensen, Darrell Jensen, Sam Spellman, Daniel Heller, Harry A.

Ahrenholtz, Timothy Weigel, Linda Buss, Dawn M. Thielen and Scott p. Chesnut (collectively, the "Officers and Directors"), Milan Kucerak, Westco Agronomy Company, LLC ("Westco"), West Central Cooperative[1], Wixted, Inc. d/b/a Wixted Pope Nora Thompson, Wixted Pope Nora Thompson & Associates, LLC, Eileen Wixted (Wixted, Inc., Wixted Pope Nora Thompson & Associates, LLC, and Eileen Wixted are referred to collectively herein as "Wixted Pope"), Gardiner Thomsen, P.C., Timothy Weigel, Daniel Mark Gardiner (Gardiner Thomsen, P.C., Timothy Weigel, and Daniel Mark Gardiner are referred to collectively as "Gardiner Thomsen"), and Farmers Cooperative Company, d.b.a., Landus Cooperative ("Farmers Cooperative"). The Wollesens allege, on information and belief, except for information based on personal knowledge, as follows:

**STATEMENT OF THE CASE**

1. This case concerns an ongoing conspiracy and scheme, by and among certain Defendants, to hide and conceal the known fraudulent and illegal conduct of Chad A. Hartzler ("Hartzler"). This case also concerns the fabrication of a "bribe story" and the subsequent use of improper litigation and propaganda distributed through widespread media to promote the false "bribe story," for purposes of further advancing the aforementioned scheme and to otherwise protect the Officers and Directors from disclosure of mismanagement and malfeasance related to their respective positions. Having been victimized by West Central, by and through Hartzler, the agent assigned to handle the Wollesens' West Central account, the Wollesens then were made a "scapegoat" to protect the Officers and Directors from having to answer for their mismanagement and malfeasance.

[1] "West Central" refers to West Central Cooperative and its subsidiaries, including Westco.

2. From late 2005 through December 2010, the Wollesens made purchases from West Central Cooperative and Hartzler, West Central's lead agronomy sales representative, who had been assigned by West Central to handle the Wollesens' West Central Cooperative account. During that period, the Wollesens had no reason to suspect their dealings with Hartzler were improper or that Hartzler should not be trusted, as a jury rightly determined on August 7, 2014. However, (i) West Central, (ii) certain members of West Central's management, (iii) certain members of West Central's boards of directors, and (iv) Gardiner Thomsen suspected by at least December 2007 that Hartzler was engaging in widespread and ongoing fraud and illegal conduct, and they confirmed widespread fraud and illegal conduct by at least January 2009. Those individuals collectively concealed that knowledge and the underlying fraud through repeated and ongoing illegal acts, including, *inter alia*, wire fraud, mail fraud, falsification of business records, and perjury.

3. The Defendants that participated in the unlawful scheme did so because Hartzler was increasing agronomy sales, which made them look good and benefited industry participants to whom Stroburg was beholden, and the disclosure of Hartzler's conduct (which he was only able to accomplish because there was a lack of internal controls and segregation of duties for his tasks on behalf of West Central) would have caused adverse financial results to each such participant. Specifically, Gardiner Thomsen actively participated in this scheme to conceal Hartzler's unlawful conduct by improperly issuing unqualified audit opinions because they knew the alternative would have been "devastating" to West Central, and Gardiner Thomsen would have lost not only West Central's business, from which it has and continues to generate millions of dollars in fees, but perhaps the work of other agriculture cooperatives in the eight States where it provides such services and professes to specialize in attestation and other services for

agriculture cooperatives. The Wollesens were harmed by their reliance upon the respective Defendants' failures to disclose known fraud and illegal actions by Hartzler, as well as their concerted efforts to conceal such knowledge.

4. Simultaneously, and further advancing the illegal scheme identified in the preceding paragraphs, all of the Officers and Directors used Hartzler's known malfeasance to conceal their own malfeasance and other problems with West Central's business that were unrelated to Hartzler.

5. Defendants, large corporations and individuals with incredible power within the agriculture industry, selected and victimized the Wollesens as their collective "scapegoat." As a result, the Wollesens have suffered millions of dollars in actual damages, as well substantial damages due to the obvious and intended emotional distress that Defendants' intentional and orchestrated conduct has caused. The Wollesens bring this Action to recover such damages, which exceed $6 million, as well as all other damages and costs that are available under applicable law, including punitive damages, attorneys' fees, and costs.

## PARTIES

6. Iowa Plains Farms is a partnership organized under the laws of Iowa, with its principal place of business located in Sac County, Iowa.

7. William S. Wollesen ("Bill Wollesen"), Kristi J. Wollesen ("Kris Wollesen") and John W. Wollesen ("John Wollesen"), individuals who reside in Sac County, Iowa, are the general partners of Iowa Plains Farms.

8. Byrite Farm Supply, Inc. is an Iowa Corporation with its principal place of business located in Sac County, Iowa. Bill Wollesen and Kris Wollesen are the shareholders of Byrite Farm Supply, Inc.

9. West Central Cooperative is an Iowa cooperative organized under Iowa Code Chapter 499, with its principal place of business located in Ralston, Iowa during the relevant period of time. Up and until its April 2016 merger with Farmers Cooperative, West Central Cooperative's headquarters were located at 406 First Street, PO Box 68, Ralston, Iowa 51459.

10. Westco was a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 406 First Street, PO Box 68, Ralston, Iowa 51459. Upon information and belief, West Central Cooperative, its wholly-owned parent, has dissolved Westco since the events giving rise to this lawsuit.

11. Jeffrey B. Stroburg ("Stroburg") is an individual who resides in Chesterfield County, Virginia. Stroburg became the Chief Executive Officer ("CEO") of West Central Cooperative in 1999, and he held the position until January 31, 2015. From February 1, 2006 until his departure, Stroburg also was leased to Westco and served as an officer of Westco.

12. Susan Tronchetti ("Tronchetti") is an individual who resides in Greene County, Iowa. Tronchetti was a member of West Central Cooperative's board of directors and its audit committee during the period of time relevant to this action. Tronchetti presently is the Chairperson of West Central Cooperative's board of directors.

13. Craig Heineman ("Heineman") is an individual who resides in Boone County, Iowa. Heineman is a member of West Central Cooperative's board of directors and was a member of the board of directors during the period of time relevant to this action.

14. Jay Drees ("Drees") is an individual who resides in Carroll County, Iowa. Drees is a member of West Central Cooperative's board of directors and was a member of the board of directors during the period of time relevant to this action.

15. Roger Ginder ("Ginder") is an individual who resides in Story County, Iowa. Ginder was a member of West Central Cooperative's board of directors and its audit committee during the period of time at issue in this action.

16. James Carlson ("Carlson") is an individual who resides in Webster County, Iowa. Carlson is a member of West Central Cooperative's board of directors and was a member of the board of directors during the period of time relevant to this action.

17. Daryl Doerder ("Doerder") is an individual who resides in Boone County, Iowa. Doerder is a member of West Central Cooperative's board of directors and was a member of the board of directors during the period of time relevant to this action.

18. Delbert Christensen ("Christensen") is an individual who resides in Audubon County, Iowa. Christensen was a member of West Central Cooperative's board of directors during the period of time at issue in this action.

19. Glen Christensen ("Christensen") is an individual who resides in Greene County, Iowa. Christensen is a member of West Central Cooperative's board of directors and was a member of the board of directors during the period of time relevant to this action.

20. Sam Spellman ("Spellman") is an individual who resides in Dallas County, Iowa. Spellman is a member of West Central Cooperative's board of director and was a member of the board of directors during the period of time relevant to this action.

21. Daniel Heller ("Heller") is an individual who resides in Shelby County, Iowa. Heller is a member of West Central Cooperative's board of directors and was a member of the board of directors during the period of time relevant to this action.

22. Scott P. Chesnut ("Chesnut") is an individual who resides in Boone County, Iowa. Chesnut was a member of the board of directors of West Central Cooperative and its audit

committee during the period from July 2003 to June 2010 (Tronchetti, Ginder and Chesnut are referred to collectively herein as the "Audit Committee").

23. Darrell Jensen ("Jensen") is an individual who resides in Guthrie County, Iowa. Jensen is a member of West Central Cooperative's board of directors and was a member of the board of directors during the period of time relevant to this action.

24. Christopher Coen ("Coen") is an individual who resides in Jackson County, Missouri. Coen served as the Chief Information Officer ("CIO") and head accountant for West Central Cooperative for the period from 2008 through 2011. In the summer of 2011, Coen was asked to, and did, tender his resignation.

25. Harry A. Ahrenholtz ("Ahrenholtz") is an individual who resides in Greene County, Iowa. For the period from 2001 until June 2011, Ahrenholtz was an employee of West Central Cooperative and the most-senior executive of West Central's agronomy division. From February 1, 2006 through August 2011, Ahrenholtz also was leased to Westco and served an officer of Westco. In September 2011, at the request of the remaining Officers and Directors, Ahrenholtz resigned from West Central.

26. Timothy Weigel ("Weigel") is an individual who resides in Polk County, Iowa. From June 27, 2005 through November 30, 2010, Weigel worked for Gardiner Thomsen, P.C. and served as an outside auditor for West Central. In the spring of 2011, Weigel joined West Central as Westco's chief internal accountant.

27. Linda Buss ("Buss") is an individual who resides in Carroll County, Iowa. For the period of time at issue, Buss served as an officer of West Central Cooperative. At all times relevant to this action, Buss has served as the Controller for West Central Cooperative. At all times relevant to this action, Buss has served as the Treasurer and Secretary for Westco.

28. Dawn M. Thielen ("Thielen") is an individual who resides in Greene County, Iowa. For the relevant period, Thielen served as West Central Cooperative's internal auditor.

29. Each of the Officers and Directors was authorized to, and did, approve and take corporate action on behalf of Westco in their positions as officers or directors of West Central Cooperative.

30. Upon information and belief, each of the Officers and Directors (other than Chesnut) approved the filing and prosecution of the lawsuit by Westco against the Wollesens—Case No. LACV046817 (Story County, Iowa) that was filed on or about May 12, 2011 (the "Lawsuit")—in their fiduciary capacities for West Central.

31. Milan Kucerak ("Kucerak") is an individual who, upon information and belief, resides in Greene County, Iowa. Kucerak has served as the Chief Executive Officer of West Central Cooperative or its successor at all times since February 1, 2015.

32. Eileen Wixted ("Wixted") is an individual who, upon information and belief, resides in Polk County, Iowa.

33. Wixted, Inc. d/b/a Wixted Pope Nora Thompson is an Iowa corporation with its principal place of business located in Polk County, Iowa.

34. Wixted Pope Nora Thompson & Associates, LLC is an Iowa corporation with its principal place of business located in Polk County, Iowa.

35. According to Wixted Pope's website, as "a founding partner of WPNT, Eileen [Wixted] is a strategic communication and crisis management veteran with extensive experience in energy and healthcare. She has helped clients manage brand damaging issues, and prepare for hostile media interviews, shareholder meetings, financial presentations, and government investigations." *See* (**EXHIBIT 42**).

36. Gardiner Thomsen, P.C. is an Iowa professional corporation with its headquarters located in Polk County, Iowa. According to Gardiner Thomsen, P.C.'s website, "[w]hen you work with Gardiner Thomsen, you enter into a partnership that is invested in mutual success. Let's work together." *See* (**EXHIBIT 67**).

37. Gardiner Thomsen, P.C.'s headquarters are located at 10555 New York Ave # 200, Urbandale, IA 50322. As explained more fully below, such "partnerships" can include those created for the purpose of advancing unlawful and otherwise improper purposes.

38. Daniel Mark Gardiner ("Mark Gardiner") is an individual who, upon information and belief, resides in Dallas County, Iowa.

39. Mark Gardiner is a certified public accountant, certified fraud examiner, partner of Gardiner Thomsen, P.C., and member of the Iowa Society of CPAs, American Institute of CPAs, Association of Certified Fraud Examiners and the National Society of Accountants for Cooperatives. Mark Gardiner works for Gardiner Thomsen, P.C. from its headquarters in Urbandale, Iowa.

40. According to Gardiner Thomsen, P.C.'s website, Mark Gardiner: "specializes in ag-related businesses, especially farmer cooperatives. He is motivated by the opportunity to assist clients with their accounting and auditing needs." *See* (**EXHIBIT 67**).

41. Gardiner Thomsen, P.C. describes itself on its website as follows:

> For more than 50 years, Gardiner Thomsen has proven itself as a trusted partner for its clients across the country. We specialize in accounting and business advisory services for agribusiness, cooperatives, credit unions, government agencies and closely held businesses. Our offices in Iowa, South Dakota and Nebraska are known industry-wide for their dedication, steady dependability and experience and are the pillars in which our growth and success is founded.
>
> The same sort of integrity and honesty that inspired Dan Gardiner to provide common sense CPA services to his clients in 1964 inspires us today, through Dan's two sons, Mark and Dennis, and the entire Gardiner Thomsen team, which works hard every day because so do our clients, and they deserve the same.

*See* (**<u>EXHIBIT 67</u>**).

42. According to Gardiner Thomsen, P.C.'s website:

> Since we opened our doors in 1964, one of our core focuses has always been serving the agribusiness industry. With clients in eight states and more than 300 years of combined staff experience, we've established a strong reputation for forming partnerships with our agricultural clients as well as performing consistent, quality cooperative audits.
>
> We do not take a one-size-fits-all approach. We recognize the uniqueness of all of our agribusiness and cooperative clients and work to fulfill their specific individual needs. Each situation is different, which is why we go the extra mile to understand your goals inside and out. For example, if you have grain bins, we will gladly put on our boots and measure inventories for a grain audit right beside you. Through risk management and peer comparisons and evaluations, our expert cooperative auditors are fully able to help you build stable balance sheets and reach your financial goals more effectively. We're experts in our field and can be experts in your field as well.
>
> We've also worked alongside management and boards of directors to help solve problems and develop strategic plans to help both large and small agribusinesses achieve their goals. We understand how the industry functions, that's why our advisers offer specialized expertise that will help you address your individual goals, as well as plan for the future.

*See* (**<u>EXHIBIT 67</u>**).

43. Dennis Gardiner is an individual who resides in Dallas County, Iowa.

44. West Central is required to submit annual financial statements that are audited in conformity with GAAP, accompanied by an unqualified audit opinion, to both the state of Iowa and, through its grain department, the Federal Government, through the United States Department of Agriculture ("<u>USDA</u>") Farm Service Administration ("<u>FSA</u>"). West Central's audited financial statements are transmitted to those agencies, using the mails.

45. GAAP requires that an "independent auditor obtain written representations from management as a part of an audit of financial statements." American Institute of Certified Public Accountants ("<u>AICPA</u>"), U.S. Auditing Standards, *Management Representations*, AU § 333.01 (Nov. 21, 2013).

46. The written representations from management must include:

> i. Knowledge of fraud or suspected fraud affecting the entity involving (1) management, (2) employees who have significant roles in internal control, or (3) others where the fraud could have a material effect on the financial statements.
>
> j. Knowledge of any allegations of fraud or suspected fraud affecting the entity received in communications from employees, former employees, analysts, regulators, short sellers, or others.

AICPA, U.S. Auditing Standards at AU § 333.06(i), (j).

47. The written representations must be made as of the date of the auditor's report. *See* AICPA, U.S. Auditing Standards at AU § 333.09. Any refusal by management "to furnish written representations constitutes a limitation on the scope of the audit sufficient to preclude an unqualified opinion and is ordinarily sufficient to cause an auditor to disclaim an opinion or withdraw from the engagement." *See id.* at § 333.13.

48. Gardiner Thomsen, P.C. has served as West Central's auditor since 1964. Gardiner Thomsen, P.C. also has offered other accounting and consulting services to West Central. For each of the fiscal years 2006-2011, Mark Gardiner served as the lead engagement partner for Gardiner Thomsen, P.C.'s professional work for West Central Cooperative and Westco. Gardiner Thomsen, P.C. continues to serve as West Central's auditor for those and other entities. For fiscal years 2012 onward, Mark Gardiner's brother, Dennis, has served as the engagement lead.

49. West Central has paid millions of dollars in fees to Gardiner Thomsen, P.C. for its services over the years, including during the period of time at issue in this Action. Gardiner Thomsen, P.C. also performs services for other entities for which individual Defendants hold positions, including First Cooperative Association, of which Carlson is the General Manager.

50. West Central's decision to retain Gardiner Thomsen, P.C. for the period of time at issue was made by the Audit Committee, Stroburg, and Buss.

51. Farmers Cooperative is an Iowa cooperative organized under Iowa Code Chapter 499, with its principal place of business located in Ames, Iowa.

52. On December 18, 2015, members of Farmers Cooperative and West Central Cooperative voted to merge West Central Cooperative into Farmers Cooperative Company. The Officers and Directors failed to provide sufficient and necessary information to West Central's members for purposes of their votes on the anticipated merger.

53. On or about April 1, 2016, West Central Cooperative merged into Farmers Cooperative, with Farmers Cooperative surviving and conducting business as "Landus Cooperative," with its primary place of business located in Ames, Iowa.

54. As part of the merger identified in the preceding paragraph, Farmers Cooperative, d.b.a. Landus Cooperative, assumed and became responsible for all pre-exiting claims against West Central Cooperative and Westco, including the claims against those entities that are at issue in this Action.

**<u>JURISDICTION AND VENUE</u>**

55. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this case presents a federal question in that it involves violations of, and conspiracy to violate, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*

56. This Court also has supplemental jurisdiction over the state-law claims pursuant to 18 U.S.C. § 1367, as the state-law claims asserted herein form part of the same case or controversy, and the fraudulent and tortious acts alleged herein arise from a common nucleus of operative facts. The Wollesens' claims under Iowa Code 706A also will require the interpretation of federal law, thereby further warranting jurisdiction of such claims in this Court.

57. The acts that give rise to the claims contained in this Complaint primarily occurred or originated within this judicial district. This Court has personal jurisdiction over each of the Defendants, because each of the Defendants either is a resident of Iowa and/or has committed intentional tortious acts within and directed towards Iowa. In addition, the subject conspiracy and scheme was undertaken in Iowa and directed at the Plaintiffs within Iowa. Defendants accordingly have sufficient contacts with the State of Iowa so as not to offend traditional due process notions of fair play and substantial justice.

58. Venue is proper in this District pursuant to: (a) 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this District; and (b) 28 U.S.C. § 1391(b)(1) and/or (3), because one or more Defendants are found in this District.

## FACTUAL BACKGROUND

### A. West Central Hires Stroburg and Hartzler.

59. Historically, West Central did not have a major share of the agronomy markets (*i.e.*, the sales of seed, chemicals, fertilizer and other products or services for farming) in the areas where it operated.

60. In 1999, West Central Cooperative hired Stroburg to serve as its CEO. One of Stroburg's primary goals was to expand West Central's presence in the agronomy industry, and do so for the benefit of industry participants who were instrumental in getting Stroburg hired by West Central.[2]

---

[2] West Central is not the first time that Stroburg has overseen an agriculture cooperative where an employee engaged in widespread fraud and illegal conduct. An employee, David Swanson, engaged in widespread fraud and illegal conduct at Countrymark Cooperative, Inc., the Indianapolis-based cooperative where Stroburg served as CEO from 1997-1999, Stroburg's job immediately preceding his hiring at West Central.

61. On September 25, 2001, an agronomy account was established for Iowa Plains Farms at West Central. Stroburg, who wanted to target large farmers to quickly achieve his aggressive goals, personally requested that the account be established. *See* (**EXHIBIT 1**) (identifying "Jeff" as the party requesting that an account be opened for Iowa Plains Farms).[3]

62. On October 5, 2001, West Central sent a credit application to Iowa Plains Farms, which, if approved, would have allowed Iowa Plains Farms to purchase agronomy products on credit. Iowa Plains Farms did not return the application, because it did not intend to purchase products from West Central on credit. *See* (**EXHIBIT 2**).

63. In February 2002, Iowa Plains Farms began purchasing agronomy products from West Central on a prepay basis through Eric Clark, West Central's Manager of Agronomy Sales and the agronomist that West Central had assigned to Iowa Plains Farms' account.

64. In the spring of 2002, Mark Bluml, the manager of West Central's credit department, met with Bill Wollesen and Eric Clark. *See* (**EXHIBIT 2**). Mr. Bluml requested that Iowa Plains Farms complete a credit application. (*Id.*). Bill Wollesen declined, and he told West Central that Iowa Plain Farms intended to prepay for its purchases. (*Id.*). Thus, by at least that date, West Central knew: (i) that Iowa Plains Farms did not intend to purchase products on credit; and (ii) its accounting records should never reflect an accounts receivable owed by Iowa Plains Farms.

65. In July 2002, West Central hired Hartzler to serve as its Seed Sales Marketing Manager. West Central Cooperative hired Hartzler to increase West Central's sales and to improve its competitive position in the agronomy industry. According to Hartzler, agronomy had always been treated like a "red-headed stepchild," and West Central wanted to be "a player"

[3] Documents attached as exhibits to this Complaint are incorporated herein by reference.

and "compete wholeheartedly with the other retailers in our area." *See* (**<u>EXHIBIT 3</u>** at p. 35). Hartzler was instructed to target specific, large farming operations. Soon thereafter, he began conducting business with Hunter Farms and Paul Mears, both large farming operations in Iowa.

66. Hartzler was an employee of West Central Cooperative at all times from July 2002 until April 30, 2011. During the period from July 2002 through December 2010, Hartzler reported to Ahrenholtz, the head of agronomy for West Central, who in turn reported to Stroburg.

67. West Central marketed Hartzler as serving in a specialized role for his assigned customers. For example, and without limitation, West Central described Hartzler on its website and elsewhere as being charged with, among other things, developing specialized product programs:

> With nearly 20 years in the agricultural industry, Chad Hartzler leads West Central's agronomy department's sales and marketing efforts. Creating coordinated marketing programs and developing specialized product programs to area farmers are Chad's focus. He also oversees continuing education programs for both West Central agronomy personnel, as well as farmer education programs, so that everyone in local agriculture can stay up-to-date with ever changing agronomic technologies.

*See* (**<u>EXHIBIT 59</u>**) (emphasis added).

68. Hartzler was given virtually unlimited authority and discretion, with insufficient controls or oversight. Hartzler was allowed to and did, among other things: (i) set retail prices for seed & chemicals; (ii) approve "free seed" for customers (*i.e.*, seed given to customers for promotional or other sales purposes); (iii) make sales; (iv) enter into prepayment contracts with customers; (v) enter prepayment contracts into West Central's systems; (vi) approve price exceptions for seed and chemicals; (vii)) make sales entries into West Central's accounting systems; (viii) collect payments from customers; (ix) retain checks from customers for prolonged periods; (x) apply payments from customers to accounts; (xi) negotiate rebate programs with

suppliers; and (xii) determine the amount of money that West Central accrued each year for rebates that had not been paid.

69. When calling on customers, Hartzler described himself as "the dealmaker" for West Central, and he told them that discounts far above West Central's published price schedule "really started" if they purchased more than $1 million annually from West Central. *See* (**<u>EXHIBIT 60</u>** at 2626 - 2627).

70. Hartzler was very successful in growing West Central's agronomy business.

71. The following chart shows the rapid growth that West Central experienced in its agronomy sales during the operative period:




72. According to Hartzler, this growth made Stroburg and the remaining Officers and Directors "happy." *See, e.g.*, (**<u>EXHIBIT 7</u>** at p. 174:9-19).

**B. Hartzler Repeatedly Violated West Central's Rules and Policies.**

73. Hartzler broke West Central's and its suppliers' rules almost immediately after being hired.

74. In February 2003 (only eight months after Hartzler was hired by West Central), Dale Carlson ("Carlson"), an Iowa farmer, contacted Hartzler. Carlson informed Hartzler that Hartzler's brother, Darren, owed money to Carlson. According to Hartzler, Carlson stated that if he was not paid the amounts owed, he intended to refer the matter to the authorities. Hartzler then stole seedcorn from West Central, and he gave it to Carlson in exchange for the forgiveness of Darren Hartzler's debt.

75. Thereafter, Hartzler annually sold West Central seedcorn to Carlson, for which Carlson provided payments to Hartzler in the form of personal checks made payable to Hartzler or entities associated with Hartzler (including, *inter alia*, "Hartzler Trucking"), which Hartzler kept for his personal benefit. *See, e.g.*, (**EXHIBIT 61**). Unbeknownst to Carlson, Hartzler stole the seedcorn from West Central. West Central has never accused Carlson of any wrongdoing or otherwise argued that his check payments to Hartzler were "bribes" or otherwise improper.

76. In the spring of 2004, Stroburg and Ahrenholtz learned that Hartzler had used a West Central customer (Paul Mears) to resell approximately 5,000 bags of Monsanto seedcorn to another customer that West Central was precluded from selling to directly (*a.k.a.*, "selling sideways"). This practice violated Monsanto's agreement with West Central. Monsanto was very upset and expressed their displeasure to West Central. West Central did not reprimand or terminate Hartzler. Instead, two months later, Hartzler was promoted to Seed Department Manager. Despite knowing of Hartzler's intentional malfeasance, Stroburg personally signed the approval form for the promotion. *See* (**EXHIBIT 4**) (indicating approval by "Jeff"). Stroburg was proud of, and rewarded, Hartzler's malfeasance, because his primary goal was aggressive growth, at any cost, for the benefit of a Minneapolis-based cooperative, which assisted Stroburg

in obtaining his employment at West Central (and his current employment) and was an owner of the distributor from which West Central procured its agronomy supplies.

**C. Hartzler is Assigned to the Wollesens' Account and Proceeds to Lie to, and Steal from, Them.**

77. From 2003 through the fall of 2005, Jay Sturtz ("Sturtz") was the West Central agronomist assigned to Iowa Plains Farms' account, and he accordingly entered into the contracts for the sale of agronomy products that were made to Iowa Plains Farms for those years. In late 2005, Sturtz informed the Wollesens that Hartzler would be taking over the account. Sturtz told the Wollesens that Hartzler had been hired to handle large accounts, and he was empowered "to do things differently." This message was consistent with the way that West Central promoted Hartzler on its website and elsewhere.

78. In the fall of 2005, Hartzler and Bill Wollesen first met to discuss potential business. Hartzler told Bill Wollesen that he had been hired to offer special deals, offer new programs, and do what was necessary to make West Central competitive with other sellers of agronomy products. During that meeting, Hartzler told Bill Wollesen that he received product from manufacturers that he could sell for his own benefit (*a.k.a.* "rep. material"). Bill Wollesen did not doubt the veracity of West Central's Seed Department Manager. During the initial meeting, Hartzler sold what he described as "rep. material" to Iowa Plains Farms, for which Iowa Plains Farms made a $5,000 payment in the form of a check made payable to "Chad Hartzler." Hartzler delivered the product as promised, although unbeknownst to the Wollesens, he stole the product from West Central.

79. Thereafter, in 2006, Hartzler contacted Iowa Plains Farms on multiple occasions. Hartzler indicated that he had "rep. material" that he could sell or otherwise was entitled to receive payment directly. At Hartzler's direction, Iowa Plains Farms made payments directly to

Hartzler for materials in the form of checks. Unbeknownst to the Wollesens, Hartzler did not have product that he could sell for his own benefit and was not otherwise entitled to receive payment; he was stealing the product from West Central.

80. From 2006 through 2010, Hartzler sold products to Iowa Plains Farms in exchange for checks made payable to Hartzler. During this entire period, the products arrived as Hartzler promised, and no one at West Central indicated to the Wollesens that anything was wrong. Iowa Plains Farms also made payments for product purchases made from West Central, through Hartzler, during this period of time.

81. The prices that the Wollesens paid for the products that they purchased from and through Hartzler were similar to, and in some cases higher, than the prices that they paid for the same and similar products from other sources during that same period. *See, e.g.*, (**EXHIBIT 5**).

82. There was nothing clandestine about any of the payments that Iowa Plains Farms made to Hartzler. Every payment was made in the form of a documented check. Iowa Plains Farms declared those payments on its tax returns and Farm Service Administration filings. In at least one instance, John Wollesen delivered and left a check made payable to "Chad Hartzler" at West Central's offices, for pick-up by Hartzler.

### D. Direct Payments to Sales Representatives are Common in the Agronomy Industry.

83. There is nothing unusual about making payments directly to sales representatives, including purchasing agronomy products directly from them, knowing their employer also sells the same products, as both the Wollesens and Dale Carlson thought they were doing with Hartzler.

84. In the fall of 2005, when Bill Wollesen first met with Hartzler to conduct business, Iowa Plains Farms had purchased millions of dollars of products over more than a

decade from Tom Brincks ("Brincks"), a sales employee of Van Diest Supply Company ("Van Diest"). During that period, Brincks simultaneously sold the same products for Van Diest and himself. There was nothing unusual or surprising to Bill Wollesen when Hartzler likewise represented that he possessed products that he could sell for his own benefit. In addition, Iowa Plains Farms had purchased agronomy products directly from several other individuals, knowing they sold the same products for their employers.

85. Brincks sold millions of dollars of agronomy products to hundreds of people and companies in Iowa over the years preceding Hartzler's introduction to the Wollesens, including cooperatives and other retailers to which he sold the same products for his employer.

86. According to the CEO of a cooperative that competes with West Central and that purchased almost $500,000 in chemicals from Brincks, rather than Van Diest, because Brincks quoted a lower price for himself than he did on behalf of Van Diest— "direct payments to sales representatives happen" and "are not off the radar" in the agronomy industry. (**EXHIBIT 6** at 1969:13 – 1972:5); (**EXHIBIT 62**). Hartzler himself testified that it is "probably common" to pay individuals directly in the agronomy industry. *See* (**EXHIBIT 7** at p. 170:16-21).

87. Upon information and belief, Hartzler targeted the Wollesens, because he knew the Wollesens would not find his offers unusual or otherwise suspect it was improper.

**E. Gardiner Thomsen Identifies the Lack of Segregation of Duties.**

88. In 2006, West Central Cooperative and Agriliance LLC, a business based in the Minneapolis area, which: (i) was owned by cooperatives Land O'Lakes and CHS, and (ii) supplied agronomy products to West Central Cooperative, formed Westco to house West Central's agronomy business. During the first annual financial audit for Westco, Gardiner Thomsen informed the Audit Committee and Westco's management, including Ahrenholtz, that Westco had significant internal control weaknesses, including a lack of segregation of the duties

held by Hartzler, and that such weaknesses could result in theft or misstatement of Westco's financial statements. *See* (**EXHIBIT 8**). Gardiner Thomsen understood and expected that Westco would address the problem by implementing appropriate internal controls.

89. West Central, and specifically the Audit Committee, Stroburg, Buss, and Ahrenholtz, ignored Gardiner Thomsen's warnings and recommendations.

90. Thereafter, in each of its annual audits, Gardiner Thomsen repeated its concerns, and West Central—specifically the members of its Audit Committee, Stroburg, Buss, and Ahrenholtz—ignored those warnings and directives.

91. In 2010, Gardiner Thomsen elevated its concerns related to the lack of internal controls and segregation of duties to a "material weakness," meaning there was a reasonable likelihood that the lack of internal controls and segregation of duties would result in a material misstatement in the financial statements. Gardiner Thomsen nevertheless continued to issue unqualified audit opinions for Westco and West Central Cooperative.

**F. The Audit Committee and Gardiner Thomsen Learn of Hartzler's Widespread Fraudulent Conduct.**

92. In February 2007, unbeknownst to Iowa Plains Farms, Hartzler was gambling excessively and had incurred substantial losses. Hartzler owed tens of thousands of dollars to Danny Newell, whom Hartzler described as his "bookie." Danny Newell was (and is) a member of West Central Agriculture and its successor. In February 2007, Hartzler solicited a check in the amount of $46,500 from Iowa Plains Farms, which the Wollesens made payable to "West Central Cooperative" and intended to be applied to Iowa Plains Farms' West Central Cooperative account as pre-payment for future purchases. Unbeknownst to the Wollesens, Hartzler instead applied the check to Danny Newell's West Central Cooperative account, to satisfy personal gambling debts.

93. Later in 2007, when the Wollesens met with Hartzler to review their account, Hartzler again told them that their February 6, 2007 payment of $46,500 had been applied to their West Central Cooperative account. The accounting prepared by Hartzler indicated as follows with respect to the $46,500 payment:

| Payments | | | |
|---|---|---|---|
| 11-10-2007 | 23000 | soybeans | |
| 11/17/2007 | 250000 | corn | |
| 11/21/2007 | 23580 | half callisto | |
| 12/27/2007 | 23000 | 2nd half callisto | |
| 2/1/2007 | 22850 | order #3 | |
| 2/6/2007 | 46500 | WCC | |
| 2/6/2007 | 46420 | Half of order #5 Chem(savings 2560)/Soybeans not paid | |
| 5/10/2007 | 24000 | $1200.00 Discount | 2000 Gallons @ 12 + 1000 Gallons @ 1.20 |
| | 459330 | | |

*See* (**EXHIBIT 9**). Unbeknownst to the Wollesens, Hartzler did not apply the "$46,500" payment made on "2/6/2007" to "WCC," as he falsely represented, but rather applied that amount to Danny Newell's West Central account to cover Hartzler's gambling losses to Mr. Newell.[4] The Wollesens first learned of this theft on or about March 1, 2013, when West Central's retained expert disclosed such information through an expert report.

[4] At trial in the Lawsuit (defined below), the exhibit marked and produced by West Central stated "wee", rather than "WCC." *See* (**EXHIBIT 73**). This was one of multiple instances where information that undercut West Central's positions was not correctly depicted on its proffered exhibits. *Compare, e.g.*, (**EXHIBIT 74**) (identified and produced by West Central as an exhibit, indicating the Wollesens returned "03" gallons of glyphosate) *with* (**EXHIBIT 75**) (the same document, previously marked and used by West Central during Kris Wollesens' deposition preceding trial, indicating that they had returned "18,303" gallons of glyphoate─enough to treat approximately 97,000 acres of farmland). Thielen knew the Wollesens purchased 18,303 gallons of glyphosate (and that it would treat over 97,000 acres) (*see* **EXHIBIT 76**), and West Central believed the Wollesens farmed 8,000 acres (*see* **EXHIBIT 77**), yet at trial in the Lawsuit, Thielen and other West Central represenatives vehemently denied any knowledge that the Wollesens resold products.

94. On or about April 20, 2007, West Central Cooperative's board of directors approved Iowa Plains Farms' admission for membership into West Central.

95. On June 25, 2007, West Central Cooperative issued one share of Class A common stock (Cert. No. 19139) to Iowa Plains Farms.

96. On December 5, 2007, Tronchetti, who was then a member of the Audit Committee, reported to Mark Gardiner, that she had received complaints from West Central employees that Hartzler was engaging in fraudulent and unlawful conduct, including stealing products and services from West Central. *See* (**EXHIBIT 10**). Tronchetti reported as follows:

> Mark,
>
> My concern was with delivery charges or lack there of on fertilizer and nitrogen. I thought that some accounts you could check would be "Hunter Farms, Paul Mear of Mear's Seed & Chemical." It is the agronomy department pricing structure that I was concerned about – not grain. I have had some concern from agronomist within the company that Chad Hartzler is offering special deals to some accounts. Also had someone comment to me that liquid nitrogen inventory was short at the end of the season last spring/summer.
>
> Thanks for your help. See you Friday.
>
> Sue.

*Id.*[5]

97. Mark Gardiner understood that the information from Tronchetti identified fraud and illegal conduct by Hartzler, and Mark Gardiner told Tronchetti that he suspected Hartzler was engaging in fraudulent conduct and theft. (**EXHIBIT 11** at pp. 2713:25 – 2714:7; 2715:12 – 2716:2; 2732:15 – 2733:19). Upon information and belief, Tronchetti concurrently relayed this

---

[5] Sue Tronchetti' s email address was "dan.tronchetti@plantpioneer.com," because she and her husband, Dan, owned a Pioneer seed dealership and sold Pioneer brand seed in competition with West Central, which sold Monsanto and other brands of seedcorn. It is not uncommon for representatives of agronomy companies to compete with the companies that they otherwise represent, as demonstrated by chairperson of the board for West Central Cooperative.

information to the remaining members of the Audit Committee (Ginder and Chesnut), Stroburg, and Buss.

98. At West Central's request, Gardiner Thomsen began conducting a fraud investigation within West Central. This work was separate and apart from the annual audit services that Gardiner Thomsen provided to West Central. Hartzler was not suspended, removed from his position, or otherwise reprimanded. Hartzler's customers, including the Wollesens, were not notified.

99. On February 1, 2008, West Central issued 20 shares of preferred stock to Iowa Plains Farms.

100. In 2008, West Central Cooperative's and Westco's management issued management representation letters that falsely stated they were not aware of any: (i) known or suspected fraud by any management-level employee, or (ii) reports of fraud by any employees, and Gardiner Thomsen, knowing of Hartzler's suspected fraud and reports of fraud by West Central employees, the effects of which were unknown, nonetheless, issued unqualified audit opinions for West Central, relying on management representation letters that it knew contained false representations. Gardiner Thomsen released the unqualified audit opinions to the Iowa Department of Agriculture and the FSA agencies, using the mails.

101. In December 2008, another West Central employee, Bill Ruzicka ("Ruzicka"), complained to the Audit Committee and other West Central employees that Hartzler was engaging in fraudulent conduct using his accounts.

102. On December 10, 2008, Gardiner Thomsen, P.C. held its "Engagement Team Discussion Concerning Fraud and Risk and RMM," which was held by the various Gardiner Thomsen, P.C. auditors who were assigned to the West Central engagement. *See* (**EXHIBIT 55**).

The meeting was attended by Mark Gardiner, Ryan Taylor, Tim Weigel and Clint Boatman, all Gardiner Thomsen, P.C. auditors who were working on the West Central engagement. While identifying the lack of internal controls at Westco as a "General Risk Consideration," and noting that there was "[a]n aggressive management style and culture [] among various top managers (CEO and select Vice Presidents)," Mr. Gardiner did not identify, disclose or otherwise address his knowledge of reported fraud and unlawful conduct by Hartzler. (*Id.*). He did not do so in order to further hide and conceal such knowledge. Thereafter, in each annual fraud discussion, Mark Gardiner likewise concealed such knowledge for the same improper purpose.

103. On December 19, 2008, Mark Gardiner spoke with Ruzicka about Ruzicka's knowledge of ongoing fraud by Hartzler. *See* (**EXHIBIT 12**). Ruzicka told Mark Gardiner that he had compiled a file that supported his understanding. (*Id.*). After scheduling an appointment with Mark Gardiner for December 22, 2008 to share those materials, Ruzicka then canceled and refused to meet with Mark Gardiner, because he feared repercussions and the loss of his job if he discussed such information with Mr. Gardiner. (*Id.*); (**EXHIBIT 11** at p. 2719:3-6). Upon information and belief, and as Ruzicka suspected, had he fully disclosed what he knew, then he would have been terminated by Stroburg and Buss, because his actions would have undercut the ongoing scheme to conceal Hartzler's fraudulent and illegal conduct.

104. On January 2, 2009, Mark Gardiner reported to the Audit Committee and Defendant Weigel as follows:

> I hope you all had a great Holiday Season! Here is an update on the agronomy issue. I visited with Bill Rucus (sp) on Friday, December 19th. I suggested to Bill, I would meet him for lunch on either Monday or Tuesday, December 22nd and 23rd. Bill stated he wanted to gather the info for us on Monday, December 22nd. I gave Bill my cell phone number, our office number and my email address, in case he wanted to contact me. I told him to contact me, once he got everything together he wanted to show us. I informed him this should be kept confidential and if he has problems or does not have access to any information to let us know. It would not be difficult for us to obtain what is needed. As of today, I have not heard back from him. But this is understandable due to the holidays. I plan on contacting him today. If you have any questions or comments, feel free to contact me.
> Thanks!

(**EXHIBIT 12**).

105. The Audit Committee, Stroburg, Buss, and Coen did not direct Ruzicka to provide the materials, and they did nothing additional in response to the information he reported. Gardiner Thomsen did not withdraw as West Central's auditor. Upon information and belief, these parties acted in such manner because they already knew of Hartzler's unlawful conduct and were acting together to conceal such knowledge for purposes of advancing their personal financial interests.

106. By January 2009, Gardiner Thomsen, Tronchetti, Chesnut, Ginder, Coen, Buss and Stroburg had confirmed that Hartzler had engaged in several acts of illegal conduct and fraud, spanning several of his accounts. Mark Gardiner documented some of his findings in a summary report, which identified several transactions with multiple accounts, including accounts belonging to Paul Mears and Hunter Farms, where Hartzler had, *e.g.*, (i) provided products or services for which West Central Cooperative did not receive any payment, and (ii) accepted returns of products that were not purchased from West Central Cooperative, providing such customers with credit on the West Central Cooperative account. *See* (**EXHIBIT 13**).

107. On May 21, 2009 Defendant Carlson emailed Stroburg as follows:

> There is rumor going around the Jefferson area that Hunter Farms received $42,000 worth of free custom anhydrous application from West Central. I've asked three WCC employees, who should know the truth, a few general questions and think there may be some truth to the rumor. Even if there is a valid explanation I think the agronomy department has lost some credibility with farmers in the Northern Region. I'm sure I don't have all the information or details but thought you should be aware of what may be going on.

(**EXHIBIT 50**).

108. Unbeknownst to Mr. Carlson, Stroburg, Coen, Buss, Mark Gardiner, and the Audit Committee already knew by at least January 2009, that Hartzler had been engaging in ongoing unlawful conduct that spanned several of his accounts, including the delivery of services to Hunter Farms for no payment. In order to hide and conceal the ongoing scheme, Stroburg

responded to Carlson (who was not part of the ongoing scheme to hide and conceal Hartzler's known fraud and illegal conduct) by intentionally and falsely characterized the application as a "volume incentive." *See* (*id.*).

109. Hartzler was not terminated or removed from his position; his customers were not notified of his malfeasance.

110. At no point did Gardiner Thomsen, the Audit Committee, Stroburg, Coen or Buss, disclose to West Central's membership or Hartzler's customers, including the Wollesens, that they knew Hartzler had engaged in several acts of fraud and illegal conduct or that the full extent of his malfeasance was unknown. At no point did Gardiner Thomsen withdraw from its auditing services for West Central or issue anything other than unqualified audit opinions, in violation of GAAP. Gardiner Thomsen continues to serve as West Central's successors' auditor, and it continues to issue "unqualified" audit opinions that are based, in part, upon prior management representation letters that Gardiner Thomsen knows to be false, and audits it knows were improper.

111. On February 1, 2009, West Central issued 20 shares of preferred stock to Iowa Plains Farms.

112. On April 17, 2009 and May 29, 2009, Westco and West Central Cooperative, respectively, issued management representation letters to Gardiner Thomsen, which falsely stated that they did not know of: (i) any known or suspected fraud by members of management or others whose fraud could have a material effect on their financial statements, or (ii) reports of fraud by any employee. Gardiner Thomsen—knowing the management representations were false and therefore could not be relied upon—nonetheless issued unqualified opinions and

released West Central's "audited" financial statements to State and Federal agencies through the mail and wires.

113. On February 1, 2010, despite confirming a year earlier that Hartzler had engaged in widespread fraud and unlawful conduct, West Central Cooperative *promoted Hartzler to Director of Seed and Chemical*. *See* (**EXHIBIT 29**).

114. That same day, West Central issued 20 shares of preferred stock to Iowa Plains Farms.

115. On April 30, 2010, Westco and West Central Cooperative, respectively, issued management representation letters to Gardiner Thomsen, which falsely stated that they did not know of: (i) any known or suspected fraud by members of management or others whose fraud could have a material effect on their financial statements, or (ii) reports of fraud by any employee and Gardiner Thomsen—knowing the management representations were false and therefore could not be relied upon—nonetheless issued unqualified opinions and released West Central's "audited" financial statements to State and Federal agencies through the mail and wires.

116. In or around May 2010, Coen prepared an analysis, based upon the prices that Hartzler had entered into West Central's systems for several of his accounts, showing the percentage discount *from cost* that Hartzler had entered. *See* (**EXHIBIT 51**). The report showed substantial discounts that were far above the range that West Central and its representatives have stated that they believed would be appropriate. Hartzler was not removed from his position or otherwise terminated; his customers were not alerted of any concerns or improprieties.

### G. Hartzler's Widespread Efforts to Conceal His Theft from the Wollesens.

117. Hartzler concealed his theft from Iowa Plains Farms through a practice commonly known as "lapping." At the same time Hartzler sold products to Iowa Plains Farms for his

personal benefit in 2006 and thereafter, he also booked a receivable for those same products on Iowa Plains Farms' West Central account. Thus, Iowa Plains Farms was billed twice for the same products—once by Hartzler and once (unbeknownst to the Wollesens) on West Central's books. Because Iowa Plains Farms only paid once (to Hartzler, at the price he had quoted), an exponentially growing account receivable was created in its account on West Central's books. This alone should have set off alarm bells at West Central because Iowa Plains Farms did not have, and refused to apply for, credit with West Central. To hide the deficit, each successive year, Hartzler solicited exponentially larger prepayments from Iowa Plains Farms. While the Wollesens were told and understood that their payments were for product, Hartzler actually applied some portion of the payments against the deficit that he had created on West Central's books.

118. Hartzler described his usage of Iowa Plains Farms' account as follows: "Basically what was happening is I was giving him kind of a Ponzi-like deal that he was prepaying at a good deal, and I was taking – using his prepay money to pay off the deal that I had given him the year before. So every year it got worse." (**EXHIBIT 7** at p. 192:12 – 193:1). Hartzler admitted that it did not make sense for the Wollesens to knowingly participate in such a scheme, given that they ended up owing progressively more as his scheme continued. (*Id*. at p. 197: 13-17).

119. Hartzler was able to perpetrate his scheme by placing Iowa Plains Farms' products in consignment. When a delivered product was placed in consignment, the item did not appear on a monthly statement unless and until the product had been billed. This prevented statements from going to Iowa Plains Farms during the year, until Hartzler could solicit the prepayment monies for the following year, which he instead applied to the ever-growing deficit.

120. Because, among other reasons, Iowa Plains Farms was a cash customer that had expressly declined credit privileges, West Central knew there should never have been any consignment or credit balance for Iowa Plains Farms' account at West Central.

121. West Central's policies required that items in consignment be billed within thirty days. Had West Central followed its own policies, the Wollesens would have been made aware of Hartzler's improper conduct by at least early as 2009 (around the same time West Central had confirmed the misconduct).

122. West Central, and specifically its internal auditor, Thielen, allowed Hartzler to misuse consignment. In early 2009—after Gardiner Thomsen, the Audit Committee, Stroburg, Coen and Buss had confirmed Hartzler, an employee it knew lacked sufficient controls, was engaging in widespread fraud, Stroburg assigned Thielen to monitor West Central's consignment accounts. Upon information and belief, Stroburg directed Thielen to allow Hartzler to continue breaking West Central's rules, so that the known malfeasance of Hartzler would not be revealed and continue to be concealed. Thielen, who reported to Stroburg, did as she was ordered. Thielen allowed Hartzler to maintain large balances in Iowa Plains Farms' consignment account for several months. She even made light of the problem, identifying an email in October 2009 to Hartzler as her "weekly reminder:) [sic]" to bill out the amounts in consignment that should have been billed months earlier. *See* (**EXHIBIT 14**). If Thielen had performed her job, Hartzler's ongoing fraud would have been revealed to the Wollesens in early 2009, thereby preventing Hartzler from his fraud and theft after that date.

123. During the time at issue, Thielen reported directly to Stroburg, which created obvious limitations on her ability to properly function as an internal *auditor over management*. West Central also had no written or other protocols that governed her responsibilities or roles.

As a CPA who previously served as an outside auditor with the Merewether Wilson accounting firm, Thielen knew that the structure of her position was improper. Thielen failed to honor her duties to West Central, but rather placed Stroburg's and West Central's managements' interests above those of West Central.

124. Beyond his misuse of consignment, Hartzler took other steps to prevent monthly statements from being generated and sent to the Wollesens—steps that would not have been required if the Wollesens were complicit with Hartzler. *Inter alia*, on November 20, 2009, Hartzler directed accounting to change the accounts receivable status for Iowa Plains Farms, so they would not receive first notices of delinquent amounts reflected on West Central's records. (**EXHIBIT 15)** ("Change A/R status for first notice per Chad"). Hartzler has testified that, "[t]here were some when I – I, or somebody else, but I think mostly me, said – told accounting, don't send a statement in those cases…" (**EXHIBIT 7** at p. 36:14-16). According to West Central, there also were instances where Hartzler physically pulled monthly statements out of the process, so that they were not mailed to the Wollesens. *See* (**EXHIBIT 17**).

125. Despite Hartzler's extensive efforts to preclude the Wollesens from receiving monthly statements, there were a few instances where monthly statements were generated, mailed, and received by the Wollesens. In those instances, Bill Wollesen called Hartzler, and Hartzler provided what has been described as "persuasive, yet untrue" explanations for the apparent errors. *See* (**EXHIBIT 7** at p. 287:1-10).

126. According to Hartzler, "[b]asically, I guess the way I can always sum it up is, he [Bill Wollesen] didn't know what I was doing…." *See* (**EXHIBIT 36** at p. 370).

127. In 2010, West Central opened a location in Sac County, Iowa. Whereas West Central previously had used the Wollesens, by and through Iowa Plains Farms and Byrite Farm

Supply Inc., to: (i) increase their sales volumes by selling into markets they did not service, and (ii) fill product orders when West Central was low on inventory, West Central no longer needed Iowa Plains Farms or Byrite Farm Supply, Inc.'s distribution or assistance in such areas.

### H. Coen, Stroburg, and Ahrenholtz Manipulate Westco's Earnings.

128. In early 2010, Coen, Stroburg, and Buss discovered a $3.5 million discrepancy in its agronomy financial statements.

129. Coen, Stroburg, and Buss then improperly increased Westco's inventory by $3.5 million, which had the effect of simultaneously increasing Westco's earnings by that same amount. The adjustment lacked any business justification. Coen, Buss and Stroburg did not inform any other West Central employees or board members that they had made this adjustment to Westco's financial statements.

130. During the year, Westco's financial records fraudulently showed that Westco was profitable, when Stroburg, Coen, and Buss knew that it was not.

### I. Ahrenholtz Learns of Hartzler's Misuse of Iowa Plains Farms' Consignment Account.

131. According to Mark Gardiner, during the period of Hartzler's fraud, Ahrenholtz was not properly serving his fiduciary position with adequate care, but rather "was just riding out until he retired. I guess that's the best way to put it." *See* (**<u>EXHIBIT 16</u>** at p. 333:8-17). Ahrenholtz's lack of care allowed Hartzler to defraud and steal from the Wollesens.

132. As indicated in the preceding paragraph, Mark Gardiner knew that Ahrenholtz was not devoting proper attention to his West Central responsibilities, yet Gardiner Thomsen did not increase the scope of its audit activities to account for this failure. Upon information and belief, that is because Gardiner Thomsen knew that Hartzler was engaging in fraud and unlawful

conduct and was conspiring to conceal such knowledge. Additional audit procedures would have undercut and disserved the ongoing scheme.

133. In November 2010, Hartzler told Ahrenholtz that Iowa Plains Farms had a substantial prepayment balance in its account. However, on November 16, 2010, Ahrenholtz learned that contrary to Hartzler's representation, West Central's records indicated that West Central supposedly had extended $2 million in credit to Iowa Plains Farms, a prepay customer that had refused any credit privileges. *See* (**EXHIBIT 18**). Ahrenholtz correctly noted to Hartzler that, "[i]f we are out of prepay we have in essence extended $2 million credit it appears to me. Do we have that kind of line approved here?" (*Id*.). No such line of credit existed, because Iowa Plains Farms had expressly declined any credit privileges years earlier. *See* (**EXHIBIT 2**).

134. Upon information and belief, Ahrenholtz conveyed this information to Stroburg, Coen and Buss. No one contacted the Wollesens about this issue or otherwise alerted them that West Central knew that Hartzler, an employee known to engage in widespread fraud and theft, was using Iowa Plains Farms' account in a manner that was inconsistent with the Wollesens' expressed intent and inconsistent with the Wollesens' actual purchases. Hartzler was not reprimanded or removed from the Iowa Plains Farms' account.

135. By at least December 8, 2010, West Central knew that, according to its records, Hartzler was making sales to Iowa Plains Farms for amounts below West Central's stated costs. (**EXHIBIT 48** at p. 1689:9-12). No one contacted the Wollesens about this issue. Hartzler was not reprimanded or removed from Iowa Plains Farms' account.

136. Instead, on December 21, 2010, Hartzler was sent to meet with Iowa Plains Farms. Hartzler was directed to and did fraudulently induce Iowa Plains Farms to enter into three prepayment contracts for 2011 inputs, for a total amount of approximately $2.1 million.

*See* (**EXHIBIT 63**). Hartzler solicited and collected three checks from Iowa Plains Farms, totaling the same amount. *See* (**EXHIBIT 64**). While Hartzler testified that he understood those payments were provided by the Wollesens as prepayments for Iowa Plains Farms' 2011 inputs, and the Wollesens understood and expected that such amounts were being given as prepayment for their 2011 inputs, Hartzler instead intended to and did apply the amounts to fill the deficit he had created in their West Central account without their knowledge. (**EXHIBIT 7** at p. 295:17-24).

**J. West Central Reverses the Fraudulent $3.5 Million Adjustment.**

137. On January 31, 2011, West Central's fiscal year ended. Shortly before the end of the fiscal year, West Central reversed the $3.5 million adjustment that Stroburg, Coen and Buss had made earlier in the year. The $3.5 million negative adjustment resulted in Westco having a loss for fiscal-year ending January 31, 2011, before accounting for any of Hartzler's wrongdoing. The aforementioned individuals knew that it would be unacceptable to report such a loss to West Central's members.

138. Upon information and belief, the $3.5 million discrepancy is unrelated to any malfeasance involving Hartzler. Upon information and belief, Stroburg, Coen and Buss (and perhaps others) intended to conceal such losses by folding them into the losses from Hartzler's theft, which they knew would be disclosed later that Spring, with Hartzler's anticipated resignation.

139. Neither West Central nor Gardiner Thomsen ever undertook steps to determine the extent of Hartzler's fraud or the effects of such fraud on West Central Cooperative or Westco's financial statements for any specific year or cumulatively.

**K. Hartzler Resigns and the Officers and Directors Use the Lawsuit and Related Publicity to Conceal their Malfeasance.**

140. On Saturday, April 30, 2011, Hartzler submitted his written resignation, wherein he admitted, "[t]his is all on my hands and my hands alone." *See* (**EXHIBIT 19**). Upon information and belief, Hartzler's resignation had been planned months earlier and was intended by Stroburg, Coen, Buss, the Audit Committee, and perhaps others that his resignation and the subsequent publicity surrounding the resignation could and would be used to hide and conceal management malfeasance, including the aforementioned $3.5 million amount.

141. Later on April 30, 2011, upon learning that West Central would not deliver any more of their 2011 farm inputs, the Wollesens traveled to West Central with the contracts that Hartzler had executed with the Wollesens on behalf of West Central and the accounting records showing the Wollesens' business dealings with Hartzler. The Wollesens threatened litigation if West Central did not honor the agreements. Stroburg and several other members of West Central's management where present, including J. Paul Konrad and Mark Bluml, did not accuse the Wollesens of any wrongdoing. Instead, Stroburg admitted that West Central had "some internal issues," although he did not disclose the nature of those issues to the Wollesens.

142. On April 30, 2011, Stroburg called Hartzler and had a private conversation. Upon information and belief, during that call, Stroburg suggested to Hartzler that he had been bribed, and Hartzler agreed to adopt Stroburg's suggestion.

143. Realizing that Hartzler could change his mind, and may do so if he was given time or the opportunity to consult with an attorney, as he had requested in his April 30, 2011 resignation letter (*see* **EXHIBIT 19**) ("I'm sure counsel needs to be included, that is fine. I will make arrangements for that also on my end…"), West Central rushed to take Hartzler's "sworn" statement. On the morning of Monday, May 2, 2011, Stroburg and West Central's attorney

appeared at Hartzler's house with a court reporter. On May 2, 2011, Hartzler, who was not represented by counsel, gave a sworn statement to Stroburg and West Central's attorney.

144. During his May 2, 2011 sworn statement, Hartzler testified that he went to Iowa Plains Farms in June or July *2006* to collect $20,000 that was owed to West Central for seed*beans* that already had been delivered to Iowa Plains Farms. According to Hartzler, during that meeting, Bill Wollesen offered to pay $2,000 cash to Hartzler if he lowered an outstanding bill for seed*beans* by $5,000. (**EXHIBIT 7** at pp. 175 – 183). According to Hartzler, he collected a check from Iowa Plains Farms for the $15,000 amount that was owed after the $5,000 reduction. (*Id*.). According to Hartzler, he was "sure" that the alleged cash bribe took place in June or July *2006*. Hartzler testified repeatedly that the alleged bribe was to lower the price for seed*bean*. (*Id*.). However, Hartzler could not explain: (i) how he went about lowering the balance owed for seed*bean* in exchange for the alleged cash payment; or (ii) why Iowa Plains Farms, a prepay customer, would have had any balance owed. (*Id*.).

145. Hartzler testified that he remembered the alleged bribe, because it was "like biting the apple", and he "sold his soul at that point." (**EXHIBIT 7** at pp. 215:17 – 216:8). However, Hartzler had stolen from West Central as early as 2003, when he provided stolen product to Carlson to satisfy Hartzler's brother's debt. (*Id*.). During his June 30, 2014 deposition, when Hartzler was asked about that comment, he responded as follows:

> Q. Now, Mr. Hartzler -- and we read this testimony earlier from your sworn statement. You claim that you remember the cash bribe because it was, quote, "like biting the apple, and that you sold your soul at that point." Is that correct?
>
> A Yeah. Uh-huh.
>
> Q. But, in fact, you were involved in criminal conduct before you and Bill Wollesen ever did any business, correct?
>
> A. Yeah. Are you talking specifically about Dale Carlson?

(**<u>EXHIBIT 7</u>** at pp. 215:17 – 216:8). Hartzler's response not only confirmed his illegal conduct using Dale Carlson, but also suggests that he had been involved in other criminal conduct.

146. The Officers and Directors (other than Chesnut, who was no longer associated with West Central) had duties to confirm Hartzler's explanation before West Central took legal action against the Wollesens or publicly accused them of engaging in illegal or improper conduct. The Officers and Directors (other than Chesnut) did not discharge those duties.

147. Coen, Stroburg, Buss, and Weigel (who had left Gardiner Thomsen, P.C. in the spring of 2011 and was working for West Central) also promoted and pursued the legal action against Iowa Plains Farms as part of the ongoing scheme to hide and conceal their prior knowledge of Hartzler's fraudulent conduct and to otherwise conceal management's malfeasance, including the aforementioned $3.5 million loss.

148. On or about May 11, 2011, in Ralston, Iowa, the Officers and Directors (other than Chesnut) nonetheless unanimously voted in their capacities as officers and directors of West Central Cooperative to initiate legal action against Iowa Plains Farms, and, on May 12, 2011, the Lawsuit was filed.

149. West Central knew, at least by the time the Lawsuit was filed, that direct payments to agronomy representatives are not uncommon. Yet, West Central claimed in the Lawsuit that the check payments from Iowa Plains Farms to Hartzler were "bribes," provided to Hartzler in exchange for lower prices on products Iowa Plains Farms purchased from West Central. Despite being inconsistent with its own records, the Verified Petition and Jury Demand, verified by Coen,[6] also repeated Hartzler's false story that Iowa Plains Farms provided a $2,000

[6] Coen also verified Westco's First Amended Petition, which was filed on May 25, 2011 and likewise contained the same, demonstrably untrue allegations.

cash bribe to Hartzler in "June or July 2006." (**<u>EXHIBIT 20</u>** at ¶ 39). The fraudulent petitions that were falsely verified by Coen were submitted via the mails and/or wires to further the unlawful scheme to conceal Hartzler's known fraud and illegal conduct.

150. The Lawsuit was approved and pursued by West Central, by and through the respective Officers and Directors, *inter alia*, to conceal and distract from their malfeasance and prior knowledge of Hartzler's wrongdoing from West Central's members, and instead to falsely place blame upon the Wollesens.

### L. The Officers and Directors Engage in Publicity, Including the Retention of a Public Relations Firm, to Further Conceal Their Malfeasance and Further Promote their Scheme.

151. On May 12, 2011, the date the Lawsuit was filed, and in order to advance the unlawful purposes identified in the preceding paragraph, Stroburg sent a letter to each of West Central's members (except for Iowa Plains Farms), which stated in part as follows:

> May 12, 2011
>
> Dear Members,
>
> Quality. Professionalism. Integrity. Innovation.
>
> These are not just words. These four core values are the foundation of all of our business partnerships and alliances.
>
> They represent who we are, what we do and how we do things to support your success and the success of each member.

***

> Over the past several months, West Central has been investigating accounting irregularities in our agronomy division, Westco Agronomy Company. These incidents appear to be related to a select group of accounts and transactions, and appear to be isolated.
>
> Our investigation is ongoing. Today, I can report that while these irregularities will have an impact on last year's financial statements, the amounts will not influence West Central's ability to conduct normal business operations. And from a member perspective, you will experience no changes in your ability to do business with us.
>
> As you might imagine, we are both surprised and disappointed to learn of these issues. However, we have implemented immediate changes to strengthen oversight of key functions within the division.
>
> Our internal investigation has led us to pursue legal action against two primary parties, both of whom have been a part of the West Central family. The suit was filed today. The parties include a former employee and a farm operation. At this point, the evidence points to behavior related to the sale and acquisition of product from West Central. In some cases, the product was acquired well below cost.
>
> The Board of Directors and Senior Management Team jointly decided to pursue this legal action. While it's painful to go through this process, it is clearly in the best interest of the entire membership to protect your investment of resources and trust in West Central.

*See* (**EXHIBIT 21**). Stroburg mailed or caused this letter to be mailed from West Central's Ralston, Iowa headquarters via United States mail for purposes of furthering the unlawful scheme.

152. Stroburg' letter was fraudulent and otherwise drafted to mislead West Central's membership. Conspicuously absent from Stroburg's letter was any statement relaying: (i) Stroburg's personal knowledge of Hartzler's malfeasance in 2004; (ii) Hartzler's suspected fraud and illegal activity as early as December 2007; (iii) the reports of impropriety that had been

received from West Central's employees in May 2008; (iv) Hartzler's confirmed, widespread fraud and illegal conduct by at least January 2009; (v) Thielen's knowledge and allowance of Hartzler to violate West Central's rules using Iowa Plains Farms' account; or (vi) any of Hartzler's known misconduct with several of his other customers. The purpose of the letter was to conceal Defendants' malfeasance and mismanagement and to create the false appearance that Hartzler's conduct was limited to and induced by the Wollesens, rather than ***one example*** of Hartzler's widespread, known, and allowed malfeasance.

153. Tellingly, while beginning his letter with West Central's four "core values," which supposedly serve as "the foundation of all [of West Central's] business partnerships and alliances," when Stroburg was deposed in the Lawsuit on April 9, 2013, he could not identify those four core values. *See* (**EXHIBIT 25** at p. 5: 4-20).

154. West Central, through the direction and approval of the Officers and Directors, retained Wixted Pope to serve as its public relations firm. Wixted Pope drafted the above-quoted May 12, 2011 letter for Stroburg's signature and issuance. The purpose of Wixted Pope's retention was to create and widely disseminate false and misleading information concerning the Wollesens, for purposes of further concealing the Officers and Directors' malfeasance and the scheme to conceal certain Defendants' prior knowledge concerning Hartzler's unlawful and fraudulent acts.

155. After the Lawsuit was filed, Wixted Pope created false and misleading propaganda and widely disseminated such information to media outlets and elsewhere. Wixted Pope, and Eileen Wixted personally, contacted media outlets in Iowa and elsewhere and provided the false explanation of events that she and Defendants had concocted. Wixted Pope was able to do so very successfully, because Eileen Wixted formerly worked as an on-air

television reporter, and she leveraged her relationships to ensure widespread dissemination of this damaging and false propaganda. Like the remaining Defendants, Ms. Wixted knew that third parties and the public would blindly rely upon her *imprimatur*.

156. Wixted Pope, and Eileen Wixted personally, took further steps to ensure that those stories remained available and published on an ongoing basis through search engines such as "Google."

157. As a result of Wixted Pope's efforts, the false "story" that was and continues to repeatedly be published in print and television across Iowa, globally on the internet, and elsewhere was that Hartzler "Took $480,000 in Bribes" from Bill Wollesen.

158. Upon information and belief, Wixted Pope knew that West Central's "bribe story" was false, and they owed a duty of care to determine the veracity of the story that they were widely disseminating before doing so. Upon information and belief, Wixted Pope knew that the remaining untrue information that it developed and disseminated was false.

159. In Wixted Pope's own words, the "Overarching Objective" of its work was to "[m]aintain stakeholder confidence in West Central," for purposes of protecting the Officers and Directors (other than Chesnut) from scrutiny, rather than to disseminate truthful and accurate information. *See* (**EXHIBIT 22** at W0006160).

160. According to Wixted Pope, a "Key Strateg[y]" of its work was to "[m]ake it clear that this is an isolated issue within the agronomy division…" (**EXHIBIT 22** at W0006161). However, as explained *supra*, Hartzler's conduct was not isolated, but rather was widespread and known by West Central and Gardiner Thomsen for several years.

161. While Wixted Pope was retained by West Central to act on its behalf, one of Wixted Pope's primary objectives was to ensure that blame was not directed towards Jeff

Stroburg specifically. Wixted personally advised Stroburg that, despite Ahrenholtz's obvious failures to discharge his responsibilities with due care over a several-year period, West Central should not terminate Ahrenholtz, because, according to Wixted Pope:

> [I]f Harry [Ahrenholtz] is dismissed ostensibly for failing to properly monitor the situation, it wouldn't take long for some to reach the following conclusion: 'If Harry should have known about Chad [Hartzler], shouldn't Jeff [Stroburg] have know [sic] about Chad [Hartzler] too.'

*See* (**EXHIBIT 22** at W0006169-70). In fact, Stroburg and others did know; they took steps to conceal such knowledge; and they should have been terminated.

162. Wixted Pope's question not only is a good one, but also one that, thanks to Wixted Pope's successful campaign to widely disseminate West Central's false and misleading story, the members of West Central and the public largely were diverted from asking.

163. Despite concerns related to fraud by Hartzler having been raised to West Central's Audit Committee by at least December 2007, concerns having been raised again in December 2008, and Hartzler's widespread fraud having been confirmed to them by at least January 2009, Wixted Pope falsely stated or implied that West Central Cooperative's board of directors did not know that Hartzler had engaged in fraud or improper conduct:

- **The Board was shocked and angry by the fraud and theft. They, too, could not understand how this could have gone on for so long without it being caught. However, the deceptive web that was built was part of the regular processes so it was impossible to see.**

*See* (**EXHIBIT 22** at W0006182).

164. Despite the repeated warnings from employees about Hartzler's fraudulent conduct, including Mr. Ruzicka's reports in December 2008, Wixted Pope's materials falsely reported to West Central's membership that "at no time did anyone come forward and say that they believed product was being stolen." *See* (**EXHIBIT 22** at W0006182).

165. Several of the statements that Wixted Pope made and published for further dissemination were intended to, and did, cause the public to believe the fabricated story that Hartzler's conduct using the Iowa Plains Farms account was isolated and that he acted in concert with the Wollesens.

166. By way of example and without limitation, Wixted Pope made the following demonstrably false statements:

(a) "This individual [Bill Wollesen] lived on the edge of our trade territory; we really didn't know that much about him. However, he and our former employee had a relationship and it was the former employee who brought the farmer in as a customer. So while he was new to our trade territory, what we didn't know at the time, he and our former employee had a previous relationship." *See* (**EXHIBIT 22** at W0006179). The truth is: Stroburg personally opened Iowa Plains Farms' account in 2001, because he wanted West Central to target the Wollesens' business. Bill Wollesen and Hartzler did not have any pre-existing relationship before West Central assigned Hartzler to Iowa Plains Farms' account *in late 2005*, long after Hartzler had been engaging in fraudulent activities. The Wollesens had purchased products from West Central from other West Central representatives for years before West Central assigned Hartzler to Iowa Plains Farms' account.

(b) "Our records indicate the activity began in June 2006 and the last transaction between the individuals occurred in March of 2011." *See* (**EXHIBIT 22** at W0006158). The truth is: This false statement repeats Hartzler's May 2011 sworn statement. West Central's own records demonstrate that the alleged 2006 bribe never took place.

(c) "[I]t appears that this is a very limited issue between one of our former employees and a member and their related parties." *See* (**EXHIBIT 22** at W0006162). The truth is: As explained *supra*, Hartzler's theft and fraud spanned several accounts over several years, and he was allowed to engage in ongoing unlawful conduct.

**M. Stroburg Uses Town Hall Meetings to Further Advance the Scheme.**

167. West Central holds annual "town hall meetings" for its members. Those meeting typically take place in April of each year. Upon information and belief, because Hartzler's resignation had been coordinated and planned, when Hartzler resigned in 2011, those meetings already had been scheduled for the two weeks immediately following his resignation, so that Stroburg could advance false information to further advance the unlawful purposes identified *supra* in paragraph 150.

168. In May 2011, after the Lawsuit was filed, Stroburg personally attended and spoke at eight town hall meetings, where he repeated unlawful, misleading, and false information prepared by Wixted Pope for purposes of his use at those meetings.

169. The purpose of the information provided at the meetings was not to accurately inform West Central's members of what Hartzler had done and how he was allowed to do it, but rather to falsely place blame on the Wollesens as a "scapegoat," in order to "maintain stakeholder confidence," so that the Officers and Directors (other than Chesnut) would not be removed from their positions based on their varying acts and degrees of malfeasance related to their mismanagement, knowledge and concealment of Hartzler's unlawful conduct. *See* (**EXHIBIT 22** at W0006165).

170. At the town hall meetings, Stroburg made several false and untrue statements for purposes of furthering the fabricated association between Hartzler and the Wollesens. *See* (**EXHIBIT 28**). The false and misleading information was prepared for Stroburg's use by Wixted

Pope. Stroburg knew that such information was untrue and, upon information and belief, Wixted Pope knew that the information was false.

171. For example, Stroburg made the following false and untrue statements during the eight town hall meetings that were held in May 2011:

(a) "How much money is involved in the fraud? The fraud involves several million dollars. I cannot be more specific with regard to the amount since we are involved in legal proceedings…" (**EXHIBIT 28** at WESTCO018601). The reference to "several million" dollars refers to the $7.8 million amount falsely associated with Hartzler's actions and the Wollesens' alleged actions, rather than the $2.3 million that West Central actually booked for Hartzler's fraud.

(b) "Will the financial losses impact us next year? No. We booked all of our losses this year, so that moving forward we're able to continue with a clean slate." In fact, Mark Gardiner, Coen, Stroburg, Buss, and Weigel elected to use Hartzler's fraud to book unrelated losses stemming from mismanagement and to further inflate such losses for purposes of inflating future years' earnings.[7] (**EXHIBIT 28** at WESTCO018601).

(c) "Why wasn't someone watching? How could this have gone on? We've asked ourselves the same question. We have a very diligent and capable accounting department. Every year we have audits, with third-parties coming in and looking over our books. And no one was able to find this. It's disappointing. What we've learned, whether it's WC or another company, if someone' intent on stealing, they will find a way….." (**EXHIBIT 28** at WESTCO018601) (emphasis added). In fact, Gardiner

---

[7] This apparently was not an uncommon practice at West Central. For example, in his deposition for the Lawsuit, Ahrenholtz was forced to admit that he booked an improper reserve in December 2010 to smooth out future earnings. *See* (**EXHIBIT 31** at pp. 251 - 254).

Thomsen (through Gardiner and Weigel) and West Central (through Coen, Stroburg, Buss and the Audit Committee) had confirmed by at least January 2009 that Hartzler had engaged in widespread fraud and unlawful conduct, yet they worked in concert to conceal such knowledge for their benefits.

(d) "Why are the losses being booked in 2011? After talking with our banking partners and audit firm, we were able to book all losses in 2011. Management chose to go this route to put this event behind us and move forward." (**EXHIBIT 28** at WESTCO018601). In fact, Gardiner, Coen, Buss, Weigel and Stroburg booked losses unrelated to the fraud and booked a reserve to inflate future years' earnings.

(e) "How did the audit fail to find this? We were certainly disappointed the fraud did not show up in the audit, but that's not that unusual. It's typically hard for fraud to show up in auditing books, particularly fraud that's intricate…." (**EXHIBIT 28** at WESTCO018602). In fact, Stroburg, Weigel, Buss, Coen and the Audit Committee had confirmed by at least January 2009 that Hartzler was engaging in widespread fraudulent and unlawful conduct.

(f) "Why were you doing business with this farmer [Bill Wollesen] when he is notorious for unethical behavior? This individual lived on the edge of our trade territory; we didn't really know that much about him. However, he and our former employee [Hartzler] had a relationship and it was the former employee who brought the farmer in as a customer…" (**EXHIBIT 28** at WESTCO018602). In fact, Stroburg personally requested that the Wollesens be targeted as a customer in 2001, and he personally requested that an account be opened for them at that time. Bill Wollesen first

met Hartzler in the Fall of 2005, when West Central introduced him to Hartzler as the sales representative that had been assigned to Iowa Plains Farms' account.

(g) "I heard Chad [Hartzler] wasn't the best employee, so why was he in that position? Everyone has different work habits, and different habits work for different people. The agronomy division had been profitable for some time and we really had no reason to suspect anything illegal was taking place. ***If we knew he was a bad employee of [or?] stealing from us, he wouldn't have been employed with us***." (**EXHIBIT 28** at WESTCO018602) (emphasis added). In fact, Stroburg knew that Hartzler violated supplier rules as early as 2004, yet responded by promoting him repeatedly. Stroburg, Buss and the Audit Committee knew by December 2007 that Hartzler was suspected of engaging in fraud and illegal conduct, yet they did not remove him from his position. In January 2009, those same individuals, along with Coen and Weigel, confirmed that Hartzler had engaged in widespread fraud. Rather than being removed from his position, on February 2, 2010, Hartzler was promoted from Seed and Chemical Sales Manager to Director of Seed and Chemical Sales. See (**EXHIBIT 29**).

(h) "I think more people should be fired. How come executives weren't fired? While I can see you are angry and hurt, I wouldn't agree with your sentiment moving forward … our efforts have shown that this case of fraud didn't go to the executive level." (**EXHIBIT 28** at WESTCO018602). As explained elsewhere in this Complaint, that simply is not true. Hartzler's fraud was allowed to continue because of widespread malfeasance at the executive level.

172. Stroburg has admitted that he used the town hall meetings to call the Wollesens, "thieves." (**EXHIBIT 25** at pp. 420:20 – 421:2). Stroburg also has admitted that he falsely told

the members of West Central that the Wollesens owned a house in Las Vegas (which is not true), even though, according to Stroburg, he has no idea whether that statement is true. Stroburg's statement concerning land ownership in the "sin city" obviously was aimed to falsely link the Wollesens with Hartzler, an admitted gambling addict. (*Id*. at pp. 82:24 – 83:8).

### N. Gardiner Thomsen, West Central, and Other Defendants Use Hartzler's Theft to Conceal Unrelated Losses.

173. According to Hartzler, his theft using Iowa Plains Farms' account totaled at most $2.5 million. *See* (**EXHIBIT 7** at p. 127). That is the amount of restitution that Hartzler agreed to pay to West Central in the criminal action against Hartzler, that was brought in this Court.

174. West Central recorded an approximately $2.3 million loss for Hartzler's "fraudulent activity." *See* (**EXHIBIT 23** at Gardiner 09870).[8]

175. Mark Gardiner cooperated, participated in, and jointly made—along with Weigel (who then worked for West Central), Stroburg, Coen, and Buss—the decisions concerning the adjustments that would be made to West Central's financial statements in May 2011, following Hartzler's resignation. Gardiner Thomsen's role went beyond that of a typical auditor, as it sat alongside the remaining individuals and made accounting entries for purposes of further concealing the Officers' and Directors' malfeasance that was unrelated to Hartzler or the Wollesens. Those financial decisions included entries that were made to fraudulently inflate West Central's earnings in subsequent years, while artificially increasing the losses that Defendants would falsely associate with Hartzler and the Wollesens for 2011. By way of

[8] The $2.3 million amount represented items that were in consignment as of the date of Hartzler's resignation. That amount included the difference between (i) the prices that Hartzler had agreed on behalf of West Central to sell products to Iowa Plains Farms, and (ii) inflated prices he had entered into West Central's systems─prices the Wollesens did not agree to pay and would not have agreed pay, given that they could procure the same or substantially equivalent products for approximately the agreed upon prices elsewhere.

example, the aforementioned individuals decided to write off and take a loss for the entire $2.5 million balance that existed in West Central's rebate accrual, even though the aforementioned individuals knew that amounts within that balance had been confirmed and were valid. As such, the decision to take a $2.5 million write-off *necessarily* would inflate future years' earnings, and Mark Gardiner was forced to admit as much during his deposition.

176. Stroburg, Mark Gardiner, Coen, Buss, and Weigel knowingly, intentionally and falsely associated an additional $5.5 million in losses (including the abovementioned $3.5 million loss) with Hartzler and the Wollesens, for purposes of concealing theirs and others malfeasance.

177. Mark Gardiner, Stroburg, Buss, Coen, and Weigel decided to book losses that were unrelated to Hartzler's fraud, and in some instances not warranted, for purposes of using Hartzler's admitted theft to conceal losses that were unrelated to his conduct, including the $3.5 million amount discussed *supra*. The losses were also intended to, and did, have the effect of improperly increasing future years' agronomy earnings. As a result, West Central booked losses totaling approximately $7.8 million in 2011—all of which West Central publicly associated with Hartzler and the Wollesens—when the extent of Hartzler's actual theft was approximately $2.3 million. *See* (**EXHIBIT 23**).

178. Immediately after participating in the decisions to make the accounting entries described in the prior paragraph and reflected on **EXHIBIT 23**, including entries that Gardiner Thomsen knew would inflate future years' earnings, Gardiner Thomsen then audited those entries, supposedly as an "independent" auditor.

179. The fraudulent and incorrect accounting entries identified in the preceding two paragraphs have affected and continue to affect subsequent financial statements, which are transmitted through the mail and wires to State and Federal agencies.

180. As described, *supra*, Stroburg falsely reported at the aforementioned town hall meetings that the losses from the alleged conspiracy between Hartzler and the Wollesens totaled $7.8 million.

181. On June 23, 2011, West Central held its annual meeting for its members. As he did every year, Stroburg informed West Central's membership that its financial statements had been audited without issue. The meeting was held at Hilton Coliseum in Ames, Iowa. Stroburg again used Hartzler's fraud to hide unrelated losses, for purposes of concealing the malfeasance of management that was wholly unrelated to Hartzler. Stroburg was reported as having stated the following:

> West Central, he said, "was a victim of fraud." An employee had been stealing from the company for some time, the theft was discovered, the employee is gone and West Central is seeking the lost funds, and the company took over a $7 million one-year write-off to cover the losses, hence the big loss in agronomy.

*See* (**<u>Exhibit 24</u>**). Of course, that was false, and Stroburg knew it was false.

182. Upon information and belief, the additional $5.5 million that was falsely associated with Iowa Plains Farms represented: (1) approximately $2.0 million in losses from a seed-condition contract with Stine Seeds that were wholly unrelated to Iowa Plains Farms, and

(2) the $3.5 million amount explained *supra*. These losses were unrelated to Hartzler or any malfeasance by Hartzler.

**O. The Unlawful Lien**

183. Upon information and belief, the Defendants realized that if the Wollesens had the financial resources to adequately defend themselves against the false accusations being levied against them in the Lawsuit, then, *inter alia*: (i) Gardiner Thomsen's, the Audit Committee's, Stroburg's, Coen's, and Buss's prior knowledge of Hartzler's unlawful conduct and conspiracy to conceal such knowledge could potentially be revealed; and (ii) the Officers and Directors' malfeasance that was falsely being associated with Hartzler and the Wollesens would be revealed. West Central, by and through the Officers and Directors, accordingly set out to financially destroy the Wollesens. The purpose was, *inter alia*, to further conceal those schemes.

184. Iowa Plains Farms had prepaid for its 2011 inputs.

185. After Hartzler's April 30, 2011 resignation, West Central refused to deliver any more products to Iowa Plains Farms, including products that it had prepaid for in December 2010 for its 2011 crops. Iowa Plains Farms' 2011 crops accordingly were the product of supplies obtained from sources other than West Central.

186. In September 2011, West Central filed a lien against Iowa Plains Farms' 2011 crops.

187. Iowa Plains Farms had not executed a UCC-1 statement in favor of West Central, or otherwise authorized any such lien.

188. Iowa Plains Farms had expressly refused any credit privileges at West Central. *See* (**EXHIBIT 2**).

189. There was no proper basis for West Central to file a lien against Iowa Plains Farms' 2011 crops.

190. Iowa Plains Farms' bank, which provided a revolving line of credit for its operations, had already properly created and perfected a first-priority lien in Iowa Plains Farms' 2011 crops, the proceeds of which totaled $1.57 million.

191. Iowa Plains Farms challenged the validity of this improper and unlawful lien, and West Central improperly used the judicial process to delay the inevitable outcome that the lien would be ruled unlawful and set aside. West Central also included a cause of action in the Lawsuit related to its improper lien and seeking to foreclose on its improper lien.

192. West Central fully exhausted the judicial process until it was resolved in early 2014.

193. West Central's position had no legal basis, and it was motivated to force the Wollesens to incur substantial financial harm. Among other things, the Officers and Directors hoped to bankrupt the Wollesens, so they would be financially unable to defend themselves from the baseless allegations levied against them in the Lawsuit, and through the public relations barrage.

194. West Central also contacted the third-party, DFS, Inc. ("DFS"), to which Iowa Plains Farms sold its 2011 grain, and West Central directed DFS to issue the check for Iowa Plains Farm's grain to both "Iowa Plains Farms" and "West Central Cooperative." West Central Cooperative then refused to endorse the checks, thereby depriving Iowa Plains Farms of the proceeds of its 2011 crops for more than two years.

195. After West Central had fully-exhausted all of its appellate rights (at great cost to West Central, and costs that were incurred for purposes of advancing the personal interests of the Officers and Directors, rather than West Central), the Story County court finally directed West

Central to endorse the checks. Iowa Plains incurred substantial financial and emotional injury based upon West Central's unlawful conduct, including both general and special damages.

**P. Other Hartzler Customers Come Forward.**

196. The Wollesens were not the only one of Hartzler's assigned customers for which he: (i) entered into agreements for a specific quantity and price; and then (ii) entered a different price into West Central's books and records.

197. In or about June 2011, Hunter Farms (West Central's second largest agronomy customer, after Iowa Plains Farms) received a statement from West Central, which reflected a price higher than the one set forth in a written agreement between Hunter Farms and West Central (acting through Hartzler). *See* (**EXHIBIT 43** at pp. 353 – 359).

198. Just as the Wollesens had done, Hunter Farms approached West Central and provided a copy of the written agreement that West Central had executed through Hartzler. *See* (*id.*); *see also* (**EXHIBIT 52**) (prices Hartzler agreed to provide to Hunter Farms).

199. West Central, by and through Defendants Stroburg, Coen, and Buss, agreed to honor the written agreement, even though it differed from the prices that Hartzler had entered into West Central's system.

200. Upon information and belief, West Central, by and through Stroburg, Coen, and Buss, agreed to honor the agreement that differed from the one Hartzler had entered on West Central's system, because they knew that if it became known that Hartzler's conduct was linked to additional accounts and individuals (*i.e.*, Hunter Farms, Paul Mears, Danny Newell, Dale Carlson, etc.), it would undercut the fabricated bribe story that had been concocted and disseminated. As noted repeatedly in the materials prepared by Wixted Pope, the goal was to falsely state that the fabricated bribe was an "isolated incident," in order to distract from and conceal from Defendants' malfeasance.

**Q. West Central and Gardiner Thomsen Submit Improperly Audited Financial Statements to State and Federal Agencies and then Backdate Documents, In An Attempt to Conceal Their Actions.**

201. Iowa Administrative Code § 50.82 sets forth the information that an agricultural cooperative association, such as West Central, must file when the cooperative issues notes or other types of indebtedness. It provides as follows:

> If, after the anniversary date of its initial notice filing, an agricultural cooperative association continues to issue notes or other evidence of indebtedness under its initial notice filing in order to maintain the exemption, the agricultural cooperative association shall on an annual basis file with the administrator an audited balance sheet and any other audited financials within 30 days of the anniversary of its initial notice filing.

*See id.* § 50.82(2).

202. The Code makes clear that audited materials must be prepared in accordance with "generally accepted accounting principles." *See id.* § 50.82(1)(*d*).

203. The United States Warehouse Act likewise requires that cooperatives with outstanding debt, such as West Central, obtain annual audited financial statements, which are audited in conformance with generally accepted accounting principles. Such financial statements and the associated unqualified opinion are then required to be submitted to the Farm Service Agency's Kansas City, Missouri office within ninety days of the end of the cooperative's fiscal year.

204. The purpose of requiring audited financial statements is to protect the members of those cooperatives and other individuals engaging in business with those cooperatives.

205. Generally accepted accounting principles *require* that an "independent auditor obtain written representations from management as a part of an audit of financial statements." *See* American Institute of Certified Public Accountants ("AICPA"), U.S. Auditing Standards,

*Management Representations,* AU § 333.01 (Nov. 21, 2013). The written representations from management must include statements regarding, *inter alia*:

> i. Knowledge of fraud or suspected fraud affecting the entity involving (1) management, (2) employees who have significant roles in internal control, or (3) others where the fraud could have a material effect on the financial statements.
>
> j. Knowledge of any allegations of fraud or suspected fraud affecting the entity received in communications from employees, former employees, analysts, regulators, short sellers, or others.

AICPA, U.S. Auditing Standards at AU § 333.06(i), (j).

206. The written representations must be made as of the date of the auditor's report. *See* AICPA, U.S. Auditing Standards at AU § 333.09. Any refusal by management "to furnish written representations constitutes a limitation on the scope of the audit sufficient to preclude an unqualified opinion and is ordinarily sufficient to cause an auditor to disclaim an opinion or withdraw from the engagement." *See id.* at § 333.13.

207. West Central is required to submit its audited financial statements to State and Federal agencies 90 days following the end of its fiscal year, which typically would be the last week of April. In 2011, upon information and belief, because Hartzler's resignation was orchestrated and planned, West Central had requested a thirty-day extension from each agency, making the statements due at the end of May 2011. West Central's audit report for fiscal year ending January 31, 2011 was due to the Iowa state grain department and USDA's FSA office by no later than May 31, 2011 (120 days following its fiscal year end).

208. West Central and its CEO, Jeff Stroburg, were aware of these regulations and its need to comply. Mr. Stroburg testified as follows during his April 9, 2013 deposition:

> Q. West Central had a regulatory deadline for its financial statements, and that deadline was May 27th, 2011; correct?

A. It's a certain number of days, 90 days, after the end of the fiscal year. That would be approximately right, yes.

Q. And why does West Central have a regulatory deadline if it's not an SEC corporation?

A. Because we have a state grain license.

Q. So under the state grain license, West Central has a deadline to submit its audited financials within 90 days of the end of the fiscal year?

A. Yes.

Q. And May 27th, 2011, West Central needed to have its financial statements audited, correct, or it would have faced repercussion from the state licensing agency?

A. Actually, I suppose it would have been more like 120 days. I'm not sure exactly what the time frame is, but the time frame relates to our grain license.

*See* (**<u>Exhibit 25</u>** at pp. 506:6 – 507:4).

209. Mark Gardner confirmed during his April 22, 2013 deposition that West Central's deadline was 120 days, because it had received a one-month extension:

Q. Which regulatory agencies were West Central's audited financials issued to before Gardiner Thomsen had received the management representation letter?

A. The USDA and IDA.

***

Q. Was there some sort of deadline or reason that the financial statements were given to them?

A. Yes. We had filed an extension. Their covenant is ninety days after their fiscal year-end, so that would make it that they would have to receive the audit report by April 30. You can file one extension, which gives you another month.

Q. Who's "they"?

A. The USDA and IDA, the warehouse division.

Q. So both of those entities, one a state entity and one a federal entity, require financial statements being filed within ninety days of fiscal year-end?

A. Yes.

***

Q. And then by the expiration of that one-month extension, Gardiner Thomsen still did not have a signed management representation letter from West Central or Westco?

A. That is correct.

*See* (**EXHIBIT 16** at pp. 72:14 – 73:25).

210. Stroburg further testified that West Central asked its auditors to release its financial statements on May 27, 2011, in order to comply with that deadline, and Gardiner dutifully complied:

Q. And West Central met that deadline, correct?

A. Yes.

Q. West Central was able to submit its audited financial statements on May 27, 2011, even though it didn't have issued a signed management representation letter?

A. The auditors released that.

Q. West Central asked them to release it?

A. Yes.

(**EXHIBIT 25** at p. 507:5-21). West Central, by and through Stroburg, Coen and Ginder, asked Gardiner Thomsen, P.C. and Mark Gardiner to release the financial statement, even though a management representation letter had not been issued. *See* (**EXHIBIT 16** at p. 316).

211. On May 27, 2011, Gardiner Thomsen, P.C., by and through Mark Gardiner, sent West Central's "audited" financial statements, along with an unqualified opinion, from its Des Moines, Iowa office, using the mails, to the Iowa Grain Department (Des Moines, Iowa) and to the USDA's FSA office in Kansas City, Missouri. The financial statements were sent to

further the scheme to hide and conceal knowledge of Hartzler's ongoing theft and otherwise improper behavior. Mark Gardiner testified during his deposition that he released the financial statements, because not doing so it would have had a "devastating" impact on West Central, even though he knew that a management representation letter is a requirement to issuing an unqualified opinion. *See* (**EXHIBIT 16** at pp. 314-315). As an "independent" auditor, that is not the standard Gardiner Thomsen was charged with applying.

212. At the time that West Central directed Mark Gardiner to release its "audited" financial statements, West Central had not provided ***any*** management representation letter, as required for financial statements to be audited in accordance with generally accepted auditing standards. Mr. Stroburg has admitted this:

> Q. But there was no management representation letter [on May 27, 2011 when West Central's financial statements were sent to state and federal regulators]?
>
> A. That's right.

*See* (**EXHIBIT 25** at p. 508:3-5).

213. Because obtaining the written representations of management is a requirement of the U.S. Auditing Standards, and because those representations had not been made by West Central's management as of the date of the auditors' report, the financial statements submitted to the USDA and state grain department were not audited "in accordance with auditing standards generally accepted in the United States of America" as asserted in the Independent Auditors Report of Gardiner Thomsen, P.C. dated May 27, 2011. *See* (**EXHIBIT 26**).

214. On July 14, 2011—more than a month-and-a-half after West Central's financial statements had been released—Coen sent a draft management representation letter to Gardiner Thomsen, P.C. *See* (**EXHIBIT 27**). The "updated" letter tellingly remove the following language:

> ~~We confirm that we are responsible for the fair presentation in the consolidated financial statements of the financial position, results of operations, and cash flows in conformity with generally accepted accounting principles. We are also responsible for adopting sound accounting policies, establishing and maintaining internal control, and preventing and detecting fraud.~~
>
> * * *
>
> ~~6. We acknowledge our responsibility for the design and implementation of programs and controls to prevent and detect fraud.~~

*Id.*

215. The proposed letter also included language that was not contained in prior years' representation letters:

> We have made you fully aware of the fraud perpetrated by an employee, resulting in a petition having been filed against such employee and others in Story County.
>
> 7. Except as made known to you, we have no knowledge of any allegations of fraud or suspected fraud affecting the company received in communications from employees, former employees, regulators, or others.
>
> We have made you fully aware of the fraud perpetrated by an employee, resulting in a petition having been filed against such employee and others in Story County.

*Id.* Upon information and belief, West Central, by and through its members of the board of directors that were not Participants (as that term is defined below), wanted West Central to pursue litigation against Gardiner Thomsen, P.C. because they were not aware that both Gardiner Thomsen *and West Central* knew about Hartzler's fraud years earlier. Those directors sought to revise the management representation letter for purposes of such anticipated litigation, which was never brought, because, *inter alia*, it would have revealed the previous knowledge of Hartzler's malfeasance and could not have been successful, given West Central's participation in Gardiner Thomsens' improper and unlawful conduct.

216. In a July 18, 2011 email from Coen to Mark Gardiner, copying Linda Buss, Stroburg, Tom Polking and John Gerken, Coen stated:

> You indicated that if we did not add back in the language that we had proposed for deletion, that you would have to 'pull' our audit, which had been previously filed with our state regulatory authorities. I'm sure you are aware of the potentially devastating business impact that would have upon West Central.
>
> In view of this, enclosed please find a revised management representation letter, we believe in the form required.

*See* (**EXHIBIT 30**).

217. On July 18, 2011, West Central's management (Stroburg, Coen and Buss) signed the management representation letter, with the additional language that Mr. Coen had added concerning Mr. Hartzler's alleged fraud, but without the deletions that Mr. Coen had sought following the release of the "audited" financial statements.

218. However, the aforementioned individuals fraudulently back-dated the letter to May 27, 2011. *See* (**EXHIBIT 30**). As previously discussed, management representation letters are to be dated as of the date of the auditor's report. They certainly should bear the date that they actually were signed. West Central's management representation letter did not exist on the date that the "Independent Auditors' Report" was issued by Gardiner Thomsen.[9]

219. An auditor's report should not be dated earlier than the date on which the auditor has obtained sufficient appropriate audit evidence to support the opinion. *See* AICPA, U.S. Auditing Standards, *Audit Documentation*, at AU § 339.23. Delays in releasing the report may require the auditor to perform additional procedures to comply with the "subsequent events" requirements of the U.S. Audit Standards. *Id*. As a required element of a financial statement audit pursuant to U.S. Auditing Standards, Gardiner Thomsen, P.C. did not have sufficient audit evidence to support its Independent Auditors' Report dated May 27, 2011.

---

[9] The work papers produced by Gardiner Thomsen, P.C. in the Lawsuit do not include a FYE 2011 management representation letter for Westco.

220. Tellingly, Gardiner Thomsen, P.C.'s work papers for the fiscal year ended January 31, 2011 audit do not include any correspondence between West Central and Gardiner Thomsen, P.C. after the May 27, 2011 date, including the July 14, 2011 or July 18, 2011 emails referenced above. Instead, and for purpose of furthering the fraudulent scheme, the audit papers include only a signed copy of the "May 27, 2011" letter. *See* (**EXHIBIT 56**).

221. Stroburg was presented the "May 27, 2011" management representation letter during his deposition. Before being shown the above-referenced emails that establish the incorrect date on the letter, Stroburg was given an opportunity to reveal the backdating. When asked whether he knew that the document was not signed on May 27, 2011, Mr. Stroburg falsely responded that he "didn't know that to be true." He also committed perjury to further conceal the fraudulent scheme by categorically denying knowledge of the July 14 and 18, 2011 emails discussed above, even though he was a recipient of each such emails:

Q. ***Now, in fact, there were discussions between West Central and Gardiner Thomsen going into July 2011 concerning this letter. Are you aware of that?***

A. ***No.***

Q. In fact, this letter hadn't been signed on May 27, 2011; is that correct?

A. I don't know that to be true.

*See* (**EXHIBIT 25** at p. 480:5-12) (emphasis added).

222. As reflected in **EXHIBIT 30**, there were, in fact, discussions between West Central and Gardiner Thomsen going into July 2011 concerning the management representation letter, and Stroburg was included in those discussions. Stroburg knew the "May 27, 2011" management representation letter was not signed on May 27, 2011. Stroburg's perjury was committed to further the scheme to conceal knowledge of Hartzler's ongoing illegal conduct.

223. Mr. Stroburg himself admits that it is improper to back-date documents:

Q. And in what context would it be okay or consistent with West Central's core values to back-date a document?

A. If the document was actually signed and executed on a particular date, you'd want to put the proper date on there.

*See* (**EXHIBIT 25** at p. 15:7-12).

224. Back dating the management representation letter, in which Gardiner, Stroburg, Coen and Buss were complicit, is unlawful under Iowa Code 715A.2(b) and undertaken to further the fraudulent scheme to conceal knowledge of Hartzler's fraud and illegal conduct.

225. The "May 27, 2011" management representation letter issued to Gardiner Thomsen also falsely states that West Central's management, "ha[d] made you fully aware of the fraud perpetrated by an employee, resulting in a petition having been filed against such employee and others in Story County." *See* (**EXHIBIT 30**). However, while Gardiner Thomsen had known for years about Hartzler's ongoing and widespread unlawful and fraudulent conduct, West Central apparently never disclosed several instances of fraud by Hartzler that it had discovered at that time, including, *e.g.*, (i) agreements with other customers that Hartzler had reached that were not reflected on West Central's books and records and discovered after Hartzler's resignation (*i.e.*, Hunter Farms), and (ii) other instances where Hartzler had admitted stealing products from West Central for resale for his personal benefit (*i.e.*, Dale Carlson).

226. In August 2014, the Wollesens wrote to the Officers and Directors (other than Coen and Chesnut) and demanded that they withdraw the improperly filed financial statements. In August 2015, the Wollesens wrote to Gardiner Thomsen and requested that it immediately withdraw improperly filed audit opinions from State and Federal records. *See* (**EXHIBIT 32**); (**EXHIBIT 33**) (copies of said letters, exclusive of exhibits referenced therein). To date, financial statements that were improperly filed for 2008 onward have not been withdrawn.

227. For fiscal year 2012, Mark Gardiner was removed from the West Central engagement and replaced by his brother, Dennis Gardiner. Gardiner Thomsen, P.C. continues to serve as West Central's auditor (and the auditor of the newly-merged successor entity), and it continues to issue audit opinions that are based, in part, on its prior incorrect audit reports. Because each audit necessarily relies upon prior years' work, and the scope must be significantly altered and expanded if no such reliance is used, Gardiner Thomsen, P.C. also continues to issue unqualified audit opinions for financial statements that it knows have been unlawfully inflated based on improper accounting entries in which it participated.

**R. Gardiner Thomsen's 2012 Audit Identifies Malfeasance by Messrs. Stroburg and Ahrenholtz.**

228. As part of its audit of West Central's financial statements for the fiscal year ending January 31, 2012, Gardiner Thomsen (Dennis Gardiner) interviewed Mike Abdiltrup ("Abdiltrup"), then the Executive Vice President of Operations for West Central. Dennis Gardiner reported as follows:

> **The interview lasted over one hour. Mike was very candid with me during the interview. As we spoke about the fraud from last year, he indicated a lot of frustration that he and others suspected that something was going on in agronomy sales. The problem was swept aside as accounting issues by Harry, previous EVP of Agronomy and others in management. He is not aware of any other fraud or suspected fraud. He feels that the current controls in place are effective (price differential reports, etc). He further expressed that there is no complaining about the sales being put on the books ("deals") this year, whereas, in the past, that was common.**
>
> **As we spoke about his impression of his and the other members of management and the board's "tone at the top" (integrity/ethics, etc) he said they were "poor". He expressed that Jeff Stroburg has no integrity. He went on to say that morale was at an all time low for the company. He felt that there was frustrations at the locations and said that he felt the accounting staff were the worst, morale wise. He thought this was due to their proximity to management. Mike even went on to say that Board President Delbert Christenson did not have the respect of members and employees.**

*See* (**EXHIBIT 34**).

229. Stroburg subsequently learned of Abdiltrup's candid comments, and he responded by terminating Abdiltrup from his position at West Central.

230. From 2006 until shortly following Hartzler's resignation in 2011, Stroburg served as the CEO of both West Central and also of a company named Renewable Energy Group, Inc.

("REG"). West Central was based in Ralston, Iowa, and REG was based in Ames, Iowa. Other West Central employees reported to Gardiner Thomsen that Stroburg was "never around" and that "Jeff [Stroburg] has spent a lot of time working on the REG stock investment; and previously served as its CEO at the same time he was CEO of WCC." *See* (**EXHIBIT 34**). Stroburg received a grant of 140,000 options for REG stock (with a strike price of $0) when REG went public in February 2012. Those shares, which are publicly traded, are worth over $1 million. Stroburg continues to serve as the Chairman of the Board for REG and he continues to receive substantial compensation and other advantages based on that position, including lavish trips.

**S. Hartzler Changes His Story.**

231. West Central, through the Officers and Directors, had confirmed the falsity of Hartzler's May 2011 "bribe story" by at least February 2012, when it sought to amend its petition in the Story County action to remove its previous allegation that a cash bribe occurred in "June or July 2006." *See* (**EXHIBIT 35** at 2d. Am. Pet, ¶ 39).[10]

232. West Central's motion seeking leave to amend its petition failed to identify this critical change or otherwise alert the Court or the Wollesens of the change. Instead, West Central's attorneys represented to the Court and the Wollesens in the motion that "discovery has also revealed the number and amount of personal payments made by the Wollesen defendants to Chad Hartzler are more numerous and greater than originally known." *See* (*id.*). West Central and its attorneys simultaneously refused to provide the Wollesens with copies of Hartzler's sworn statements, remarkably claiming privilege over the sworn statements of Hartzler, West

[10] The Second Amended Petition was verified by Kathy Sporrer. At trial in the Lawsuit, West Central presented Thielen as its corporate representative on issues relating to the alleged bribes.

Central's adversary in the Lawsuit. West Central refused to provide the sworn statements, because it did not want the Wollesens to realize that Hartzler had changed his story.

233. On March 28 and 29, 2013, the Wollesens deposed Hartzler in the Lawsuit. When asked whether the Wollesens bribed him, Hartzler responded, "I never said—that was never my word, 'bribe'…" *See* (**EXHIBIT 3** at pp. 292:24 – 293:4). Hartzler also confirmed that he no longer alleged that he received a cash payment from the Wollesens in 2006. *See* (**EXHIBIT 36** at pp. 386:25 – 387:3), and he also testified that direct payments to sales representatives, such as the ones he fraudulently solicited from the Wollesens to perpetrate his theft from West Central and the Wollesens, are not uncommon. (*Id*. at pp. 366:24 – 367:2).

234. During his March 28 and 29, 2013 deposition, Hartzler instead testified that a cash payment was given to him by Bill Wollesen in June *2005*, rather than June or July *2006*. (**EXHIBIT 36** at pp. 386 – 387). Hartzler again testified that the alleged bribe was to reduce a bill outstanding for seed*bean*, although Hartzler again could not explain: how he supposedly lowered any bill; why any such bill would have existed for a prepay customer; or why he would have been at the Wollesens' house, since he had not yet been assigned to their account at that time. (*Id*. at p. 387:22-24; p. 411:7-18). According to Hartzler, Bill Wollesen gave him $2,000 in cash to lower an outstanding bill for seed*bean* from $23/bag to $17/bag. *See* (**EXHIBIT 3** at p. 25:13-16, **EXHIBIT 3** at p. 338:11-23).

235. Hartzler's revised story is demonstrably false. *Inter alia*, Iowa Plains Farms *prepaid* $105,000 for 6,000 bags of seedbean in January 2005. *See* (**EXHIBIT 37**). Thus, Iowa Plains Farms already had prepaid for its seedbean at $17.50/bag, and it still had a prepay balance into and through June 2005. *See* (**EXHIBIT 38**); (**EXHIBIT 39**).

236. In addition, while Hartzler testified that he received a check for the $15,000 owed to West Central at the time of the alleged cash bribe (the remainder after he supposedly lowered the $20,000 that was owed to $15,000), West Central's owns records demonstrate that Iowa Plains Farms did not provide any check to West Central in or around June 2005.

**T. West Central Rejects Hartzler's Demonstrably False Explanation and Fabricates a Different, Demonstrably False Explanation.**

237. Because both of Hartzler's "stories" are false, West Central rejected both of Hartzler's alleged "bribe stories" at trial in the Lawsuit. West Central instead presented a different, yet likewise demonstrably false, explanation of the alleged bribe. Thielen, West Central's corporate representative, testified that her explanation was her "best guess." Stroburg directed Thielen to develop an explanation, and that is exactly what she did, even if it did not make sense and was demonstrably false.

238. West Central and the Officers and Directors (other than Chesnut) continued to pursue the Lawsuit, despite knowing that: (i) both of its chief witness' alleged explanations of a cash payment were demonstrably false, and (ii) according to their chief witness, cash payments to agronomy representatives such as those solicited by Hartzler from the Wollesens are "probably common." They did so for improper purposes.

239. Upon information and belief, West Central has spent more than $6 million to pursue the Lawsuit against the Wollesens, a patently unreasonable amount, requiring the Wollesens to incur millions of dollars of legal fees and costs. West Central spent this amount at the direction of the Officers and Directors, because they were using the Lawsuit for improper purposes.

**U. West Central's Unlawful Expulsion of Iowa Plains Farms.**

240. Trial in the Lawsuit originally was scheduled to begin in June 2013.

241. On June 6, 2013, Stroburg sent a certified letter to Iowa Plains Farms, stating in pertinent part:

> This letter is to notify you that at the West Central Cooperative Board meeting held on May 21, 2013, the directors unanimously determined that Iowa Plains Farms should be expelled from membership in West Central Cooperative, and its common stock cancelled.

*See* (**EXHIBIT 40**). The letter did not identify the specific members of the board that had voted.

242. Chapter 499.18 of the Iowa Code provides: "The directors may expel any member [of a cooperative organized under Chapter 499] if the member … has willfully violated any article or bylaw which provides for such penalty."

243. West Central Cooperative's Amended Articles of Incorporation, as amended (attached as **EXHIBIT 41**), provide as follows:

> Section 3. Expulsion. The directors may expel any member who has willfully violated any article or bylaw which provides for such penalty.

244. Iowa Plains Farms has never willfully violated any article or bylaw providing for expulsion from West Central, and the voting members of West Central's board knew that at the time of the expulsion vote, or would have known that if they had discharged their fiduciary duties. West Central's purported expulsion of Iowa Plains Farms and purported cancellation of its common stock violated West Central's Articles of Incorporation and Iowa Code Section 499, and it was taken solely for tactical reasons in the Lawsuit, which itself was pursued by the Officers and Directors (other than Chesnut) for their personal interests.

245. Tellingly, while West Central and its counsel repeatedly argued at trial in the Lawsuit that Iowa Plains Farms was the only member to have been expelled, remarkably, to this day, Danny Newell—a member of West Central who Hartzler testified was a "bookie" and for whose benefit Hartzler stole from both the Wollesens and West Central to satisfy illegal

gambling debts—remains a member of West Central, and, upon information and belief, West Central has not taken any legal action against Mr. Newell.

246. In August 2015, as West Central and Farmers Cooperative Company apparently were discussing their anticipated merger, the Wollesens received a letter from Farmers Cooperative, notifying them that Iowa Plains Farms was being expelled based on its failure to make adequate purchases from Farmers Cooperative. *See* (**EXHIBIT 65**). Upon information and belief, Iowa Plains Farms was expelled because Farmers Cooperative and West Central realized that its anticipated merger would have resulted in Iowa Plains Farms becoming a member in the newly-merged entity, which they sought to prevent.

### V. The Jury Rightfully Concludes That the Wollesens Did Not Engage in Any Wrongdoing.

247. The trial in the Lawsuit began on July 8, 2014, and it concluded on August 5, 2014. On August 7, 2014, the jury reached its verdict, through special interrogatories, that the Wollesens did not: (i) bribe Hartzler; (ii) engage in any conduct that they knew or had reason to know violated Hartzler's duties to West Central; (iii) engage in any unlawful or improper conduct; and/or (iv) engage in any willful conduct directed towards West Central. The jury instead awarded Iowa Plains Farms $576,189 in damages on its counterclaims for breach of contract and fraud related to the products that West Central refused to deliver in 2011 after Hartzler's resignation.

248. The Wollesens subsequently demanded that the Officers and Directors (other than Messrs. Chesnut, Coen and Ginder, who were no longer affiliated with West Central) reinstate Iowa Plains Farms as a member in West Central Cooperative and reimburse them for lost amounts during the period of improper exclusion. *See* (**EXHIBIT 32**).

249. The Officers and Directors have refused to reinstate Iowa Plains Farms or provide any reimbursement.

**W. Stroburg's Resignation.**

250. In August 2014, following the jury's verdict, the Wollesens wrote the Officers and Directors and demanded, *inter alia*, that Stroburg be removed from his position for, *inter alia*, backdating West Central's 2011 management representation letters. *See* (**Exhibit 32**).

251. In the fall of 2014, Stroburg was forced to resign from West Central by those Officers and Directors who were not part of the unlawful scheme to hide and conceal Hartzler's known theft and fraud.

252. The Officers and Directors falsely portrayed the circumstances surrounding his departure, to further conceal Stroburg's and their malfeasance.

253. The Officers and Directors (other than Chesnut), through West Central's Director of Communications, Alicia Clancy, falsely announced publicly that Stroburg had "retired." *See* (**Exhibit 49**).

254. The "retired" Stroburg then immediately began a full-time position as the CEO of Southern States Cooperative in Richmond, Virginia. Upon information and belief, Stroburg's new position was obtained by individuals and entities that he benefited through the expansion of West Central's agronomy business.

**X. West Central Continues to Disseminate False and Misleading Information.**

255. West Central and its agents continue to state and otherwise publish false and misleading information concerning the Wollesens. For example and without limitation, at a West Central meeting with members in 2015, Milan Kucerak, the CEO of West Central, referred to Bill Wollesen as a "crook" and falsely stated that he had conspired with Hartzler to defraud West Central.

**COUNT I**
**MALICIOUS PROSECUTION**

256. The Wollesens incorporate herein by reference the allegations contained in paragraphs 1 through 255 and the exhibits attached hereto as though set forth in their entirety.

257. This Count is brought by the Wollesens against the Defendants (except Chesnut, Gardiner Thomsen, P.C., and Daniel Mark Gardiner).

258. As to Wixted Pope, this action is brought for aiding and abetting and conspiracy to undertake malicious prosecution.

259. The motivation for pursuing the Lawsuit was, *inter alia*, to distract from the Officers and Directors' improper management, as well their repeated malfeasance, including: the concealment of Hartzler's known malfeasance; actions rewarding Hartzler for breaking West Central's rules over the years; and failures to take appropriate action in response to repeated knowledge and warnings concerning Hartzler's unlawful conduct.

260. The Lawsuit was not based upon probable cause.

261. Hartzler's "cash bribe story" was and remains demonstrably false, and direct payments are common in the agronomy business. West Central and its counsel knew that direct payments are common before it initiated the Lawsuit, and its chief witness further confirmed this information when deposed.

262. The Lawsuit was brought for improper motives and with malice by the respective Defendants.

263. The respective Defendants knew there was no probable cause, and that the Lawsuit was being pursued against the Wollesens for improper purposes.

264. The respective Officers and Directors authorized the Lawsuit and caused it to be filed and continued for their benefits, to the detriment of the Wollesens.

265. While the Lawsuit was brought in the name of Westco, it was authorized by the respective Officers and Directors in their capacities as directors of West Central Cooperative, and undertaken on its behalf.

266. West Central Cooperative was the appropriate party for any such claims that were pursued in the Lawsuit, and the Officers and Directors approved the Lawsuit in their capacity as officers and directors of West Central Cooperative.

267. Since the lawsuit was filed, West Central has dissolved Westco.

268. If necessary, the Wollesens are entitled to pierce the corporate veil to assert any claims for malicious prosecution otherwise attributable to Westco against West Central Cooperative.

269. The respective Defendants also engaged in malicious prosecution through their assertion of a Count in the Lawsuit that they were entitled to foreclose on a lien on Iowa Plains Farms' crops. There likewise was no probable cause for such cause of action, and it was pursued for improper purposes.

270. The improperly filed and pursued Lawsuit, including the unlawful lien asserted therein, resulted in millions of dollars of special and other damages to the Wollesens.

271. The improperly filed lien was undertaken for improper purposes, without probable cause, and with malice against Iowa Plains Farms.

272. As to Wixted Pope, this Count is brought for aiding and abetting the malicious prosecution of the remaining Defendants.

273. The improperly filed and pursued Lawsuit, including the unlawful lien asserted therein, resulted in millions of dollars of special and other damages to the Wollesens.

**COUNT II**
**UNLAWFUL EXPULSION & UNLAWFUL REFUSAL TO REINSTATE**

274. The Wollesens incorporate herein by reference the allegations contained in paragraphs 1 through 273 and the exhibits attached hereto as though set forth in their entirety.

275. This count is brought by Iowa Plains Farms against West Central Cooperative, Farmers Cooperative Company, and the Offices and Directors (other than Chesnut).

276. Iowa Plains Farms could only be expelled from West Central Cooperative upon a proper determination that it willfully undertook certain specified improper actions.

277. Iowa Plains Farms did not willfully undertake any such improper actions, and the respective Officers and Directors knew, or should have known, that Iowa Plains Farms had not undertaken any such actions when they voted to expel Iowa Plains Farms.

278. The purpose of Iowa Plains Farms' expulsion was to aid trial strategy for the improperly pursued Lawsuit.

279. At a minimum, the respective Officers and Directors were required to wait until the conclusion of trial in the Lawsuit to undertake any such action, and then, only if the jury had found Iowa Plains Farms liable, which it did not.

280. The respective Officers and Directors also deprived the Wollesens of adequate due process before making their improper decision to expel Iowa Plains Farms.

281. The expulsion and cancellation of Iowa Plains Farms' stock was unlawful and improper, and it violated the written agreement between West Central Cooperative and Iowa Plains Farms, as reflected in West Central Cooperative's bylaws.

282. As a result of West Central Cooperative's cancellation of Iowa Plains Farms' stock, Iowa Plains Farms' reasonable expectation to receive fair value for its shares and distributions therefrom has been denied, without justification.

283. Following the Jury's determination in the Lawsuit, the respective Defendants were required to reinstate Iowa Plains Farms.

284. West Central, through the respective Officers and Directors, has refused to reinstate Iowa Plains Farms or provide them with the dividends and other amounts owed for the period of unlawful expulsion, and it has done so to further the schemes otherwise identified herein.

285. The expulsion of Iowa Plains Farms was *ultra vires* and has no legal effect.

286. The expulsion by Farmers Cooperative was pre-textual, unlawful, and pursued to further the malicious and improper motives of West Central.

287. In addition to damages, Iowa Plains Farms requests preliminary and permanent injunctive relief that the unlawful expulsion had no effect, and that Iowa Plains has been a member of West Central at all times since April 2007, or, in the alternative, immediately reinstating Iowa Plains Farms as a member and shareholder of Farmers Cooperative Company at the same level Iowa Plains Farms would have had if neither WCC nor or Farmers Cooperative had unlawfully cancelled Iowa Plains Farms's interests.

**COUNT III**
**BREACH OF FIDUCIARY AND OTHER DUTIES**

288. The Wollesens incorporate herein by reference the allegations contained in paragraphs 1 through 287 and the exhibits attached hereto as though set forth in their entirety.

289. This Count is brought by Iowa Plains Farms against the Officers and Directors, Gardiner Thomsen, and Wixted Pope.

290. Each of the Officers and Directors owed fiduciary duties of care, good faith, and loyalty to West Central Cooperative and Westco.

291. Each of the Officers and Directors breached the duties of care, loyalty and good faith that they owed to West Central Cooperative and Westco.

292. Gardiner Thomsen and Wixted Pope aided and abetted and conspired with the Officers and Directors to breach fiduciary duties and other duties owed by the Officers and Directors to West Central Cooperative and Westco. Iowa Plains Farms was injured and damaged by such conduct in a manner that was unique from other members of West Central Cooperative.

293. The respective Defendants breaches of their fiduciary duties resulted in millions of dollars of damages to the Wollesens.

294. The damages suffered by Iowa Plains Farms from the above-referenced breaches of the fiduciary duties were unique to Iowa Plains Farms and not incurred by other members of West Central Cooperative.

295. Iowa Plains Farms contacted the Officers and Directors and demanded to be reimbursement for damages incurred. The Officers and Directors have refused.

**COUNT IV**
**ABUSE OF PROCESS**

296. The Wollesens incorporate herein by reference the allegations contained in paragraphs 1 through 295 and the exhibits attached hereto as though set forth in their entirety.

297. This Count is brought by the Wollesens against West Central Cooperative, Westco, and Farmers Cooperative.

298. Through the Lawsuit, West Central and Westco has and continues to use the legal process in an improper or unauthorized manner, and the Wollesens have suffered millions of dollars of damages as a result of the abuse.

299. West Central Cooperative filed an improper lien on Iowa Plains Farms' 2011 crops.

300. There was no legal basis under existing Iowa law, or any reasonable expansion of Iowa law, to file the improper lien.

301. West Central and its counsel knew West Central had no legal basis for filing the improper lien.

302. West Central filed the lien with improper motives, specifically to inflict financial harm on Iowa Plains Farms. West Central and it counsel then used the legal process, including numerous filings in Iowa courts, wherein it made meritless arguments that had no legal basis, all for the purpose of delaying the inevitable outcome that the improper lien would be removed and the subject funds released.

303. The use of legal process was improper and unauthorized.

304. Iowa Plains Farms incurred substantial damages as a result of West Central Cooperative's abuse of process, including, but not limited to, financial damages, attorneys' fees that are unique and identifiable from the other aspects of the Lawsuit, and severe emotional harm.

**COUNT V**
**TORTIOUS INTERFERENCE WITH**
**EXISTING AND PROSPECTIVE BUSINESS RELATIONSHIPS**

305. The Wollesens incorporate herein by reference the allegations contained in paragraphs 1 through 304 and the exhibits attached hereto as though set forth in their entirety.

306. This Count is brought by Iowa Plains Farms against West Central Cooperative, Farmers Cooperative Company, and Wixted Pope.

307. West Central Cooperative knew of existing contracts and potential business relationships between Iowa Plains Farms and third parties.

308. West Central Cooperative intended to and did, improperly and intentionally, interfere with certain of Iowa Plains Farms' existing contracts and prospective business relationships.

309. West Central Cooperative's improper interference caused existing contracts and prospective business relationships to fail.

310. Wixted Pope knowingly aided and abetted West Central Cooperative's tortious interference.

311. Iowa Plains Farms was damaged as a result of the improper conduct alleged in this Count.

**COUNT VI**
**BREACH OF FIDUCIARY AND OTHER DUTIES – GARDINER THOMSEN AND WIXTED POPE**

312. The Wollesens incorporate herein by reference the allegations contained in paragraphs 1 through 311 and the exhibits attached hereto as though set forth in their entirety.

313. This Count is brought by Iowa Plains Farms against Wixted Pope and Gardiner Thomsen. The claims in this Count, and unlike Count III, are brought against these defendants on account of the duties that they owed directly to West Central.

314. Wixted Pope owed fiduciary duties and duties of good faith and loyalty to West Central Cooperative and Westco.

315. Wixted Pope also aided and abetted breaches of fiduciary duties by the Officers and Directors.

316. Wixted Pope breached fiduciary duties and duties of good faith and loyalty that it owed to West Central Cooperative and Westco.

317. Gardiner Thomsen owed fiduciary duties and other duties of good faith and loyalty to West Central Cooperative and Westco.

318. Gardiner Thomsen breached fiduciary duties and duties of good faith and loyalty that it owed to West Central Cooperative and Westco. Such breaches resulted in damages to Iowa Plains Farms that were directly and proximately caused by such breaches, and Iowa Plains Farms has been injured in a way that is unique and not shard generally by West Central's members.

319. These breaches of fiduciary and other duties that are the subject of this Count resulted in specific and direct harm to Iowa Plains Farms.

320. The Wollesens suffered damages that are unique, separate and distinct from those suffered by West Central or its other members as a result of Gardiner Thomsen's and Wixted Pope's breaches of fiduciary and other duties.

321. Iowa Plains Farm suffered millions of dollars of damages as a result of the allegations in this Count.

**COUNT VII**
**CIVIL RICO, 18 U.S.C. § 1962(a), 1962(b), and 1962(c)**

322. The Wollesens repeat and reallege each of the allegations contained in paragraphs 1 through 321 and the exhibits attached hereto, as if fully set forth herein.

323. This Count is asserted against Gardiner Thomsen, P.C., Mark Gardiner, Timothy Weigel, Dennis Gardiner, Stroburg, Coen, Buss, Tronchetti, Ginder, and Chesnut (collectively, the "Participants").

324. The claim of federal RICO violation identified in this Count arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO").

325. At all relevant times, each of the Wollesens was a "person" within the meaning of RICO, Title 18 United States Code Sections 1961(3) and 1964(c), and each of the Participants

was a "person" within the meaning of RICO, Title 19 United States Code Sections 1961(3) and 1962(c).

326. At all times relevant to this Complaint, the Participants constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that is, a group of business entities or individuals associated in fact, which were engaged in, and the activities of which affected, interstate commerce and foreign commerce for unlawful purposes.

327. The function, purpose and goal of the unlawful enterprise was to conceal and hide the ongoing and known fraudulent and illegal conduct of Hartzler, as well as mismanagement of the business, which function, purpose, and goal was obtained through repeated, intentional felonious acts identified within 18 U.S.C. § 1961 and otherwise.

328. The enterprise was created in or about late December 2007, when RICO Defendants Stroburg, Buss, Chesnut, Tronchetti, Ginder, Gardiner Thomsen, P.C., and Mark Gardiner learned of Hartzler's unlawful and fraudulent conduct. Rather than discharging their respective duties at that time by terminating Hartzler, disclosing his conduct to his customers (including the Wollesens), and/or otherwise removing him from his position of trust within West Central, the Participants instead agreed and conspired to hide and conceal such information and knowledge for their personal benefits.

329. The enterprise is an association-in-fact enterprise, with an unlawful purpose (*e.g.*, to conceal the known fraud and illegal conduct of Hartzler); a relationship among those associated with the enterprise (explained *supra*); and a longevity over a period of years, allowing the Participants to pursue and carry out the enterprise's purpose.

330. Upon information and belief, in late December 2007, Stroburg directed: (i) Chesnut, Ginder, Tronchetti, and Buss, who were personally and financially aligned with

Stroburg through their appointment at West Central and other legitimate business activities; and (ii) Gardiner Thomsen, which has and continues to earn millions of dollars from their auditing and other accounting services that are provided to West Central, to conceal the known fraudulent conduct of Hartzler. These individuals agreed and conspired to do so.

331. Stroburg knew that if Hartzler's conduct was revealed, as one of his direct supervisors, such revelation: (i) would have reflected extremely poorly on him; (ii) could have revealed that he had previously rewarded Hartzler for violating West Central's and its supplier's rules; (iii) would have revealed the true state of Westco's agronomy division; (iv) would prevent Hartzler from growing West Central's agronomy sales for the benefit of third-parties; and (v) should have resulted in his immediate termination. Chesnut, Ginder, Tronchetti, and Buss knew that if they did not proceed in the manner with which they were directed, then they would be removed from their positions and face other adverse consequences. Gardiner Thomsen P.C. and Mark Gardiner knew that if they revealed Hartzler's fraud, failed to issue perfunctory and materially misleading audit opinions, or withdrew from representing West Central, they would lose not only the West Central engagement, but also services for other cooperatives in Iowa and the other states where Gardiner Thomsen, P.C. operates. Thus, each of the enterprise's initial Participants were personally motivated and benefitted personally from their participation in the unlawful enterprise.

332. Following the enterprise's creation in December 2007, the Participants concealed and hid Hartzler's known illegal acts and fraud for several years, through the repeated use of unlawful acts including, *inter alia*, mail fraud, wire fraud, falsification of business records, and perjury.

333. Coen joined West Central in July 2008. By at least January 2009, Coen learned of the enterprise and its unlawful purposes, and he became a member and Participant of the enterprise. In January 2009, Coen learned from Stroburg and Buss that Gardiner Thomsen had confirmed that Hartzler was engaging in widespread illegal and fraudulent conduct. *See* (**EXHIBIT 13**); (**EXHIBIT 11** at pp. 2721:24 – 2722:5). Following the orders and commands of Stroburg, Coen directed Gardiner Thomsen to cease any activities related to any investigation of Hartzler, for purposes of further concealing Hartzler's known and ongoing unlawful and fraudulent conduct. (*Id*.). Thereafter, Coen allowed Hartzler to continue his unlawful and fraudulent conduct, along with the remaining Participants, and he likewise undertook unlawful actions to conceal and hide such information and knowledge.

334. Coen ultimately was terminated by Stroburg in July 2011. Upon information and belief, Coen was terminated by Stroburg at that time, because he sent the above-referenced incriminating emails on July 14, 2011 and July 18, 2011, which documented unlawful activities of the enterprise. Upon information and belief, had Coen not created that paper-trail documenting what Stroburg already knew (*i.e.*, that Stroburg, Coen, and Ginder had directed Gardiner Thomsen to release West Central's "audited" financial statements on or about May 27, 2011, through the mails from Gardiner Thomsen P.C.'s office in Des Moines, Iowa to the USDA FSA office in Kansas City, Missouri and the Iowa grain department's office in Des Moines, Iowa, even though there was no management representation letter and he and others within West Central had not fully disclosed Hartzler's known fraud), Coen would not have been terminated.

335. On or about January 2, 2009, Weigel learned of the enterprise and its unlawful purpose, and he became a Participant of the enterprise. *See* (**EXHIBIT 12**). Thereafter, Weigel took steps to advance and the enterprise and its unlawful purpose.

336. Upon information and belief, in December 2011, Dennis Gardiner learned of the enterprise and its unlawful purpose, and he became a Participant of the enterprise. Thereafter, and as explained more-fully below, Dennis Gardiner agreed to, and has, take unlawful acts in furtherance of the unlawful and improper scheme to conceal and hide the known fraud and unlawful conduct of Hartzler through unlawful means.

337. At all relevant times, the Participants conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, Title 18 United States Code 1961(5), in violation of RICO, Title 18 United States Code Section 1962(c).

338. Each of the Participants participated in the operation and management of the unlawful enterprise. By way of example and without limitation, Gardiner Thomsen participated in the operation and management of the subject enterprise by, among other things: (i) identifying, causing, and making fraudulent accounting entries following Hartzler's resignation in May 2011, for purposes of improperly concealing unrelated losses, and (ii) knowingly taking intentional and affirmative steps to conceal Hartzler's confirmed theft, including, by way of example and without limitation, the issuance of unqualified audit opinions on or about May 30, 2008, May 29, 2009, April 30, 2010, May 27, 2011, May 30, 2012, that were fraudulent because, *inter alia*, they fraudulently stated that West Central's financial statements had been audited in accordance with GAAP, and they were based upon management representation letters which

Gardiner Thomsen knew falsely represented that no employees of West Central were known or suspected to have engaged in fraudulent activities.

339. By way of example and without limitation, the Defendants identified in this Count participated in the operation and management of the subject enterprise by, among other things: (i) falsifying business records of West Central on or about May 28, 2008, May 30, 2008, April 17,2009, May 29, 2009, April 30, 2010, May 12, 2011, July 18, 2011, May 1, 2012, and May 12, 2012, to falsely state that: (a) West Central and its management was not aware of any employee with management-level responsibility that had undertaken suspected or confirmed fraud, and (b) no employee had reported fraud; (ii) backdating business records to conceal malfeasance, (iii) creating false accounting entries for purposes of improperly concealing management's malfeasance in May 2011, including entries to inflate future years' earnings; (iv) signing and transmitting management representation letters through the mails and wires that were false and fraudulent; and (v) engaging in perjury during discovery in the Lawsuit in order to further conceal the unlawful enterprise, as described *supra*.

340. In addition to any legitimate transactions, the course of conduct of the unlawful enterprise included preparing false business records, using the mails and wires to further the fraudulent scheme, submitting false business records to State and Federal agencies outside the State of Iowa by use of the mails and wires.

341. The individual Participants undertook the specific unlawful conduct for purposes of concealing their own malfeasance. Gardiner Thomsen undertook the specific unlawful conduct for purposes of ensuring that it continued to collect fees from West Central and its other clients in the agronomy industry.

342. At all relevant times, Defendants engaged in "racketeering activity" within the meaning of Title 18 United States Code § 1961(1), by engaging in two or more of the acts set forth above and/or described below within a ten-year period. The acts set forth above and/or those identified herein below constitute a violation of one or more of the following statutes: Title 18 United States Code Section 1341 (mail fraud) and Title 18 United States Code Section 1343 (wire fraud).

343. As part of the Participants' fraudulent scheme and conspiracy, the Participants operated and managed the enterprise by engaging, *inter alia*, in the acts identified above and listed below. Each of the Participants either personally made the decision that the enterprise should engage in, among other things, the acts described above and below, or knowingly implemented the decision to engage in, among other things, such acts.

344. The fraudulent scheme to hide and conceal Hartzler's unlawful and otherwise fraudulent conduct through the use of ongoing unlawful means began in or around late December 2007 and continues to this day. In connection with defendant's scheme, the acts of racketeering activity have occurred after the effective date of the RICO statutes, 18 U.S.C. § 1961, *et seq*., and on numerous occasions over a substantial time period of approximately eight years and within ten years of each other. Defendants' conduct has involved and continues to pose a threat of long-term criminality. As a direct and proximate result of the scheme, the Wollesens have incurred injury within the United States.

345. As part of their pattern of racketeering activity, and in order to carry out or attempt to carry out the unlawful scheme and to further conceal such scheme once there was a threat it would be exposed, Defendants placed and/or or caused to be placed through their agents and representatives, in authorized depositories for mail, fraudulent material to be delivered by

the United States Postal Service or by a private or commercial interstate carrier according to the directions thereon, and/or took and received and caused to be taken and received from the mail or such carrier certain mail matter.

346. The pattern of racketeering engaged in by the Participants involved the previously alleged and related illegal schemes, including repeated mail fraud carried out from at least May 2008 to the present, and directed at and otherwise affecting the Wollesens, among others. Such pattern of racketeering includes, *inter alia*, in the knowing creation and issuance of fraudulent financial statements to State and Federal agencies using the mails.

347. Such unlawful use of the mails for the furtherance and concealment of the scheme included, but was not limited to, the following:

(a) On May 30, 2008, Stroburg and Jeffrey Goldstein, an Executive Vice President of West Central Cooperative, signed the management representation letter attached as **EXHIBIT 66**. Upon information and belief, they mailed or caused the letter to be mailed via U.S. mail from West Central's Ralston, Iowa headquarters to Gardiner Thomsen's Urbandale, Iowa headquarters on that same day.[11] The letter falsely and fraudulently stated that "[w]e have no knowledge of any fraud or suspected fraud affecting the company involving- a. Management, b. Employees who have significant roles in internal control, or Others where the fraud could have a material effect on the financial statements." In fact, Hartzler, a West Central Cooperative employee who was leased to Westco where he served in management roles and who was suspect to have perpetrated fraud and illegal conduct, filled each of the aforementioned categories. The

[11] Gardiner Thomsen's headquarters are located at 10555 New York Avenue, Urbandale, Iowa 50322. Certain correspondence at issue in this Action incorrectly identifies that location as being in "Des Moines." *See, e.g.*, **EXHIBIT 66**.

letter also falsely and fraudulently stated, "[w]e have no knowledge of any allegations of fraud or suspected fraud affecting the company received in communications from employees, former employees, regulators, others." In fact, and as documented by Tronchetti's December 5, 2007 email, West Central had received reports alleging fraud and theft by Hartzler by at least that date.

(b) On May 30, 2008, Gardiner Thomsen, P.C., by and through Mark Gardiner, signed and mailed an "Independent Auditors' Report for West Central Cooperative." *See* (**EXHIBIT 44**). The report was mailed from Gardiner Thomsen, P.C.'s Urbandale, Iowa office to both: (i) the USDA FSA office in Kansas City, Missouri, and (ii) the Iowa Department of Agriculture's Grain Warehouse Bureau's office in Des Moines, Iowa. The report falsely and fraudulently states that "we conducted our audits in accordance with auditing standards generally accepted in the United States of America." (*Id*.). In fact, Gardiner Thomsen and Mark Gardiner knew that they had failed to perform their audit in conformity with such standards. Beyond relying upon a management letter that they knew incorrectly stated that (i) West Central's management was not aware of any known or suspected fraud by any management-level employees; and (ii) West Central's management was not aware of reports of fraud by an employee, Gardiner Thomsen also had failed to take required and necessary steps to determine the extent and effects of such fraud, as required under generally accepted auditing standards. Moreover, the report states that West Central's financial statements were correctly stated, in all material respects, in accordance with generally accepted accounting standards. However, Gardiner Thomsen and Mark Gardiner knew that the extent of Hartzler's

fraudulent and unlawful conduct had not been identified, rendering it unable to make such a representation.

(c) On April 17, 2009, Westco, by and through Ahrenholtz, signed the management representation letter that is attached as **EXHIBIT 70**. Upon information and belief, Ahrenholtz mailed (or caused to be mailed) the letter that same day from West Central's Ralston, Iowa headquarters to Gardiner Thomsen, P.C.'s headquarters in Urbandale, Iowa. By and through the management representation letter, Westco falsely and fraudulently stated that "[w]e have no knowledge of any fraud or suspected fraud affecting the company involving – a. Management, b. Employees who have significant roles in internal controls, or c. Others where the fraud could have a material effect on the financial statements." *See* (**EXHIBIT 57** at Gardiner 15774). By and through the management representation letter, Westco falsely and fraudulently stated that "We have no knowledge of any allegations of fraud or suspected fraud affecting the company received in communications from employees, former employees, regulators or others." (*Id.*). In fact, as of that date, Westco had confirmed that Hartzler had engaged in widespread fraud and illegal conduct, and it had received reports by at least December 5, 2007 that Hartzler had engaged in fraudulent and unlawful conduct.

(d) On May 29, 2009, Stroburg and Coen signed the management representation letter attached as **EXHIBIT 69**. Upon information and belief, they mailed or caused the letter to be mailed via U.S. mail from West Central's Ralston, Iowa headquarters to Gardiner Thomsen's Urbandale, Iowa headquarters on that same day. The letter falsely and fraudulently stated that "[w]e have no knowledge of any fraud or suspected fraud affecting the company involving- a. Management, b. Employees who

have significant roles in internal control, or Others where the fraud could have a material effect on the financial statements." In fact, Hartzler, an employee who was then *confirmed* to have perpetrated widespread fraud and illegal conduct, filled each of the aforementioned categories. The letter also falsely and fraudulently stated, "[w]e have no knowledge of any allegations of fraud or suspected fraud affecting the company received in communications from employees, former employees, regulators, others." In fact, and as explained above, both Coen and Stroburg knew by at least January 2009 that Hartzler had engaged in widespread fraud using several of his accounts; Tronchetti had received reports of fraud involving Hartzler in December 2007; West Central employee, Bill Ruzicka, had reported fraud by Hartzler in December 2008; and West Central had received reports of fraud involving Hunter Farms by at least May 21, 2009.

(e) On May 29, 2009, Gardiner Thomsen, P.C., by and through Mark Gardiner, signed and mailed an "Independent Auditors' Report for West Central Cooperative." *See* (**EXHIBIT 45**). The report was mailed from Gardiner Thomsen, P.C.'s Des Moines, Iowa office to both (i) the USDA FSA office in Kansas City, Missouri and (ii) the Iowa Department of Agriculture's Grain Warehouse Bureau's office in Des Moines, Iowa. The report falsely and fraudulently states that "we conducted our audits in accordance with auditing standards generally accepted in the United States of America." (*Id*.). In fact, Gardiner Thomsen, Mark Gardiner and Weigel knew that they had failed to perform the audit in conformity with such standards. Beyond relying upon a management letter that they knew incorrectly stated that: (i) West Central's management was not aware of any known or suspected fraud by any management-level employees; and (ii) West Central's management was not aware of reports from employees of fraud,

Gardiner Thomsen also had failed to take required and necessary steps to determine the extent and effects of such fraud, as required under generally accepted auditing standards. Moreover, the report states that West Central's financial statements were correctly stated, in all material respects, in accordance with generally accepted accounting standards. However, Gardiner Thomsen, Mark Gardiner, and Weigel knew that the extent of Hartzler's fraudulent and unlawful conduct had not been identified, rendering it unable to make such a representation.

(f) On April 30, 2010, Westco, by and through Ahrenholtz, signed the management representation letter that is attached as **EXHIBIT 71**. Upon information and belief, Ahrenholtz mailed (or caused to be mailed) the letter that same day from West Central's Ralston, Iowa headquarters to Gardiner Thomsen, P.C.'s headquarters in Urbandale, Iowa. By and through the management representation letter, Westco falsely and fraudulently stated that "[w]e have no knowledge of any fraud or suspected fraud affecting the company involving – a. Management, b. Employees who have significant roles in internal controls, or c. Others where the fraud could have a material effect on the financial statements." *See* (**EXHIBIT 57** at Gardiner 15774). By and through the management representation letter, Westco falsely and fraudulently stated that "We have no knowledge of any allegations of fraud or suspected fraud affecting the company received in communications from employees, former employees, regulators or others." (*Id.*). In fact, as of that date, Westco had *confirmed* that Hartzler had engaged in widespread fraud and illegal conduct, and it had received reports in December 2007, December 2008 and May 2009 that Hartzler had engaged in fraudulent and unlawful conduct.

(g) On April 30, 2010, Stroburg, Coen, and Buss signed a management representation letter and mailed (or caused to be mailed) such letter via U.S. mail from West Central's Ralston, Iowa headquarters to Gardiner Thomsen's Urbandale, Iowa headquarters on that same day. The letter falsely and fraudulently stated that "[w]e have no knowledge of any fraud or suspected fraud affecting the company involving- a. Management, b. Employees who have significant roles in internal control, or Others where the fraud could have a material effect on the financial statements." In fact, Hartzler, an employee who was *confirmed* to have engaged in widespread fraudulent and illegal conduct, filled each of the aforementioned categories. The letter also falsely and fraudulently stated, "[w]e have no knowledge of any allegations of fraud or suspected fraud affecting the company received in communications from employees, former employees, regulators, others." In fact, West Central had received reports alleging fraud and theft by Hartzler by at least December 5, 2007, as well as subsequent reports from Bill Ruzicka in December 2008 and the aforementioned reports of fraud involving Hunter Farms in May 2009.

(h) On April 30, 2010, Gardiner Thomsen, P.C., by and through Mark Gardiner, signed and mailed an "Independent Auditors' Report for West Central Cooperative." *See* (**EXHIBIT 46**). The report was mailed from Gardiner Thomsen, P.C.'s Des Moines, Iowa office to both (i) the USDA FSA office in Kansas City, Missouri and (ii) the Iowa Department of Agriculture's Grain Warehouse Bureau's office in Des Moines, Iowa. The report falsely and fraudulently states that "we conducted our audits in accordance with auditing standards generally accepted in the United States of America." (*Id.*). In fact, Gardiner Thomsen and Mark Gardiner knew that they had

failed to perform their audit in conformity with such standards. Beyond relying upon a management letter that they knew incorrectly stated that (i) West Central's management was not aware of any known or suspected fraud by any management-level employees, and (ii) West Central's management was not aware of reports from employees of fraud, Gardiner Thomsen also had failed to take required and necessary steps to determine the extent and effects of such fraud, as required under generally accepted auditing standards. Moreover, the report states that West Central's financial statements were correctly stated, in all material respects, in accordance with generally accepted accounting standards. However, Gardiner Thomsen and Mark Gardiner knew that the extent of Hartzler's fraudulent and unlawful conduct had not been identified.

(i) On May 12, 2011, and in furtherance of the scheme to hide, conceal and distract from prior knowledge of Hartzler's fraudulent and unlawful conduct, Coen verified the *Petition and Jury Demand*[12] that was filed in the Lawsuit. Coen verified the pleading as follows: "I, on behalf of Westco Agronomy Company, LLC, certify under penalty of perjury and pursuant to the laws of the State of Iowa that the preceding is true and correct to the best of its knowledge and belief." The Verified Petition and Jury Demand parroted Hartzler's demonstrably-false allegation that Bill Wollesen gave a cash bribe to Hartzler in "June or July 2006." Coen either knew that such allegation was false, or he failed to confirm the accuracy and therefore falsely testified that such information was based upon the "best of Westco's knowledge and belief." Upon

[12] Westco requested a trial by jury for all of its claims in the original petition and each of following two amendments. Twenty days before trial, and after the deadline to file motions or amend its pleadings, Westco moved to further amend its petition, to limit the claims for which it requested a jury trial. The court overseeing the Lawsuit denied Westco's delinquent request.

information and belief, upon signing the verification, Coen caused an original copy of his false verification to be sent via the U.S. mails from Westco's Ralston, Iowa location to the offices of West Central's attorney in the Lawsuit, Nyemaster, Goode, PC, at 700 Walnut Street #1600, Des Moines, IA 50309.

(j) On May 12, 2011, and in furtherance of the scheme to hide, conceal and distract from prior knowledge of Hartzler's fraudulent and unlawful conduct, Stroburg sent or caused to be sent via U.S. Mail, from West Central's Ralston, Iowa offices, to each and every member of West Central Cooperative (other than the Wollesens) the letter that is identified *supra* and attached hereto as **EXHIBIT 21**. The letter falsely made misrepresentations for purposes of furthering the scheme, including, *inter alia*, that Stroburg and West Central had only recently discovered impropriety by Hartzler; Hartzler's conduct was "related to a select group of accounts and transactions and appear to be isolated"; and "we are both surprised and disappointed to learn of these issues." In fact, the Participants, including Stroburg, knew of Hartzler's widespread and fraud years earlier, and Hartzler's misuse of the Wollesens' account was *one example* of the exact conduct that the Participants knew of years earlier. With respect to the Wollesens, Stroburg and others knew by at least December 2010 that Hartzler was misusing the Wollesens' account and selling products to them for prices below West Central's stated costs.

(k) On May 25, 2011, and in furtherance of the scheme to hide, conceal and distract from prior knowledge of Hartzler's fraudulent and unlawful conduct, Coen verified Westco's *First Amended Petition and Jury Demand*[13] that was filed in the

[13] Westco again requested a jury trial for all of its claims.

Lawsuit. Coen verified the pleading as follows: "I, on behalf of Westco Agronomy Company, LLC, certify under penalty of perjury and pursuant to the laws of the State of Iowa that the preceding is true and correct to the best of its knowledge and belief." The Verified Petition and Jury Demand parroted Hartzler's demonstrably false allegation that Bill Wollesen gave a cash bribe to Hartzler in "June or July 2006." Coen either knew that such allegation was false, or he failed to confirm the accuracy and therefore falsely testified that such information was based upon the "best of Westco's knowledge and belief." Upon information and belief, upon signing the verification, Coen caused an original copy of his false verification to be sent via the U.S. mails from Westco's Ralston, Iowa location to the offices of West Central's attorney in the Lawsuit, Nyemaster, Goode, PC, at 700 Walnut St #1600, Des Moines, IA 50309.

(l) On May 27, 2011, Gardiner Thomsen, P.C., by and through Mark Gardiner, signed and mailed an "Independent Auditors' Report for West Central Cooperative." The report was mailed from Gardiner Thomsen, P.C.'s Des Moines, Iowa office to both (i) the USDA FSA office in Kansas City, Missouri and (ii) the Iowa Department of Agriculture's Grain Warehouse Bureau's office in Des Moines, Iowa. *See* (**EXHIBIT 72**). The report falsely and fraudulently states that "[w]e conducted our audits in accordance with auditing standards generally accepted in the United States of America." In fact, Gardiner Thomsen and Mark Gardiner knew that they had failed to perform their audit in conformity with such standards. They also knew that they had not received any management representation letter from West Central, as required to perform an audit in conformity with generally accepted auditing standards. Beyond relying upon a management letter that they knew incorrectly stated that West Central's management

was not aware of any known or suspected fraud by any management-level employees, Gardiner Thomsen had failed to take required and necessary steps to determine the extent and effects of such fraud, as required under generally accepted auditing standards. *See* (**EXHIBIT 47**). Moreover, the report states that West Central's financial statements were correctly stated, in all material respects, in accordance with generally accepted accounting standards. However, Gardiner Thomsen, PC and Mark Gardiner had participated in and made accounting entries that they knew were fraudulent and incorrect, and they also knew that the extent of Hartzler's fraudulent and unlawful conduct had not been identified.[14] The May 27, 2011 "audited" financial statements, when mailed to the government, included falsified business records done to further the purpose of hiding Hartzler's malfeasance and to hide losses resulting from

(m) On or about May 1, 2012, Westco, by and through Linda Buss, Treasurer of Westco, and J. Paul Konrad, the Executive Vice President of Agronomy, signed a management representation letter on behalf of Westco, which fraudulently stated that "[w]e have no knowledge of any allegations of fraud or suspected fraud affecting the accompany received in communications from employees, former employees, regulators or others." (**EXHIBIT 58**). The letter also falsely and fraudulently stated that "[w]e have no knowledge of any fraud or suspected fraud affecting the company involving – a. Management, b. Employees who have significant roles in internal control, or c. Others where the fraud could have a material effect on the consolidated financial statements." (*Id.*) In fact, Westco and the respective signatories were aware of fraud involving

[14] The audit work papers produced by Gardiner Thomsen, P.C. do not include a management representation letter from Westco for FYE Jan. 31, 2011. Upon information and belief, Gardiner Thomsen, PC never received any management representation letter from Westco.

Hartzler that had not been disclosed to Gardiner Thomsen, including, *inter alia*, the aforementioned fraud involving Dale Carlson and Danny Newell. Upon information and belief, the letter was mailed from West Central's Ralston, Iowa headquarters to Gardiner Thomsen, P.C.'s Urbandale, Iowa headquarters.

(n) On or about May 10, 2012, Jeff Stroburg, Rick Vanderheeden, and Linda Buss signed a management representation letter on behalf of West Central Cooperative, which falsely stated that West Central Cooperative had disclosed all suspected and/or known fraud involving any management-level employees or those with significant roles in internal controls, to Gardiner Thomsen P.C. *See* (**EXHIBIT 54**). Stroburg and Coen both were aware of confirmed fraud by Hartzler that had not been disclosed to Gardiner Thomsen, P.C., or its newly appointed engagement-lead, Dennis Gardiner. Upon information and belief, the signed management representation letter was sent via the U.S. mail from West Central's Ralston, Iowa headquarters to Gardiner Thomsen's Urbandale, Iowa headquarters on or about May 10, 2012.

(o) On or about May 30, 2012, Gardiner Thomsen, P.C., by and through Dennis Gardiner, signed and mailed an "Independent Auditors' Report for West Central Cooperative." The report was mailed from Gardiner Thomsen, P.C.'s Des Moines, Iowa office to both (i) the USDA FSA office in Kansas City, Missouri and (ii) the Iowa Department of Agriculture's Grain Warehouse Bureau's office in Des Moines, Iowa. The report falsely and fraudulently states that "we conducted our audits in accordance with auditing standards generally accepted in the United States of America." In fact, Gardiner Thomsen, P.C. and Dennis Gardiner knew that it had failed to perform its audit in conformity with such standards. Gardiner Thomsen, P.C. knew that, by relying upon

prior audits that were not performed in conformity with such standards, and failing to identify the extent of Hartzler's fraud, the 2012 audit likewise was not performed in accordance with such standards.

(p) Upon information and belief, on or about May 30, 2013, 2014, 2015 and 2016, Gardiner Thomsen P.C, by and through Dennis Gardiner, signed and mailed an "Independent Auditors' Report for West Central Cooperative." The reports were mailed from Gardiner Thomsen, P.C.'s Des Moines, Iowa office to both (i) the USDA FSA office in Kansas City, Missouri and (ii) the Iowa Department of Agriculture's Grain Warehouse Bureau's office in Des Moines, Iowa. The reports falsely and fraudulently state that "we conducted our audits in accordance with auditing standards generally accepted in the United States of America." In fact, Gardiner Thomsen and Dennis Gardiner knew that they had failed to perform the audit in conformity with such standards. Gardiner Thomsen and Dennis Gardiner knew that, by relying upon prior audits that were not performed in conformity with such standards, and failing to identify the extent of Hartzler's fraud, these audits likewise were not performed in accordance with such standards.

348. As part of their pattern of racketeering activity, and in order to carry out or attempt to carry out the fraudulent scheme once there was a threat it would be exposed, the Participants transmitted and/or caused to be transmitted, individually and/or through their authorized agents and representatives, by means of wire communication in interstate commerce, fraudulent writings, signs, signals, pictures and sounds, to wit, telephonic, fax and electronic mail transmissions.

349. The following are examples of such transmissions, using the wires and traveling interstate through such wires, which were directed and/or received by the Participants in furtherance of the unlawful scheme:

(a) On May 21, 2008, Wesco, by and through its Executive Vice President and Board Chairman, signed a management representation letter to Gardiner Thomsen, P.C. and Mark Gardiner. *See* (**EXHIBIT 57**). The letter was sent via facsimile on May 22, 2008. By and through the management representation letter, Westco falsely and fraudulently stated that "[w]e have no knowledge of any fraud or suspected fraud affecting the company involving – a. Management, b. Employees who have significant roles in internal controls, or c. Others where the fraud could have a material effect on the financial statements." (*Id.* at Gardiner 15774). By and through the management representation letter, Westco falsely and fraudulently stated that "We have no knowledge of any allegations of fraud or suspected fraud affecting the company received in communications from employees, former employees, regulators or others." (*Id.*). Upon information and belief, and as indicated on the facsimile stamp, the facsimile was sent to Gardiner Thomsen's Urbandale, Iowa headquarters from facsimile number 651-765-7182. Upon information and belief, the facsimile was sent from Agriliance LLC's headquarters at 5500 Cenex Drive, Inver Grove Heights, MN 55077, and it therefore crossed State lines, using the wires, for purposes of furthering the unlawful scheme.

(b) On July 18, 2011, Coen sent, via email from his office at West Central's Ralston, Iowa headquarters, the fraudulently back-dated "May 27, 2011" management representation letter. The fraudulent letter, intentionally backdated to falsely appear as

though it existed at the time the financial statements were released as described above, was received by Mark Gardiner on that same day in his office in Urbandale, Iowa. The email and its fraudulent content (*i.e.*, a management representation letter dated incorrectly and which fraudulently stated that West Central had disclosed all of the known instances of fraud by Hartzler) was sent in order to further and progress the enterprise's scheme to conceal Hartzler's unlawful and fraudulent conduct and the enterprise Participants' prior knowledge of such conduct. Upon information and belief, the email crossed interstate lines following its transmission, and before its receipt, by the individuals identified as recipients on said document.

350. Each transmission described above was, on information and belief, in furtherance of the fraudulent scheme or to conceal or otherwise hide the scheme, and had the same or similar purpose, results, participants, and victims.

351. Upon information and belief, each Participant had specific knowledge that the mails and wires were being utilized in furtherance of the overall purpose of the scheme to defraud, and/or it was reasonably foreseeable that the mails and wires would be used in connection with the furtherance of the scheme.

352. The frequency and number of acts of mail and wire fraud demonstrate that the use of the mail and/or interstate wire communication in violation of 18 U.S.C. §§ 1341 and 1343 was and is an ongoing and continuing pattern and practice of the Enterprise. Gardiner Thomsen has and will continue to issue fraudulent audit reports to State and Federal agencies using the mails.

353. The Participants also undertook other unlawful conduct to further the scheme. For example, and as explained *supra*, on April 9, 2013, Stroburg committed perjury during his April 2013 deposition by categorically denying the July 2011 communications relating to the

backdated management representation letter and by falsely denying knowledge that the "May 27, 2011" management representation letter was not signed on that date. On May 12 and 25, 2011, Coen committed perjury by signing false verifications the petitions that were filed on those dates. On April 22, 2013, Mark Gardiner falsely testified that he was not aware of improprieties involving Hunter Farms' account, when he had confirmed by at least January 2009 that Hartzler had delivered products and services to Hunter Farms, for which West Central had not received any payment.

354. Moreover, as discussed *supra*, Gardiner Thomsen, Mark Gardiner, Weigel, Stroburg and Buss intentionally falsified business records by making accounting entries in May 2011 that they knew were false and necessarily would inflate future years' earnings. Such entries were intended to conceal mismanagement into the limited information concerning Hartzler that was disclosed, for purposes of further concealing the Participants' prior knowledge and other management malfeasance.

355. The Participants were aware, or had knowledge of, *inter alia*, the essential nature and scope of the enterprise, and each knowingly intended to and did participate in the enterprise and scheme. Specifically, the Participants were aware that the objective of the enterprise was to hide and conceal Hartzler's unlawful and fraudulent conduct and the Participants' knowledge of such conduct, as well as mismanagement of the company.

356. Each of the Participants acted with the intent to deprive the Wollesens of their property and engaged in a scheme or artifice to defraud, as that term is defined in 18 U.S.C. § 1346.

357. The acts alleged are related to each other by virtue of common participants, common victims, common methods of commission, common purpose and common results.

358. The illegal enterprise is ongoing. Gardiner Thomsen has and continues to participate in the unlawful enterprise in exchange for payments, and its knowledge that if it did not participate in the unlawful enterprise, it would no longer receive such fees from West Central and other clients. The remaining Defendants engaged and/or continue to engage in such conduct for purposes of retaining their employment. Upon information and belief, following Stroburg's departure on January 31, 2015, Tronchetti has and continues to serve as the leader of the enterprise, directing the remaining Participants, and she assumed the role of Chairman of the Board, *inter alia*, to ensure that she would have the power and ability to undertake such role.

359. As a direct and proximate result of the violation of Title 18 United States Code Sections 1962(a)c, 1962(b), and 1962(c) by the Participants, the Wollesens have been injured within the United States and have incurred millions of dollars of damages.

360. The Wollesens have suffered an injury to their business or property within the United States within the meaning of 18 U.S.C. § 1964, by the actions of defendants in violation of 18 U.S.C. § 1962(c).

361. The Wollesens relied upon the fraudulent and unlawful transmissions identified above and were proximately damaged as a result of such reliance. Hartzler was assigned by West Central to handle Iowa Plains Farms' West Central account and otherwise manage business with the Wollesens. The Wollesens understood that he was required to and would follow West Central's rules and engage in business transactions with them in a lawful, ethical and proper manner. Had Hartzler been removed from his position (or his conduct otherwise disclosed) when his unlawful and fraudulent conduct was discovered in late December 2007, then the Wollesens would have ceased conducting business with or through Hartzler.

362. West Central proudly advertises to its members annually that it has received audited financial statements. The Wollesens, like other members of West Central Cooperative, were aware since at least December 2007, that West Central obtained unqualified audit opinions on an annual basis. For this reason, Wixted Pope developed the untrue responses identified above for Stroburg to provide to West Central Cooperative's members when they asked why the audit failed to identify Hartzler's conduct. Gardiner Thomsen knows that West Central reports that it has received unqualified audit opinions at its annual meetings. For example, Gardiner Thomsen, P.C. identifies disclosure at West Central's annual meetings as one of the objectives for its audit services:

> Ascertain the reporting objectives of the engagement to plan the timing of the audit and the nature of communications required.
>
> ***Filing deadline with the USDA of 90 days after fiscal year end. Annual Meeting for the cooperative is in Mid-June.***

(**EXHIBIT 53**).

363. The Wollesens have incurred distinct and new injuries within the four-year period preceding the filing of this Action. *Inter alia,* in order to further conceal the unlawful enterprise, in the Fall of 2012, when the Wollesens sought materials from Gardiner Thomsen for use in the Lawsuit through a validly-issued subpoena, Gardiner Thomsen refused to provide any materials unless and until the Wollesens paid the hourly rates of accountants in order to print work-papers. Upon information and belief, Gardiner Thomsen did so with the intent and purpose of preventing the Wollesens from obtaining information that would reveal the enterprise. The Wollesens ultimately were coerced to pay such amounts in December 2012, and seek such amounts through this Action. The Wollesens also have lost rental farm land as a result of the enterprise, and

subsequent steps taken following the Lawsuit, which was pursued, *inter alia*, to pursue the unlawful scheme giving rise to this Count.

364. The Wollesens also are entitled to damages and trebling of its damages, and an award of its attorneys' fees and costs to bring this action pursuant to Title 18 United States Code Section 1964(c).

365. The Wollesens are entitled to have any applicable statute of limitations equitably tolled, and the Participants should be equitably estopped from asserting the statute of limitations as a defense, for any injuries incurred prior to the period beginning four years before this Action was filed.

366. The Wollesens diligently worked to discover their injuries and the acts giving rise to them. The Participants, the other Defendants, and their representatives implemented an orchestrated scheme to prevent the Wollesens from discovering such information. As a result, it was not until July 2014, when the Wollesens first learned such information. And, if the knowledge of their attorney (who was removed from the Lawsuit over the Wollesens' objections on April 29, 2013—the first business-day following the conclusion of the depositions in the Lawsuit) is imputed to the Wollesens, then such knowledge first occurred on April 22, 2013, when Mark Gardiner was deposed in the Lawsuit.

367. The documents giving rise to questions concerning the scheme in said deposition were not provided by Gardiner Thomsen, P.C. until March 2013, when (several months after its initial production and deadline to respond to the subpoena pursuant to which they were produced), Gardiner Thomsen P.C. produced the documents attached as **EXHIBIT 68**.

368. The Wollesens pray for judgment as hereinafter set forth.

**COUNT VIII**
**<u>RICO CONSPIRACY, 18 U.S.C. § 1962(d)</u>**

369. The Wollesens repeat and reallege each of the allegations contained in paragraphs 1 through 368 and the exhibits attached hereto, as if fully set forth herein.

370. As set forth in Count VII, the Participants associated with and comprised an enterprise within the meaning of RICO, Title 18 United States Code Section 1961(4), and conducted or participated, directly or indirectly, in the conduct of the unlawful enterprise's affairs through a pattern of racketeering activity within the meaning of RICO, Title 18 United States Code Section 1961(5), in violation of RICO, Title 18 United States Code Section 1962(c).

371. At all relevant times, each of the Participants was associated with the unlawful enterprise and knowingly agreed and conspired to violate Title 18 United States Code Section 1962(c), by either agreeing to the commission of numerous predicate acts of mail/wire fraud or other felonious acts, as described above, or agreeing to the enterprise's overall objective of fraudulently hiding and concealing the known unlawful and fraudulent conduct of Hartzler, in violation of 18 U.S.C. §1962(c).

372. The Wollesens have been injured within the United States by the actions of the Participants as a direct and proximate result of the RICO violations described above by, *inter alia*, the loss of millions of dollars in prepaid monies provided to West Central, the loss of rental agreements and associated profits, and amounts they were forced to pay to Gardiner Thomsen for purposes of its attempt to deprive the Wollesens of information from which they might discover the scheme at issue, thus constituting an injury to the Wollesens' business or property within the meaning of 18 U.S.C. §1964.

373. The Wollesens are entitled to damages in an amount to be determined at trial. The Wollesens also are entitled to treble damages, and their attorneys' fees and costs to bring this action pursuant to Title 18 United States Code Section 1964(c).

374. Any applicable statute of limitations should be equitably tolled and the Participants should be estopped from asserting the statute of limitations as a defense, as explained above in Count VII.

375. The Wollesens pray judgment as hereinafter set forth.

**COUNT IX**
**ONGOING CRIMINAL CONDUCT, IOWA CODE CHAPTER 706A**

376. The Wollesens incorporate herein by reference the allegations contained in paragraphs 1 through 375 and the exhibits attached hereto as though set forth in their entirety.

377. This Count is brought against Gardiner Thomsen, P.C., Mark Gardiner, Coen, Buss, Stroburg, Ginder, Tronchetti, Weigel, and Chesnut. The Defendants to this action have undertaken several, repeated unlawful acts on an ongoing basis for purpose of furthering and advancing their improper scheme to conceal and hide Hartzler's fraud and to otherwise conceal and hide their own malfeasance.

378. For example, and in furtherance of such common goals:

(a) Coen, Buss, and Stroburg did, for a period of several years, sign management representation letters that they knew were false.

(b) Ginder, Tronchetti and Chesnut knew that such representations were false, and they knowingly conspired with and aided and abetted the unlawful conduct of the other Defendants identified in this Count.

(c) Gardiner Thomsen has for a period of at least seven years, and continues to, annually issue improper audit opinions and submit those unlawful audit opinions with State and Federal agencies using the mails and/or wires.

(d) Stroburg and Mark Gardiner committed perjury to further the unlawful scheme explained and identified more fully above in Count VII.

(e) Stroburg, Coen, Buss, Weigel, Gardiner Thomsen, PC and Mark Gardiner made false business entries, aimed at concealing their knowledge of Hartzler's fraud, malfeasance unrelated to Hartzler, and to improperly hide unrelated losses with Hartzler's disclosed malfeasance at the time it was disclosed.

379. The Defendants named in this Count worked together to advance their unlawful and joint goal of concealing and hiding their knowledge of Hartzler's fraud and unlawful conduct, and each of the Defendants undertook unlawful conduct in furtherance of the scheme.

380. Iowa Code 706A.2.4 provides that it "is unlawful for a person to commit specified unlawful activity as defined in section 706A.1."

381. Iowa Code 706A.1.5 provides that "'Specified unlawful activity' means any act, including any preparatory or completed offense, committed for financial gain on a continuing basis, that is punishable as an indictable offense under the laws of the state in which it occurred and under the laws of this state."

382. Iowa Code § 714.8 makes it a felony to, among other things, "[m]ake[] any entry in or alteration of any public records, or any records of any corporation, partnership, or other business enterprise or nonprofit enterprise, knowing the same to be false."

383. Iowa Code § 715A.2(b) makes it a felony to, "[m]ake[], complete[], execute[], authenticate[], issue[], or transfer[] a writing so that it purports to be the act of another who did

not authorize that act, or so that it purports to have been executed at a time or place or in a numbered sequence other than was in fact the case, or so that it purports to be a copy of an original when no such original existed."

384. Gardiner Thomsen has engaged in violations of Iowa Code 706A.1 and Iowa Code 706A.2 by engaging in ongoing acts that are indictable under Iowa law, including, among other things, engaging in ongoing felonious "fraudulent practices" and illegal forgery. *See* Iowa Code §714.8.4; §715A.2(1)(b).

385. Gardiner Thomsen, P.C. also violated Iowa Code 706A.2(5) by negligently empowering Mark Gardiner to facilitate specified unlawful activity, including, but not limited to ongoing felonious fraudulent practices.

386. Gardiner Thomsen, PC, Mark Gardiner, Stroburg, Coen and Buss violated Iowa Code 715A.2(b) through their unlawful backdating of West Central Cooperative's "May 27, 2011" management representation letter.

387. Iowa Code 720.2 provides that "[a] person who, while under oath or affirmation in any proceeding or other matter in which statements under oath or affirmation are required or authorized by law, knowingly makes a false statement of material facts or who falsely denies knowledge of material facts, commits a class "D" felony…." Mark Gardiner and Stroburg violated Iowa Code 720.2 through their perjury in furtherance of the improper scheme.

388. The Wollesens have been damaged and injured as a direct and proximate result of the respective Defendants' specified unlawful activity on an ongoing basis, including its repeated preparation of fraudulent business records and submission of false business records to State and Federal agencies and their use of specified unlawful conduct to conceal their knowledge of

Hartzler's theft and fraud, for the personal benefit and advancement of the interests of the Defendants named in this Count.

389. The Wollesens are entitled to recover three-fold their actual damages, and the cost and expenses of investigation and prosecution of this action, including reasonable attorneys' fees and costs pursuant to Iowa Code Section 706.3(7), and all equitable relief as allowed under Iowa Code 706A, including injunctive relief requiring Gardiner Thomsen to withdraw its unlawful audit opinions from State and Federal agencies.

390. Upon filing, a copy of this filed Complaint will be submitted promptly via certified mail to the Iowa Attorney General, as required under Iowa 706A.3.10.

**COUNT X**
**FRAUDULENT MISREPRESENTATION**

391. The Wollesens incorporate herein by reference the allegations contained in paragraphs 1 through 390 and the exhibits attached hereto as though set forth in their entirety.

392. This Count is brought by the Wollesens against Gardiner Thomsen.

393. For the entire period of time at issue, Gardiner Thomsen has known that its audited financial statements were used by West Central annually for purposes of its grain licensure; that West Central annually reported to its members that it obtained audited financial statements; and that West Central annually notified its members that it had obtained unqualified audit opinions.

394. Gardiner Thomsen's work papers recognize that the audit and West Central's results are discussed at, and necessary for, West Central's annual meeting, which typically is held in mid-June of each year:

> Ascertain the reporting objectives of the engagement to plan the timing of the audit and the nature of communications required.
>
> > ***Filing deadline with the USDA of 90 days after fiscal year end. Annual Meeting for the cooperative is in Mid-June.***

(**EXHIBIT 53**). Moreover, the materials prepared by Wixted Pope for West Central's use following Hartzler's resignation included false and misleading responses, to be provided when members inquired about why West Central's audit failed to identify Hartzler's fraud, because West Central knows and understands that its members know it receives annual audited financial statements and they rely upon them in conducting business with West Central.

395. Gardiner Thomsen knew and foresaw that its unqualified audit opinions would be relied upon by the Wollesens.

396. The Wollesens were members of classes for which the subject "audited" financial statements were intended to benefit.

397. West Central and Gardiner Thomsen knew that West Central's members, including the Wollesens, relied upon Gardiner Thomsen's unqualified audit opinions.

398. The Wollesens were aware that West Central received audited financial statements each year, and that the audit opinions were unqualified.

399. The Wollesens reasonably relied on Gardiner Thomsen's unqualified audit opinions in electing to conduct business with West Central, including the purchases they made through Hartzler.

400. The Wollesens reasonably relied upon the fraudulent misrepresentations made by Gardiner Thomsen in its audit opinions for West Central during the subject fiscal-years 2008, 2009, and 2010, and specifically its "unqualified" opinions.

401. Had Gardiner Thomsen's and West Central's knowledge of Hartzler's fraud been disclosed; had Gardiner Thomsen failed to issue an unqualified opinion based upon the management representation letters that it knew were false; and/or had Gardiner Thomsen withdrawn from its role as auditor, then the Wollesens would have ceased their business conduct with or through Hartzler.

402. In each of its audit opinions, Gardiner Thomsen provided an unqualified audit opinion, and it represented and warranted that such opinion was based upon an audit of West Central's respective entities in compliance with GAAP.

403. In fact, and as explained more fully above in Count VII, Gardiner Thomsen knew that for each audit that it conducted for West Central for the fiscal years-ending in 2008-2010, such audits were not undertaken in compliance with GAAP, and its opinions were improperly based upon fraudulent management representation letters.

404. Gardiner Thomsen was aware, or should have been aware, that its fraud investigation services concerning Hartzler would directly impact and affect the Wollesens.

405. The Wollesens have incurred millions of dollars in damages as a result of the fraudulent misrepresentations and negligence that are the subject of this Count.

**COUNT XI**
**PROFESSIONAL NEGLIGENCE**

406. The Wollesens incorporate herein by reference the allegations contained in paragraphs 1 through 405 and the exhibits attached hereto as though set forth in their entirety.

407. This Count is brought by the Wollesens against Gardiner Thomsen.

408. Gardiner Thomsen had a duty to undertake its services, including its auditing work and fraud investigation, in a manner consistent with prevailing professional standards and rules.

409. Gardiner Thomsen did not perform its work in a manner that satisfies accepted professional standards.

410. Gardiner Thomsen's auditing and fraud investigation services were performed negligently.

411. Gardiner Thomsen's failure to satisfy accepted professional standards was willful and wanton.

412. The Wollesens were in a class of persons known to use and rely upon Gardiner Thomsen's audits for West Central and its separate fraud investigation services.

413. The Wollesens were aware of Gardiner Thomsen's auditing services and relied upon its annual, unqualified opinions during the period of time at issue.

414. If Gardiner Thomsen had performed its audit and fraud investigation in a manner that was consistent with accepted professional standards, the Wollesens would have learned of Hartzler's fraudulent conduct and would have ceased doing business with Hartzler immediately.

415. The Wollesens were harmed and injured as a direct and proximate result of Gardiner Thomsen's professional negligence in a way that was unique and separate from other members of West Central.

**COUNT XII**
**DEFAMATION**

416. The Wollesens incorporate herein by reference the allegations contained in paragraphs 1 through 415 and the exhibits attached hereto as though set forth in their entirety.

417. This count is brought against Wixted Pope, West Central Cooperative and Milan Kucerak.

418. Wixted Pope made false and misleading statements concerning the Wollesens, including untrue statements of fact that they had engaged in felonious acts and other acts of moral turpitude.

419. Wixted Pope published those statements to others, including employees of West Central and media outlets, for the specific purpose of having those false and misleading statements further disseminated.

420. Wixted Pope and its principals knew the profound effects that the dissemination of information through the media would have.

421. Wixted Pope's false and misleading statements continued to be published after the initial date they were made.

422. Upon information and belief, Wixted Pope paid to sponsor content, so that news articles that were published at Wixted Pope's direction, which included false and untrue statements of fact concerning felonious acts by the Wollesens, would remain online and receive preference in google searches.

423. Despite the Jury's confirmation in August 2014, that those statements of felonious acts were untrue, Wixted Pope has taken to no steps to retract its prior statements or cause the media outlets that it directed to repeat its false and untrue statements to retract their untrue statements.

424. The publication of false and untrue statements by Wixted Pope for specific purpose that they be further disseminated by others has, and continues to cause the Wollesens substantial financial harm.

425. West Central, through Milan Kucerak and others, has made and published false and misleading statements concerning Bill Wollesen and the Wollesens, including calling them "crooks" and otherwise stating and implying that they have engaged in criminal conduct.

426. The Wollesens have incurred substantial financial and other damages as a result of the defamatory statements of fact described herein.

**COUNT XIII**
**PUNITIVE DAMAGES**

427. The Wollesens incorporate herein by reference the allegations contained in paragraphs 1 through 426 and the exhibits attached hereto as though set forth in their entirety. The conduct of each of the Defendants was committed in willful and wanton disregard for the rights of the Wollesens. The conduct of the Defendants was directed specifically at the Wollesens. The Wollesens are entitled to punitive damages for Defendants' conduct.

**JURY DEMAND**

The Wollesens demand a trial by jury.

**REQUESTED RELIEF**

WHEREFORE, the Wollesens respectfully pray that judgment be entered against Defendants and the following relief be entered against Defendants in favor or the Wollesens:

A. All monetary damages available, including all direct, indirect, general, special and other damages available at law or otherwise, in an amount exceeding $6 million;

B. Damages for emotional distress and other emotional harm;

C. Declaratory judgment that Iowa Plains Farms' expulsion from West Central Cooperative was unlawful and void, and providing Iowa Plains Farms temporary and permanent injunctive relief, reinstating Iowa Plains Farms as a member of West Central Cooperative (and Farmers Coop) and payment of all dividends and other amounts owing to Iowa Pains Farms for

the period West Central unlawfully expelled Iowa Plains Farms, including through its successor, Farmers Cooperative, and other damages incurred as a result of the unlawful expulsion;

E. Attorneys' fees and other costs incurred to investigate and pursue this action;

F. Treble damages where available by law;

G. Punitive damages;

H. Immediate and permanent injunctive relief requiring West Central and Gardiner Thomsen to: immediately withdraw financial statements that were improperly filed with any state or federal agency; immediately cease from serving as the auditor for Farmers Cooperatives; and requiring Gardiner Thomsen to report its malfeasance to all applicable professional licensing agencies and bodies;

I. Prejudgment interest; and

J. Such other and further legal or equitable relief that may be available and appropriate.

Dated this 9th day of August, 2016.

Respectfully Submitted,

HEIDMAN LAW FIRM, L.L.P.

BY: */s/ Jeff W. Wright*

JEFF W. WRIGHT, AT0008716
JOEL D. VOS, AT0008263
1128 Historic 4th Street
P.O. Box 3086
Sioux City, Iowa 51102
Phone: (712) 255-8838
Fax: (712) 258-6714
E-Mail: Jeff.Wright@heidmanlaw.com
E-Mail: Joel.Vos@heidmanlaw.com

By: */s/ Samuel L. Blatnick*

Samuel L. Blatnick, AT0011632
Juliet A. Cox (*Pro Hac Vice)*
KUTAK ROCK LLP
Two Pershing Square
2300 Main Street, Suite 800
Kansas City, MO 64108
Telephone: (816) 502-4603
Facsimile: (816) 960-0041
E-mail: samuel.blatnick@kutakrock.com
**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 9, 2016, the above and foregoing was filed with the Clerk of the Court through CM/ECF system which will send electronic notification to all counsel of record.

*/s/ Jeff W. Wright*
ATTORNEYS FOR PLAINTIFFS

I, on behalf of myself and also on behalf of Iowa Plains Farms and Byrite Farm Supply, Inc., certify under penalty of perjury and pursuant to the laws of the State of Iowa that the preceding is true and correct to the best of my knowledge and belief.

Date: August 9, 2016

William S. Wollesen

Kristi J. Wollesen

John W. Wollesen