**THE UNITED STATES DISTRICT COURT FOR THE STATE OF KANSAS**

| | |
|---|---|
| SAMUEL LOUIS BLATNICK,<br>Plaintiff,<br>vs.<br>LAIRD NOLLER AUTOMOTIVE, INC., *ET AL.*<br>Defendant. | Case No. 2:26-cv-02480-KHV-RES |

**OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS**

Laird Noller Automotive Inc. and its co-conspirators comprise an illegal enterprise using seemingly legitimate storefronts to conduct unlawful conduct on an ongoing basis. A consumer such as Plaintiff is lured into their dealerships by the promise of a stated price. But, when the customer attempts to purchase a vehicle, they are required to purchase undisclosed add-ons, such as the service package Plaintiff was required to buy.[1] As the FTC noted in its March 2026 warning letters to Laird Noller Automotive, Inc. (and two other Noller dealerships), the practice of requiring consumers to purchase warranty packages is deceptive and unlawful: "Examples of illegal pricing practices include: … requiring consumers to buy additional items not reflected in the advertised price." *See* (Ex. 1). One month after the front was identified by the FTC, Defendants then effectuated the transfer of the subject dealership to McCarrthy.

[1] Mr. Blatnick has no idea what the package entails; he has never used it; and does not even have a copy of the subject policy. Mr. Blatnick services his Jeeps at Reed Jeep.

Two weeks ago (after Plaintiff's amendment was filed), additional facts concerning the scheme were further revealed (*facts Defendants' counsel already knew*). Plaintiff was contacted by another aggrieved customer, Jarett Thornton.[2] Not only was Mr. Thornton required to purchase an add-on, but Laird Noller also subsequently forged his signature on several documents for additional add-ons to inflate the "market price" of the vehicle to the amount of financing he needed to purchase the vehicle with an underwater trade-in. Mr. Thornton only learned of the forged add-ons when he received a letter from the vendor of one of the add-ons. A copy of the verified complaint in that Action is attached as Exhibit 2, along with referenced exhibits. Plaintiff asks that the Court take judicial notice of the pending Missouri action. As noted therein, both the Kansas Attorney General and Kansas Department of Revenue acknowledged the impropriety of Laird Noller's conduct.

RICO was passed to stop the criminal infiltration of otherwise legitimate businesses; that is exactly what is happening here. Laird Noller Automotive, Inc. and its co-conspirators constitute an association-in-fact enterprise. When Mr. Blatnick complained to Laird Noller Automotive, Inc., its counsel of record offered to refund the $895 that Mr. Blatnick was required to pay for the unwanted service package. When Mr. Thornton complained, Defendants' counsel of record likewise offered to refund the $14,400 in forged add-ons that had been purchased without Mr. Thornton's knowledge. This is wrong, and it needs to immediately be stopped. Laird Noller's *modus operandi* is clear: when called to task, it simply offers to refund the ill-gotten funds. That is simply not acceptable, and this action (and the action brought on account of Mr. Thornton) are brought to: (i) hold Laird Noller Automotive, Inc. and its co-conspirators accountable, and (ii) stop the illegal scheme from continuing through Laird Noller's remaining dealerships in Kansas.

---

[2] Mr. Blatnick learned that Defendants' counsel of record had likewise responded to his complaints and had likewise offered to simply refund amounts paid for illegal add-ons.

## ALLEGED FACTS AND PROCEDURAL POSTURE

1. Mr. Blatnick's daughter turned fourteen on November 2, 2026. In Kansas, a person may obtain a learner's permit when they turn fourteen. Mr. Blatnick and his wife thought it beneficial for their daughter to learn how to drive on the vehicle that she would ultimately drive. In October 2025, Mr. Blatnick began looking for a low-mileage Jeep Compass that was <$20,000. (Cplt. ¶¶11-13).

2. By late October 2025, Mr. Blatnick's deadline for buying a vehicle was approaching. Mr. Blatnick had a one-week arbitration in New York the week before Christmas and one a week after the new year. From Monday, November 3, 2025, through late January, Mr. Blatnick would be in New York virtually every day.[3] (Cplt. ¶17).

3. On October 31, 2025 and November 1, 2025, Mr. Blatnick saw a listing for a 2025 Jeep Compass on Laird Noller's website; the vehicle had just over 13,800 miles, and it was listed as being sold for $19,999. (Cplt. ¶14).[4] Mr. Blatnick also viewed the vehicle on cars.com, and called the dealership to schedule an appointment while in Kansas City, MO. (Cplt. ¶¶15, 21).

4. On November 1, 2025, Mr. Blatnick and has family celebrated his daughter's birthday (November 2) by having lunch at Kata Nori in Kansas City, MO. (Cplt. ¶15). Following the meal, Mr. Blatnick (who had driven separately to allow him to drive to Lawrence) abandoned his family's birthday celebration and drove to Lawrence to test-drive the vehicle; the remainder of his family returned to their home in Overland Park, KS in his wife's vehicle. (*Id.*).

---

[3] Mr. Blatnick was lead counsel for a one-week AAA arbitration in New York the week before Christmas and then another during the first week of January 2026; the depositions for those matters were taken in the weeks leading up to the proceedings, each of which was tried to completion.
[4] Mr. Blatnick's cars.com search had a maximum price of $20,000. Therefore, he would not have identified the vehicle if its actual price was listed.

5. Mr. Blatnick arrived at the vehicle to test-drive the vehicle. (Cplt. ¶18). The price quoted on the vehicle was listed as $19,999, plus $699 for documentation. (*Id*. at ¶19). After the test-drive, when Mr. Blatnick and the salesperson went into the dealership to negotiate, he was presented with a contract that included a $1,399 service package. (*Id*.).

6. Mr. Blatnick told the service representative that he did not want a service package; the salesperson told Mr. Blatnick that all customers were required to purchase a service package, and he could not purchase the vehicle without a service package. (Cplt. ¶20).

7. The service package was not listed on the cars.com web listing, Laird Noller's web listing, or the sticker on the car. (Cplt. ¶21). It was also not disclosed when Mr. Blatnick called to schedule the appointment on November 1, 2025, when Mr. Blatnick was in Kansas City, MO, having a "birthday lunch" with his family. (Cplt. ¶15).

8. Mr. Blatnick would not have gone to Lawrence to look at the vehicle (and abandon his family) if he knew that he was required to purchase a service package; he would have gone to a different dealership to purchase one of the dozens of similar vehicles for sale in the Kansas City metro area. (Cplt. ¶23).

9. Because Mr. Blatnick would be traveling the next two months, and he and Mrs. Blatnick wanted their daughter to learn on the vehicle she would eventually drive (she would get her learner's permit the following Monday), he reluctantly purchased the vehicle with a $895 service package. (Cplt. ¶24).

10. Mr. Blatnick had (and has) no idea what he purchased; he has never used the package and has no intention of doing so. (Cplt. ¶27). Because the overwhelming majority of Laird Noller's customers likewise don't use the packages, the vendors know or reasonably should know that the customers are being forced to purchase them. (*Id*.).

11. Other customers have posted on-line that they experienced similar conduct: "RUDE, they only cared about the "other" sales items like their Advantage package, etc. They really talk about that "bird poop protection" and "nitrogen filled tire" $1,999 package.. (BTW – you don't have to buy it, it is not "already on the car") small print or not…" (Cplt. ¶31).

12. Another customer (who, as it turns out, is Mr. Thornton) posted: "Lies and fraud manipulated contracts added several contracts and didn't [sic] even know we had them forged signatures all over…" (Cplt. ¶43).

13. While Mr. Blatnick was negotiating, a young couple sat to his right, about 5-10 feet away; they likewise were required to purchase a service package and were clearly surprised that they had to do so. (Cplt. ¶58).

14. In March 2026, Laird Noller was one of 97 car dealerships in the country to receive a warning letter from the FTC. *See* (Ex. 1). The letter states, *inter alia*, as follows:

> This letter is to advise you that you may be advertising prices for cars that are lower than what you actually charge customers. Such deceptive tactics harm not only consumers, but competition, by making it hard for law-abiding businesses to compete on any even playing field
>
> ***
>
> Examples of illegal pricing practices included:
>
> - advertising a price that does not reflect all required fees,
> - advertising a price that reflects rebates or discounts not available to all consumers,
> - advertising a price that fails to take into account the amount of an additional required down payment,
> - conditioning the advertised price on consumer using dealer financing,
> - ***requiring consumers to buy additional items not reflected in the advertised price***, and
> - advertising unavailable or nonexistent vehicles.
>
> I am concerned that your company may be engaging in one or more of these practices. Accordingly, ***I encourage you to review your practices, including by making sure the prices you advertise include all required fees and charges*** aside

> from required government charges, to ensure you are complying with applicable laws. ***This would include, at a minimum, evaluating your advertised prices and actual prices and confirming they match.***

(Ex. 2) (emphasis added).

15. The letter warned Laird Noller that the FTC, "will continue to monitor the marketplace and take additional action as warranted." (Ex. 2).

16. The Participants don't only include Laird Noller Automotive, Inc., McCarthy and the subject vendors, but also related Laird Noller entities that likewise received warning letters from the FTC. *See* (Cplt. ¶98); *see also* https://caredge.com/guides/ftc-warning-letter-dealers-named-2026 (identifying Noller Ford of Lawrence and Noller Ford of Topeka as likewise receiving warning letters).

17. Faced with the threat of prospective action by the FTC, Laird Noller sold the dealership the following month to Defendant McCarthy. (Cplt. ¶41). Upon information and belief, the sale was effectuated to conceal the scheme, and McCarthy therefore purchased the dealership at a fire sale price. (*Id.*) McCarthy certainly conducted diligence before the sale and clearly knew that Laird Noller: (i) had received the letter, and (ii) was profiting from the illegal conduct at issue.

18. As part of the unlawful scheme and to conceal the offending conduct, the dealership was sold to Defendant, McCarthy, the following month. Upon information and belief, McCarthy knew that it could purchase the dealership at a fire sale price because of the illegal conduct, and therefore actively took part in steps to conceal illegal conduct. (Cplt. ¶48).

19. The subject vendors, the identities of which are not yet known, likewise were knowing participants. And, even if they didn't possess actual knowledge, the vendors certainly knew that the packages weren't being used, such that they should know.

20. On June 8, 2026, after unsuccessfully attempting to resolve this dispute without litigation, Mr. Blatnick filed this civil action in the District Court for Johnson County Kansas.

21. Defendants obtained an extension and answered the petition on July 15, 2026.

22. Thereafter, on July 23, 2026, Plaintiff discovered the FTC warning letter (and its temporal relationship to the April 2026 sale of the dealership to McCarthy). Defendants had not disclosed the FTC warning or Mr. Thornton's ongoing dispute. Mr. Blatnick filed the letter with this Court. *See* (Ex. 1).

23. On July 23, 2026, Plaintiff filed a motion for leave to amend along with a proposed amended petition. Because Defendants had answered the state-court petition, and the potential response to civil RICO in state court, Mr. Blatnick sought leave to amend.

24. On August 12, 2026, Defendants removed to this forum, based upon the civil RICO claim that Plaintiff sought to add (but was never granted leave to file). Defendants did so despite the fact the state court never acted on Plaintiff's request for leave to amend.

25. Thereafter, Plaintiff was given leave to file the Complaint and filed the operative Complaint.

26. During the week of August 31, 2026, Mr. Blatnick received an unsolicited email from Jarett Thornton. Mr. Thornton subsequently explained that he had purchased a vehicle from Laird Noller in late 2025 and that, in addition to being required to purchase a $1,400 add-on, unbeknownst to him and his wife, Laird Noller had forged his name on almost $15,000 in bogus add-ons. *See* (Ex. 1). Laird Noller did so to artificially inflate the stated value of the vehicle, so that the loan on the vehicle could be approximately $20,000 more than the actual value of the vehicle. (*Id.*).[5]

---

[5] Mr. Thornton has a recorded call where a management-level representative of the dealership explained that their lenders want them to increase the amount and that it benefits them

27. When Mr. Blatnick threatened to sue Laird Noller (through its counsel of record in this Action), Defendants' counsel responded by offering the return of his $895. Laird Noller (through the same attorneys) likewise responded to Mr. Thornton by offering to return the $14,400 in forged (and undisclosed) add-ons. One thing is clear: Defendants are engaging in ongoing unlawful conduct using the mails and the wires. Defendants have made a calculated decision that it is more profitable to offer refunds for illegal conduct and then incur the costs of defense than it is to stop their unlawful conduct. And, upon information and belief, Defendants' counsel of record in this Action is aware of, and has responded to, a *multitude* of other complaints.

28. Defendants' attempt to limit this Action to a "single used car" transaction simply ignores reality. Plaintiff is one of hundreds, if not thousands, of individuals victimized by Defendants' unlawful, ongoing scheme.

## LEGAL ARGUMENT

### A. Legal Standard for a Motion to Dismiss

Granting a motion to dismiss, "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation omitted). "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id*. (*quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556 (2007). However, "[t]he burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (*quoting Twombly*, 550 U.S. at 556).

### B. Defendants' Substantive Argument are Readily Dismissed.

#### a. Plaintiff Has Properly Pled a Common Law Fraud Claim.

Under Kansas law, the elements of actual fraud are: (i) a false statement of existing and material fact; (ii) known to be false or made recklessly; (iii) made intentionally for purpose of inducing another's action; (iv) reasonable reliance on the statement; and (v) damage because of reliance). *Nelson v. Nelson*, 288 Kan. 570, 583, 205 P.3d 715, 726 (2009) (*citing Kelly v. VinZant*, 197 P.3d 803 (Kan. 2008)).

Plaintiff has alleged the following: (i) the price of the car was misrepresented to him; (ii) such misrepresentation was intentional; (ii) Mr. Blatnick relied upon the stated price to leave his daughter's birthday lunch and abandon his family to travel to Lawrence to view the vehicle (two days before leaving for two-and-a-half months) and also to forego purchasing an alternative vehicle that afternoon;[6] (iii) that such reliance was reasonable, and (iv) that was injured as a result (*e.g.*, he would not have gone; test drove; or sat down to negotiate the purchase if the actual price had been disclosed and lost the opportunity to purchase an alternative vehicle without a required service package). Plaintiff has adequately pled a fraud claim, and he is entitled to his actual and punitive damages.

In addition, the vehicle had been leased by a smoker. When Mr. Blatnick test drove the vehicle he was told they would perform a ozone on the vehicle, and that it would remove the smell. Mr. Blatnick is not a smoker and has never purchased a car previously used by someone who smoked in their vehicle. Mr. Blatnick reasonably relied upon the representation. It was because of the ozone that Mr. Blatnick paid for the vehicle on November 1, 2025, but took possession on

---

[6] It was approximately 4 pm when Mr. Blatnick completed his test drive on a Saturday; when the add-on was disclosed; it was not feasible to travel to another dealership; Mr. Blatnick left for New York mid-afternoon the following Monday, so he likewise could not attempt to purchase a vehicle on that day.

November 3, 2025, before leaving for New York. Upon receipt the vehicle had a heavy chemical smell (worse than smoke) that Mr. Blatnick was told would dissipate. Despite repeated attempts to removed the odor, it remains. Mr. Blatnick would not have purchased the vehicle if he knew it would continue to have an offensive odor, and he was likewise damaged by such fraudulent representation.[7]

**b. Plaintiff May Recover for Each Deceptive and/or Unconscionable Act.**

The KCPA prohibits, "any deceptive act or practice in connection with a consumer transaction" and defining "consumer transaction," in pertinent part, as "a sale ... of property or services within this state ... to a consumer." K.S.A. §§50-624(c); 50-626(a). The KCPA expressly provides that it is to be construed liberally in order to protect consumers from suppliers who commit deceptive and unconscionable practices. K.S.A. 50–623; *Unruh v. Purina Mills,* 289 Kan. 1185, 1207, 221 P.3d 1130 (2009).

To recover damages for either type of violation under the KCPA, a party must establish that he or she was "aggrieved" by the violation of the Act. K.S.A. 50–634(a), (b); see *Finstad v. Washburn University,* 252 Kan. 465, 472, 845 P.2d 685 (1993). A consumer need not establish measurable monetary damages to qualify as aggrieved. *See Lowe v. Surpas Resource Corp.,* 253 F.Supp.2d 1209, 1229 n. 16 (D. Kan.2003).

The KCPA does not define the term "aggrieved." The Kansas Supreme Court has held that "a consumer need not establish measurable monetary damages to qualify as aggrieved. *Via Christi Regional Med. Center, Inc. v. Reed*, 314 P.3d 852 Kan. 2013).

In *Finstad v. Washburn Univ. of Topeka,* 845 P.2d 685 (Kan. 1993), the Kansas Supreme Court defined the term as "'[h]aving suffered loss or injury.'" *Id.* at 690 (*quoting* Black's Law

[7] This also serves as a separate and distinct deceptive practice under the KCPA, for which Mr. Blatnick is entitled to recovery.

Dictionary 65 (6th ed.1990)). In *Welch v. Centex Home Equity Co., LLC*, No.95-981, 2008 WL 713690, at *6 (Kan. App. 2008) (unpublished opinion), a Kansas appellate panel opined that, "*Finstad* does not hold that an aggrieved consumer must be aware of, have relied upon, *and* be damaged by the deceptive act. Rather, *Finstad* holds that there must be a causal connection between the defendant's conduct and the plaintiff's damages." A panel of the Kansas Court of Appeals held that, "[t]o be aggrieved under the statute, the consumer must prove that the seller's act has adversely affected the consumer's legal rights. Additionally, the consumer must show that there was a causal connection between the deceptive act and the claimed injury. [Citations omitted.]"

In *Welch v. Centex Home Equity Co*., LLC, No. 95,981, 2008 WL 713690, at *6 (Kan. App. 2008) (unpublished opinion), a panel of the Kansas Court of Appeals opined that "Finstad does not hold that an aggrieved consumer must be aware of, have relied upon, and be damaged by the deceptive act. Rather, *Finstad* holds that there must be a causal connection between the defendant's conduct and the plaintiff's damages." Thus, "[a] consumer becomes aggrieved when the consumer suffers legal harm, even if he or she fails to discover or recognize the harm." *Florez v. Ginsberg*, 449 P.3d 770 (Kan. App. 2019) But consumers must still show that their damage relates to the alleged misrepresentation. *Schneider v. Liberty Asset Mgmt.*, 45 Kan. App. 2d 978, 986 (2011).

Laird Noller Automotive, Inc. engaged in multiple instances of deceptive practices that individually and collectively aggrieved Mr. Blatnick and led him to abandon his family to travel to Lawrence on November 1, 2026, rather than the hundreds of other dealerships in the Kansas City metro that had similar vehicles for sale (or continue celebrating his daughter's birthday). Mr. Blatnick viewed and relied upon both the cars.com and Laird Noller website listings. Mr. Blatnick

relied upon the sticker on the vehicle when he arrived at the dealership. Mr. Blatnick relied upon the statement of the salesperson when he spoke before traveling to the dealership and those before and during the test-drive; at no time was the required add-on mentioned, and also on the telephone call he made to schedule the appointment.

Defendants seek to exclude Mr. Blatnick's review of remaining vehicles on Laird Noller's various websites. Mr. Blatnick regularly purchases and sells cars; he is a "car enthusiast." Mr. Blatnick has been aggrieved by each of Defendants' posts that he has viewed, because he has no way of knowing what the actual price of a listed vehicle is and therefore may not properly evaluate Defendants' postings relative to competitors. To that end, while Mr. Thornton was required to purchase a disclosed add-on, his was $1,440; Mr. Blatnick's was $895. As such, he has been deprived of the important information to determine whether or not to visit any of Defendants' dealerships (Laird Noller still operates at least two dealerships in Kansas). While perhaps not a monetary loss, such deprivation does constitute a "loss or injury" as required under the KCPA.

Defendants rely *solely* upon *Finstad v. Washburn Univ. of Topeka,* 252 Kan. 465, 845 P.2d 685 (1993). In that case, students sued under the KCPA where the university published in course materials that a course was accredited when, in fact, it was not. Many of the students, however, enrolled in the program before the catalogue was published or without knowledge of the error in the catalogue. The students claimed that they were "aggrieved" consumers under the KCPA because they paid tuition for a program that was not accredited. *Id*. The Kansas Supreme Court disagreed, arguing that the plain language of the statute provides relief only to those consumers aggrieved (i.e. those who suffer loss or injury) because of a violation of the Act. *Id.* at 689 The court refused to "interpret an aggrieved consumer to be one who is neither aware of nor damaged by a violation of the Act..." and concluded that "the district court did not err in holding that a causal

connection is still required to maintain an action under K.S.A. 50-634(b)…" *Id.* at 692.[8] Here, there is a causal connection between Defendant's conduct and Plaintiff being aggrieved.

**c. Defendants are Operating a Rico Enterprise.**

RICO was designed to prevent the illicit infiltration of legitimate enterprises. *See* S. Rep. No. 91-617, at 76 (1969). "RICO provides a private right of action in federal court for individuals injured in their business or property through fraudulent conduct." *Robert L. Kroenlein Trust ex rel. Alden v. Kirchhefer,* 764 F.3d 1268, 1274 (10th Cir. 2014); 18 U.S.C. 1964(c) (providing private right of action and treble damages for § 1962(c) violations). That is exactly what has happened withing the Laird Noller organization with the knowing participation of third parties. To avoid dismissal, Plaintiff must only plausibly allege that Defendants each: (i) conducted the affairs (ii) of an enterprise (iii) through a pattern (iv) of racketeering activity. *See* 18 U.S.C. §1962(c)); *Robbins v. Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002).

There is nothing novel about applying civil RICO to ongoing unlawful conduct in the sale of vehicles. Courts have denied dismissal (or allowed amendment) under very similar circumstances. For example, in *Moore v. It's All Good Auto Sales, Inc.,* 907 F. Supp. 2d 915, 926 (W.D. Tenn. 2012), a woman attempted to purchase a Toyota Camry. She was initially told that the downpayment would be $1,000; the plaintiff stated she only had $600. The dealership told her that they "can work something out with you, we can work something out." A contract was then provided that had "quickpays," which the plaintiff understood to be a downpayment of $1,000. After signing the contract, the plaintiff took a closer look at the contract, and it appears the total downpayment was $1,520, not $1,000. The dealership told her the $520 was sales tax. Moore

[8] Unlike the students in that case, Mr. Blatnick has viewed Laird Noller's listing for all of its cars. (Cplt. at ¶60).

returned to the dealership and was told that if she didn't want the car, she could leave it on the lot. The district court denied dismissal.

In *Kia Am., Inc. v. DMO Auto Acquisitions, LLC,* 775 F. Supp. 3d 607 (D.N.H. 2025), the court denied a motion to dismiss where the distributor of cars and parts brought a civil action against a collection of dealerships ad two of the dealerships' executives for RICO on account of scheme to submit fraudulent sales documents to the distributor to obtain fraudulent incentive payments; *see also Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575 (D. Md. 2014) (denying dismissal of 1962(c) claim filed by buyers who filed putative class action alleging that used car dealership and associated company misrepresented prior short-term rental use of vehicles they sold to buyers).

In *Alkhatib v. New York Motor Grp. LLC*, No. CV-13-2337 ARR, 2015 WL 3507340, at *21 (E.D.N.Y. June 3, 2015), Plaintiff alleged a fraudulent lending scheme by a car dealership, lending institution, and others. The court found the claim against the dealership representative plausible and recommended the plaintiff be granted leave to amend to fix certain deficiencies in pleading; *see also Taylor v. Bob O'Connor Ford, Inc.,* No. 97 C 0720, 1999 WL 183656, at *4 (N.D. Ill. Mar. 25, 1999) (granting leave to cure defects where plaintiff alleged a RICO enterprise against a car dealer who allegedly charged $999 for rust protection but did not apply the protection).

**i. Plaintiff Need Not Plead 1962(a) or (b).**

RICO outlaws four *independent* types of activities: (i) Section 1962(a) prohibits a person from investing in an enterprise any income derived from a pattern of racketeering activity; (ii) Section 1962(b) prohibits a person from using a pattern of racketeering activity to acquire or maintain control over an enterprise; (iii) Section 1962(c) prohibits a person from conducting the

affairs of an enterprise through a pattern of racketeering;5 and (iv) Section 1962(d) prohibits a person from conspiring to violate §§ 1962(a), (b), or (c). Defendants correctly argue that Plaintiff has not pled claims for 1962(a) or (b). Plaintiff does not need to. Plaintiff's claims are based upon 1962(c) and (d).

**ii. The Enterprise is Properly Pled.**

RICO broadly defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Plaintiff alleges an association-in-fact (Cplt. ¶96), which the Supreme Court has defined having "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose" *Boyle v. United States*, 556 U.S. 938, 946 (2009).

The Supreme Court's decision in Boyle[9] "establishes a low threshold for pleading such an enterprise." *Delgado v. Ocwen Loan Servicing, LLC*, 2014 WL 4773991, at *16 (E.D.N.Y. Sept. 24, 2014) (internal citations omitted). "Formal hierarchy, role differentiation, regular meetings, or established procedures are not required; rather, an informal group may constitute an enterprise as long as 'the group ... function[s] as a continuing unit and remain[s] in existence long enough to pursue a course of conduct.'" *Alkhatib*, 2015 WL 3507340, at *9 (*quoting Boyle*, 556 U.S. at 948).

Plaintiff alleges that Laird Noller Automotive, Inc., McCarthy, Laird Noller's affiliated entities, and the participating third parties that provide the subject service packages comprise an association-in-fact enterprise that requires customers to purchase undisclosed add-ons. Plaintiff alleges that he will add the participating third parties when identified through discovery[10] With

[9] *Boyle v. United States*, 556 U.S. 938 (2009).

[10] Plaintiff does not possess the service materials he was required to purchase. While information was sent to Mr. Blatnick while at his prior firm (before Mr. Blatnick added) civil RICO, he does not have access to his prior firm

respect to McCarthy, Plaintiff alleges that once the Federal Government identified Laird Noller's conduct, McCarthy then knowingly purchased the dealership at a fire-sale price in furtherance of the scheme.[11] This is no stretch; McCarthy clearly conducted diligence on the dealership and was aware that Laird Noller was generating its profits from the illegal conduct at issue.

Specifically, Plaintiff has alleged, *inter alia*, as follows:

> Laird appears to be operating viable car dealerships throughout Kansas. However, the dealerships are a front. In fact, for years, Laird has used the dealerships as a front for ongoing, illegal conduct. And, upon information and belief, Laird's dealerships are not profitable without the illegal conduct, which is, in part, why the subject dealership was sold less than a month after the FTC warning letter was received.
>
> Specifically, as acknowledged by the FTC through its March 2026 letter [and the Kansas Attorney General and KDOR in letters to Mr. Thornton] Laird's pattern and practice throughout it Kansas network of dealership of requiring the purchase of an add-on service package and/or other items is illegal.
>
> ***
>
> The enterprise is an association-in-fact enterprise, with an unlawful purpose (e.g., to require, yet conceal the requirement that all used vehicles[12] be sold with a service package and/or other required add-ons); a relationship among those associate with the enterprise (explained supra); a longevity over a period of years, allowing the Participants to pursue and carry out the enterprise's purpose.
>
> The Laird entities (through their various dealerships) and McCarthy and the providers of the unlawful add-ons, all joined together to form and conduct the affairs of the association in fact enterprise at issue (including third-party vendors of the subject service packages—whose identities and full involvement will not be known until discovery had been conducted) to implement and execute a scheme to fraudulently require all customers to purchase not only an advertised vehicle at its advertised price, but also undisclosed service packages and related items. *See, e.g., In re ClassicStar Mare Lease, Litg.*, 727 F.3d at 492 (recognizing that "corporate defendants are distinct from RICO enterprises when they are functionally separate, as when they perform different roles within the enterprise or use their separate legal

emails or materials related to this matter. Mr. Blatnick now knows that Ethos is a participant, and Ethos has been named as a Defendant in the *Thornton* action.

[11] Lower rung participants in the enterprise who are under the direction of upper management may be liable under RICO if they have "some part" in operating or managing the enterprise's affairs. *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1100 (10th Cir. 1999)

[12] In fact, Plaintiff now knows it is all vehicles, used or new, as evidenced by Mr. Thornton's experiences.

> incorporate to facilitate racketeering activity."); *Securiton Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 262-264 (2d. Cir. 1995) (concluding that individual defendant and his two corporations in distinct lines of business were necessarily distinct from each other as well as from the alleged association-in-fact enterprise).

(Cplt. ¶¶86-87, 96).

> The Laird entities (through their various dealerships) and McCarthy and the providers of the unlawful add-ons, all joined together to form and conduct the affairs of the association in fact enterprise at issue…

(Cplt. ¶98).

Mr. Blatnick has alleged as follows with respect to the purpose of the association-in-fact enterprise:

> The function, purpose and goal of the unlawful enterprise was to illegally require t[he] sale of undisclosed service packages and other add-ons as a requirement to purchase used vehicles, as well as mismanagement of the business, which function, purpose, and goal was obtained through repeated, intentional felonious acts identified within 18 U.S.C. 1961 and otherwise.

(Cplt. ¶94)

Under controlling 10th Circuit authority, Mr. Blatnick has pled an association-in-fact enterprise. For example, in *George v. Urb. Settlement Servs.,* 833 F.3d 1242, 1250 (10th Cir. 2016), the 10th Circuit reversed dismissal of a civil RICO claim and noted as follows:

> They don't contend that either a parent corporation or its subsidiary corporation is the enterprise. Rather, they assert that BOA and Urban—two separate legal entities—joined together, along with several other entities, to form and conduct the affairs of the BOA–Urban association-in-fact enterprise. The plaintiffs further allege that BOA conducted the enterprise's affairs, rather than BOA's own affairs, by acting in concert with Urban and other members of the enterprise to implement and execute a scheme to fraudulently deny HAMP loan modifications to qualified borrowers.

*Id.* at 1250.

Defendants' description of Laird Noller as a "legitimate company" (ECF – at 10) is, at best, incomplete. At best, it may have once been a "legitimate company" that has been infiltrated by

ongoing criminal conduct. It is one of 97 companies (in an industry notorious for illegal and otherwise questionable conduct) to be identified by the FTC for engaging in ongoing unlawful conduct, and both the Kansas Attorney General and KDOR have indicated that its analogous practices with Mr. Thornton were likewise illegal. Mr. Thornton's experiences, which were disclosed to Defendants' counsel before it filed its Motion[13], make clear that Defendants' suggestion that there is no "common unlawful purpose in 1984 or for decades thereafter," is simply false.[14]

Finally, at this stage, Mr. Blatnick has no way of knowing when, specifically, Defendants' unlawful practices began. As such, Mr. Blatnick has identified Laird Noller's date of formation as the only concrete date that is ascertainable. Court have noted:

> It is not always reasonable ... to expect that when a defrauded plaintiff frames his complaint, he will have available sufficient factual information regarding the inner workings of a RICO enterprise to determine whether a defendant was merely "substantially involved" in the RICO enterprise or participated in the "operation or management" of the enterprise. Thus, where the role of the particular defendant in the RICO enterprise is unclear, plaintiffs may well be entitled to take discovery on this question.

*Aiu Ins. Co. v. Olmecs Med Supply, Inc*. 2005 WL 371030, at *8 (E.D.N.Y. Feb. 22, 2005) (*citing Friedman v. Hartman*, 1994 WL 376058, at *2 (S.D.N.Y. July 15, 1994)).

**iii. Plaintiff Pled with the Particularity Available at the Time of Pleading.**

---

[13] Defendants' counsel serve as Laird Noller's "fixer." Laird Noller's counsel is provided the complaints its receives for its unlawful conduct, and it then responds by sending letters offering to refund the ill-gotten proceeds. Upon further discovery, it may become apparent that Defendants' counsel of record are also participants in the enterprise. Plaintiff reserves his rights to name them at a later date.

[14] Mr. Blatnick lacks knowledge sufficient to identify the specific date when the illegal and improper scheme began. Mr. Blatnick has identified 1984 as alleged date, because that is the date of formation of Laird Noller Automotive Group, Inc. *See* https://www.sos.ks.gov/eforms/BusinessEntity/Search.aspx. Plaintiff is confident that the subject conduct, which continues at Noller's other dealerships, continued long enough to satisfy closed-ended continuity for the subject dealership and open-ended continuity with respect to Laird Noller's remaining Kansas dealerships.

18 U.S.C. §1961(1)(B) defines "racketeering activity" to include indictable acts of mail and wire fraud as prohibited under 18 U.S.C. §§ 1341 and 1343, respectively. To establish a pattern of racketeering activity, Plaintiff must allege at least two predicate acts. *See* 18 U.S.C. §1961(5) (requiring at least two predicate acts to establish "pattern of racketeering activity"); *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 838 (10th Cir. 2005). To establish the predicate act of wire fraud, a plaintiff must allege "that the defendant use[d] interstate wire, radio or television communications in furtherance of the scheme to defraud." *BancOklahoma Mortg. Corp. v. Cap. Title Co.,* 194 F.3d 1089, 1102 (10th Cir. 1999) (internal quotation omitted).

Predicate acts of mail or wire fraud must be pleaded with particularity under Federal Rule of Civil Procedures 9(b). *George v. Urban Settlement Servs.,* 833 F.3d 1242, 1254 (10th Cir. 2016). That simply means that "plaintiffs must 'set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'" *Id*. (*quoting Koch v. Koch Indus*., 203 F.3d 1202, 1236 (10th Cir. 2000)).

Plaintiff has pled subject wire fraud with particularity, including the use of the wires in the two postings (cars.com and Laird Noller's website), which he viewed on October 31, 2025. Mr. Blatnick (while in Kansas City, MO) also telephoned the dealership (on November 1, 2025) to schedule the viewing; there was no disclosure of any required add-ons during that call. Indeed, every single listing that Laird Noller had for used vehicles (hundreds) was an instance of wire fraud, as Defendants used the wires to publish and disseminate listings that were fraudulent and failed to disclose required add-ons.

Specifically, Plaintiff alleges the following instances of wire fraud, which identify the specific fraudulent practice and date such use was used and observed by Plaintiff:

> By and through the posting of the subject cars.com listings and analogous listings on its own website, including the ones Mr. Blatnick observed in November 2025,

> are instances of wire fraud, where Participants have illegally used the wires to perpetrate their fraud.
>
> ***
>
> Laird used the mails and wires on an ongoing basis to perpetrate the fraud. At any given time, Laird has, literally, hundreds of fraudulent postings on its website and on cars.com. In every instance, the wires are illegally used to post listings and the Participants know are fraudulent, because they fail to identify that a purchaser is required to purchase an expensive service package and/or other undisclosed (and high profitable) required add-ons.
>
> With respect to Mr. Blatnick, he viewed the fraudulent listing for the vehicle at issue on or about October 31, 2025, on both Laird's website and also on cars.com. Defendant used the wires to post both of those listings. Mr. Blatnick also spoke with the dealership via telephone while he was having lunch with this family in Missouri on November 1, 2025. The required add-on was not disclosed, meaning that was also an event of wire fraud.
>
> ***
>
> Plaintiff must allege at least two predicate acts. *See* U.S.C. ¶1961(5) (requiring at least two predicate acts to establish a "pattern of racketeering activity"); *Garrett v. Selby Connor Maddux & Janer,* 425 F.3d 836, 838 (10th Cir 2005). Plaintiff has pled subject wire fraud with particularity, including the use of the wires in the two postings (cars.com and Laird Noller's website), which he viewed in the days immediately prior to Saturday, November 1, 2025. Indeed, every single listing that Laird Noller had for used [and new] vehicles (hundreds) was an instance of wire fraud, as Defendants used the wires to publish and disseminate listings that were fraudulent and failed to disclose required add-ons.

(Cplt. ¶¶102-104, 112).

Rule 9(b)'s purpose is "to afford [a] defendant fair notice" of a plaintiff's claims and the factual grounds supporting those claims. *Schwartz v. Celestial Seasonings, Inc.,* 124 F.3d 1246, 1252 (10th Cir. 1997). It cannot be denied that Plaintiff has been given "fair notice" of its underlying discretions.

"In determining whether a plaintiff has satisfied Rule 9(b), courts may consider whether any pleading deficiencies resulted from the plaintiff's inability to obtain information in the defendant's exclusive control." *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1255 (10th Cir.

2016); *See, also Emery v. Am. Gen. Fin., Inc.,* 134 F.3d 1221, 1323 (7th Cir. 1998) ("Rule 9(b) is relaxed upon a showing" that plaintiff is unable to obtain essential information in defendant's possession without pretrial discovery); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1418 (3d Cir. 1997) (explaining that Rule 9(b)'s "normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control" but that "even under a relaxed application of Rule 9(b) …. [p]laintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible"); *Scheidt v. Klein*, 965 F.2d 963, 967 (10th Cir. 1992) ("Allegations of fraud may be based on information and belief when the facts in question are peculiarly within the opposing party's knowledge and the complaint sets forth the factual basis for the plaintiff's belief."). This applicable here, where Plaintiff is but on victim of an ongoing (concealed) scheme to engage in unlawful conduct.

Finally, Plaintiff now possesses concrete evidence of another victim of Laird Noller's illegal scheme. *See, generally*, (Ex. 1). Plaintiff requests leave to amend to add the additional acts of wire fraud undertaken by certain Defendants and others in furtherance of the enterprise's ongoing scheme.

**iv. Defendants Confound Continuity with Injury.**

Defendants' argument that Plaintiff may not pursue a civil RICO claim on account of a single transaction Defendants confound the concepts of standing and continuity.[15]

RICO allows "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter [to] sue therefor in any appropriate United States district court and ... recover threefold the damages he sustains and the cost of the suit, including a reasonable

[15] Plaintiff now can identify two specific transactions within the past year.

attorney's fee...." 18 U.S.C. § 1964(c). "Congress modeled §1964(c) on the civil-action provision of the federal antitrust laws, § 4 of the Clayton Act...." *Holmes v. Secs Investor Protection Corp*., 503 U.S. 258, 267 (1992). Thus, like the Sherman Act, standing for private individuals under RICO requires a plaintiff to have "been injured in his business or property by the conduct constituting the violation." *Sedina S.P.R.L. v. Imrex, Co.*, 473 U.S. 479, 496 (1985). Plaintiff has alleged injury to his property, namely that he was required (like every other customer) to purchase an undisclosed service package as a requirement to purchase the subject vehicle.

**v. Conspiracy Has been Properly Pled**

Section 1962(d) makes it unlawful to conspire to violate subsections (a), (b), or (c) of § 1962. 18 U.S.C. § 1962(d). The crux of a § 1962(d) violation is the agreement to violate one of the substantive provisions of § 1962. *U.S. v. Sessa*, 125 F.3d 68, 71 (2d Cir. 1997); *Verrees v. Davis*, No. 1:16-cv-01392-LJO-SKO, 2018 WL 1919824, at *9 (E.D. Cal. Apr. 24, 2018) (*quoting Oki Semiconductor Co. v. Wells Fargo Bank, Nat'l Ass'n*, 298 F.3d 768, 774-75 (9th Cir. 2002)) ("It is the mere agreement to violate RICO that § 1962(d) forbids; it is not necessary to prove any substantive RICO violations ever occurred as a result of the conspiracy."). The Supreme Court has clarified that although the conspirator need not agree to commit or facilitate every part of the substantive offense, he must "intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense…" *Salinas v. United States*, 522 U.S. 52, 65 (1997).

To state a claim under § 1962(d), the plaintiff must allege the existence of an "agreement to participate in an endeavor which, if completed, would constitute a violation" of the RICO statute. *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co*., 719 F.3d 849, 856 (7th Cir. 2013); *In re Ins. Brokerage Antitrust Litig*., 618 F.3d 300, 373 (3d

Cir. 2010); *Flores v. United Airlines*, 426 F. Supp. 3d 520, 537 (N.D. Ill. 2019) (*quoting Goren v. New Vision Int'l, Inc*., 156 F.3d 721, 732 (7th Cir. 1998)).

This requires the plaintiff to make a two-part showing: (i) that the defendant agreed to facilitate the operation of an enterprise through a pattern of racketeering activity; and (ii) that the defendant agreed that someone (not necessarily the defendant) would commit at least two predicate acts. *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011); *Brouwer v. Raffensperger, Hughes & Co*., 199 F.3d 961, 967 (7th Cir. 2000); *accord Crowe v. Henry,* 43 F.3d 198, 206 (5th Cir. 1995); *Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir. 1989); *Gas Tech. Inst. v. Rehmat*, 524 F. Supp. 2d 1058, 1074 (N.D. Ill. 2007); *In re Managed Care Litig*., 150 F. Supp. 2d 1330, 1349-50 (S.D. Fla. 2001); *Ross v. Patrusky, Mintz & Semel*, No. 90-CV-1356, 1997 WL 214957, at *12 (S.D.N.Y. Apr. 29, 1997); *In re Motel 6 Sec. Litig*., No. 93-CV-2183, 1997 WL 154011, at *5 (S.D.N.Y. Apr. 2, 1997) (outlining elements).

Plaintiff has alleged that McCarthy knowingly undertook steps in furtherance of the unlawful scheme by purchasing the dealership at a "fire sale" price once the conduct was identified by the federal government. Defendants take issue with the fact that, at this stage, Plaintiff does not possess specific information about the third parties providing the offending package; Plaintiff did not possess such information at the time the amendment was filed. He now can identify Ethos and the subject dates, as pled in the Thornton complaint; Plaintiff stands ready to amend to add such information.

### III. Plaintiff is Entitled to Pursue Injunctive Relief Under the KCPA And Civil RICO

Now we come to what really matters to Laird Noller—the ability to continue with its illegal practices. Defendants' argument is based upon an assumption that Mr. Blatnick would not attempt to purchase a vehicle from Defendants again. Mr. Blatnick has never made such representation in

pleadings or elsewhere, and Mr. Blatnick regularly searches for, purchases and sells cars in this State.

Regardless, the KCPA provides that "[w]hether a consumer seeks or is entitled to damages or otherwise has an adequate remedy at law or in equity, a consumer aggrieved by an alleged violation of this act may bring an action to: (i) Obtain a declaratory judgment that an act or practice violates this act; or (ii) enjoin of obtain a restraining order against a supplier who was violated, is violating or is likely to violate this act." K.S.A. 50-634(a) (Private Remedies). The KCPA further provides that, "[w]hether a consumer seeks or is entitled to recover damages or has an adequate remedy at law, a consumer may bring a class action for declaratory judgment, an injunction and appropriate ancillary relief, except damages, against an act or practice that violates this act." K.S.A. 50-634(c).[16]

The comments to K.S.A. 50-634 further provide as follows: "1. Subsection (a) permits a consumer to obtain appropriate declaratory and injunctive relief regardless of whether he recovers or has standing to recover damages…. 3. [u]nder subsection (c), an aggrieved consumer may bring a private class action for declaratory relief and injunctive relief. The term "appropriate ancillary relief" would, for example, include an action for rescissions of contracts entered into by the class….." [17]

Thus, it is abundantly clear that Mr. Blatnick has standing under the KCPA to seek declaratory and injunctive relief with regard to the alleged deceptive practices. Defendants' argument is frivolous, and Defendants should be appropriately admonished.[18]

[16] Plaintiff requests leave to amend his complaint to add a claim for class certification for injunctive relief, only.
[17] Defendant, Laird Noller Automotive, Inc., continues to operate and sell vehicles in the State of Kansas, regardless of its sale of the specific dealership at issue following receipt of the FTC warning letter.
[18] Plaintiff requests leave to amend to add a class claim solely for purposes of injunctive relief.

Defendants' position is curious and would eradicate the purpose of the KCPA. A reasonable, aggrieved consumer is not likely to engage in business again with a fraudster such as Laird Noller. Defendants' position would, in effect, remove the injunctive relief from the statute. Defendants will argue that a Plaintiff who didn't purchase the add-on wasn't harmed (according to Defendants, viewing a deceptive listing is not enough) can't bring a claim, but those who are harmed, cannot obtain injunctive relief?

The KCPA's injunctive relief is intended to protect the public; not to make sure that individuals who have been harmed do not knowingly get harmed again. *See State ex rel. Stovall v. ConfiMed.com, L.L.C.*, 38 P.3d 707,715 (Kan. 2002) (The public is adequately protected by the injunction that was issued, and the trial court's refusal to expand the scope of the KCPA under the facts of this case is affirmed.").

Section 1964(a) of RICO provides that federal district courts may issue orders to "prevent and restrain" violations of Section 1962.15 Section 1964(b) expressly authorizes the Attorney General to institute proceedings "under this section."16 And Section 1964(c) expressly authorizes any "person injured in his business or property . . . [to] sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the costs of the suit, including a reasonable attorney's fee . . . ." The circuits are split on the issue of whether injunctive relief is available in a civil claim, with the Tenth Circuit never deciding the issue, and the United States Supreme Court did not rule on the issue in the most-recent case where it granted cert. on the subject issue. *See Scheidler v. National Organization for Women*, 537 U.S. 393 (2003).

**III. Amendment**

It is clear that Defendants are using a legitimate business operation as a front for consistent, ongoing unlawful conduct. As noted above, that is the exact reason that RICO was enacted. The

FTC has recognized it; the Kansas Attorney General has acknowledged it; and the Kansas Department of Revenue has acknowledged it. Defendants have undoubtedly responded aggressively, as Plaintiff seeks to stop the unlawful scheme pursuant to which Laird Noller uses its dealerships as fronts to make money. The conduct is not unconscionable; it is abhorrent and must be stopped.

To the extent the Court deems any of the Defendants' arguments to have merit, Mr. Blatnick respectfully requests leave to amend. Mr. Blatnick was contacted by Mr. Thornton after filing the amendment and now has learned additional information, including other parties participating in the unlawful scheme. In addition, he now possesses additional acts of mail and wire fraud undertaken in furtherance of the scheme. And, in response to Defendants' "single transaction" theory, Mr. Blatnick now possesses an additional, concrete instance of the conduct (Mr. Thornton knowingly was required to purchase one add-on; then Laird Noller forged his signature on others to increase the "market value" of the vehicle to the amount necessary to obtain financing). This Action is at its inception; there would be no prejudice. And, with respect to amendment, Mr. Blatnick notes that Defendants never disclosed the FTC letter or complaints by other consumers, including Mr. Thornton. It strains credulity to think that Defendants and their counsel of record are not aware of . Mr. Blatnick discovered the FTC letter through his independent investigation and recently learned of Mr. Thornton's experiences through his contact.[19]

### IV. Plaintiff's Disclosure

Defendants' counsel (who regularly conceal unlawful conduct on behalf of Defendants) downloaded Mr. Blatnick's prior (and highly successful) complaint in the Wollesen case and take

[19] Defendants assert that in paragraphs 116,121, and 127 of the Complaint (ECF 18) still contain references to the Wollesens. The paragraphs do not contain any references to the Wollesens. They identify unlawful conduct that was present in that case and is likewise present and therefore pled here.

great fodder highlighting instances were language in the Complaint tracks language in the Wollesen Complaint. Those instances do not identify the Wollesens but rather represent illegal conduct that is applicable in both actions. Mr. Blatnick has previously disclosed that he used that prior complaint as a starting point for his complaint in this Action. Moreover, Mr. Blatnick openly disclosed this in his CERTIFICATION REGARDING THE USE OF ARTIFICIAL INTELLIGENCE:

> Plaintiff has relied upon materials from prior civil RICO actions wherein Plaintiff represented plaintiffs of defendants. *See, e.g., Ackelson v. Aquawood, LLC*, No 419CV00135rgesbj (S.D. Iowa); Wollesen v. W. Cent. Coop., No. C 16-4012-MWB (N.D. Iowa), Caplan v. Dollinger, 803 F.Supp. 3d 219, 228 (S.D.N.Y. 2025); RES-AZ One, LLC v. McAdams, No. CV-16-02392-PHX-SPL (D. Ariz.); Westco Agronomy Co, LLC v. Wollesen, (Dist. Nev. County, Iowa).

(Cplt. P. 23).

There is nothing remarkable about referencing prior complaints. The fact that Defendants' counsel feels the need to resort to such antics, rather than the substance of Defendants' opposition is telling. Plaintiff conducted a Westlaw search to see if there were any reported RICO cases where Defendants' lead counsel was a counsel of record; the search revealed no cases.

**V. SUCCESSOR LIABILITY**

In addition to its participation in the sale of the subject dealership after the Federal Government warned it of ongoing unlawful conduct, McCarthy is named for all claims under a theory of successor liability for all claims, including civil RICO. *See* (Cplt. ¶¶44-48). Defendants do not address McCarthy's liability as the purchaser of a dealership identified by the FTC as engaging in unlawful conduct in their Motion.

**CONCLUSION**

People generally hate purchasing a vehicle, because it is widely accepted that car dealerships are "sketchy" and attempt to squeeze every dollar they can out of every transaction.

That has (i) led to CarMax's success (no negotiating and $25 fees for documentation); (ii) Tesla's success; and (iii) previously served as the business model for GM's brand, Saturn Motors.

There are, literally, tens of thousands of car dealerships in Kansas. *See* https://search.yahoo.com/search?fr=mcafee&type=E210US714G91984&p=how+many+car+dealerships+are+in+the+united+states. In March 2026, Laird Noller managed to have the notable distinction of having ***three*** of its Kansas dealerships amongst the 97 dealerships to receive warning letters from the FTC. That is quite an accomplishment.

Laird Noller is a criminal; it is as simple as that. Its conduct is not comprised of "one off" instances by rogue employees. Laird Noller's entire business model is based upon illegal fraud involving the use of add-ons and the failure to disclose the actual price of its vehicles (new and used) to its consumers. This Action (and the more recent Action filed on behalf of Mr. Thornton) aim to implement the only civil mechanism available to compensate victims (Mr. Thornton's Missouri action seeks class relief under the MMPA) and ensure that Defendants can no longer prey upon consumers. Laird Noller's (who still operates several dealerships throughout Kansas) M.O. is obvious; when called to task, it simply offers to refund the ill-gotten gains (while keeping the millions of dollars it has made on other customers and continuing to engage in the unlawful conspiracy). This Action was brought to put an end to Defendants' conduct.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Dated: September 23, 2026

**BLATNICK LAW LLC**

By: *_/s/ Samuel L Blatnick_*
Samuel Louis Blatnick, Esq.
15732 Oakmont Street
Overland Park, KS 66221
slb@blatnicklaw.com
(773) 206-0868
Advocacy-Integrity-Results™

**CERTIFICATE OF SERVICE**

Defendant, Mr. Blatnick, certifies under the penalty of perjury that Plaintiff's counsel was served via the Court's electronic filing system on Wednesday September 23, 2026.